## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 7 |
| DECADE, S.A.C., LLC, et al.,[1] | Case No. 18-11668 (CSS)<br>(Jointly Administered) |
| Debtors. | |
| DAVID W. CARICKHOFF, solely in his capacity as chapter 7 trustee for the estates of DECADE, S.A.C., et al., | Adv Proc. No. 19-50095 (CSS) |
| Plaintiff, | |
| v. | |
| AARON GOODWIN, REGINA GOODWIN AND ERIC GOODWIN, | |
| Defendants.[2] | |

## THE TRUSTEE'S [PROPOSED] FINDINGS OF FACT
## AND CONCLUSIONS OF LAW

<div style="display:flex;">

**ASHBY & GEDDES, P.A.**
Ricardo Palacio (#3765)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, Delaware 19899-1150
Tel: 302.654.1888
Fax: 302.654.2067

**PILLSBURY WINTHROP SHAW PITTMAN LLP**
Patrick E. Fitzmaurice
Brian L. Beckerman
Stephanie M. Coughlan
31 West 52nd Street
New York, New York 10019
Tel: 212.858.1000
Fax: 212.858.1500

</div>

*Counsel for David W. Carickhoff, Chapter 7 Trustee*
Dated: December 17, 2021

---

[1] The Debtors and the last four digits of each Debtors' respective federal Employer Identification Number are: Decade, S.A.C., LLC (8395); Gotham S&E Holdings, LLC (5927); Decade S.A.C. Contracts, LLC (7243); Decade S.A.C. II, LLC (5679); and Decade S.A.C. Executives, LLC (9865).

[2] Though referenced in the case caption, by agreement of the parties, Regina Goodwin has been dismissed, with prejudice, as a party-defendant in this action. 10/12/21 Tr. at 9:6-8.

# TABLE OF CONTENTS

**PAGE**

FINDINGS OF FACT .................................................................................................. 3

I.   THE PARTIES ..................................................................................................... 3

    A.   Plaintiff Chapter 7 Trustee of the Debtors ..................................................... 3

    B.   Defendant Aaron Goodwin ............................................................................. 4

    C.   Defendant Eric Goodwin ................................................................................ 4

II.  THE GOODWINS' ATHLETE MANAGEMENT BUSINESSES ..................... 5

III. THE FAILED STEALTH DEAL ......................................................................... 7

IV.  THE DECADE DEAL .......................................................................................... 8

    A.   The Parties Construct a New Deal .................................................................. 8

    B.   Terms of the Decade Deal............................................................................... 8

    C.   The Goodwins Are Desperate for Cash ....................................................... 10

    D.   The Goodwins Lack Legal Representation ................................................... 13

    E.   The Goodwins' Employment Agreements with Decade ............................. 14

        1.   The Importance of Section 28, the Assignment Provision, to 23 Capital................... 14

        2.   Decade and the Goodwins Negotiate the Decade Employment Agreements ............ 16

        3.   The Events on the Evening of February 11, 2016, and February 12, 2016 ................ 19

        4.   The Goodwins Never Read the SPA Before Signing the Signature Pages; Eric Goodwin Also Never Read His Decade Employment Agreement Before Signing its Signature Page ..................................................................... 25

V.   THE DECADE DEAL CLOSES ON FEBRUARY 22, 2016 AND THE GOODWINS RECEIVE $ 9.5 MILLION IN CASH, PLUS A $25.5 MILLION PROMISSORY NOTE 26

VI.  DECADE AND THE GOODWINS PERFORM UNDER THE SPA FOR ONE YEAR... 27

    A.   Immediately Following the Closing, the Goodwins Inform Their Employees About the SPA, and Decade Pays Compensation to the Goodwins and Former GAME and GSM Employees ....................................................................... 27

    B.   The Goodwins Receive the Executed SPA and Decade Employment Agreements – With Sections 27 and 28 Included – And Continue to Perform Under Both Agreements for Over 12 Months ................................................................... 28

VII. DECADE DEFAULTS ON THE LOAN AGREEMENT AND FILES FOR BANKRUPTCY ............................................................................................... 33

CONCLUSIONS OF LAW ......................................................................................... 35

I.      JURISDICTION AND VENUE ...................................................................... 35

II.     SUBSTANTIVE GOVERNING LAW ............................................................ 36

III.    LEGAL STANDARDS GOVERNING THE TRUSTEE'S CLAIM ................. 38

   A.    Declaration of Enforceability of the SPA ................................................ 38

   1.    Element 1: Capacity to Contract ........................................................... 39

   2.    Element 2: Mutual Assent ..................................................................... 39

   3.    Element 3: Consideration ...................................................................... 42

IV.     LEGAL STANDARDS GOVERNING THE GOODWINS' COUNTERCLAIMS ........... 42

   A.    Fraud in the Execution .......................................................................... 43

   1.    Element 1: Inducement Based on Misrepresentation ............................... 44

      a.   Alleged Misrepresentation Regarding the SPA .................................... 44

      b.   Alleged Misrepresentation Regarding the Decade Employment Agreement ....... 45

   2.    Element 2: Excusable Ignorance ............................................................ 48

   B.    Fraudulent Inducement .......................................................................... 52

   1.    Element 1: Material Misrepresentation or Omission ................................. 52

   2.    Element 2: Scienter .............................................................................. 52

   3.    Element 3: Reliance .............................................................................. 54

   4.    Element 4: Injury ................................................................................. 56

   5.    Ratification .......................................................................................... 58

   C.    Fraudulent Misrepresentation ................................................................. 63

   D.    Declaration of Unenforceability .............................................................. 64

CONCLUSION ...................................................................................................... 66

## **TABLE OF AUTHORITIES**

**Page(s)**

Cases

*88 Blue Corp. v. Reiss Plaza Assocs.*,
   183 A.D.2d 662 (N.Y. App. Div. 1st Dep't 1992).............................................................43, 62

*Ackerman v. Ackerman*,
   120 A.D.3d 1279 (N.Y. App. Div. 2d Dep't 2014) ..............................................................48

*In re Affirmative Ins. Holdings, Inc.*, 565 B.R. 566 (Bankr. D. Del. 2017)...................................36

*Allen v. WestPoint–Pepperell, Inc.*,
   945 F.2d 40 (2d Cir. 1991)........................................................................................62

*Asset Mgmt. Assocs. of N.Y., Inc. v. Emerson Telecomm. Prods. LLC*,
   No. 08-CV-2506 (TCP) (ARL), 2011 WL 318100 (E.D.N.Y. Jan. 25, 2011) .......................62

*Baiul v. NBC Sports*,
   No. 15-CV-9920 (KBF), 2016 WL 1587250 (S.D.N.Y. Apr. 19, 2016), *aff'd*
   *sub nom. Baiul v. NBC Sports, a*................................................................................38

*Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank*,
   850 F. Supp. 1199 (S.D.N.Y.1994), *aff'd*, 57 F.3d 146 (2d Cir. 1995)................................62

*Banque Nationale de Paris v. 1567 Broadway Ownership Assocs.*,
   214 A.D.2d 359 (N.Y. App. Div. 1st Dep't 1995)..............................................................61

*Matter of Barone (M & K Realty Co.)*,
   143 A.D.2d 1008 (1988) ...........................................................................................51

*Big Apple Consulting USA, Inc. v. Belmont Partners, LLC*,
   20 Misc. 3d 1144(A), (Sup. Ct. Nassau Cnty. 2008) ..........................................................55

*Blue Water Env't, Inc. v. Inc. Vill. of Bayville*,
   N.Y., 12 Misc. 3d 1169(A), (Sup. Ct. Nassau Cnty.) .....................................................54, 57

*Burton v. Label, LLC*,
   344 F. Supp. 3d 680 (S.D.N.Y. 2018)...........................................................................41

*China Privatization Fund (Del.), L.P. v. Glaxy Ent. Grp. Ltd.*,
   95 A.D.3d 769 (N.Y. App. Div. 1st Dep't 2012)................................................................42

*Colasacco v. Robert E. Lawrence Real Estate*,
   68 A.D.3d 706 (N.Y. App. Div. 2d Dep't 2009) ...............................................................54

*Colburn Fam. Found. v. Chabad's Child. of Chernobyl*,
    No. 06 Civ. 2351 (RMB), 2013 WL 1870087 (S.D.N.Y. May 1, 2013) .............................. 59+

*Cont'l Airlines, Inc. v. Lelakis*,
    943 F. Supp. 300 (S.D.N.Y. 1996), *aff'd*, 129 F.3d 113 (2d Cir. 1997) ................................. 54

*Dalessio v. Kressler*,
    6 A.D.3d 57 (N.Y. App. Div 2d Dep't 2004) ................................................................. 43, 44

*Dasz, Inc. v. Meritocracy Ventures, Ltd.*,
    108 A.D.3d 1084 (N.Y. App. Div. 4th Dep't 2013) ........................................................ 43, 49

*Davidowitz v. Patridge*,
    No. 08 Civ. 6962 NRB, 2010 WL 5186803 (S.D.N.Y. Dec. 7, 2010) ................................... 52

*Desert Outdoor Advert. v. Super. Ct.*,
    196 Cal. App.4th 866 (2011) ............................................................................................... 37

*Deuley v. DynCorp. Int'l, Inc.*,
    8 A.3d 1156 (Del. 2010) ..................................................................................................... 37

*Forreststream Holdings Ltd. v. Shenkman*,
    No. 16-cv-01609-LB, 2017 WL 1112963 (N.D. Cal. 2017) ................................................. 37

*Friedman v. Fife*,
    262 A.D.2d 167 (N.Y. App. Div. 1st Dep't 1999) ............................................................... 49

*Gillman v. Chase Manhattan Bank, N.A.*,
    73 N.Y.2d 1 (1988) ............................................................................................................. 48

*J.A.O. Acquisition Corp. v. Stavitsky*,
    18 A.D.3d 389 (N.Y. App. Div. 1st Dep't 2005) ................................................................ 63

*Kaye v. Grossman*,
    202 F.3d 611 (2d Cir. 2000) ............................................................................................... 56

*Kregos v. Associated Press*,
    3 F.3d 656 (2d Cir. 1993) ................................................................................................... 57

*Lansco Corp. v. N.Y. Brauser Realty Corp.*,
    63 A.D.3d 513 (N.Y. App. Div. 1st Dep't 2009) ........................................................... 40, 64

*Marciano v. DCH Auto Grp.*,
    14 F. Supp. 3d 322 (S.D.N.Y. 2014) ................................................................................. 43

*McCaddin v. Se. Marine Inc.*,
    567 F. Supp. 2d 373 (E.D.N.Y. 2008) ............................................................................... 44

*McLean v. Balkoski*,
    125 A.D.2d. 234 (N.Y. App. Div. 1st Dep't 1986).............................................58, 61

*Meyercord v. Curry*,
    38 A.D.3d 315 (N.Y. App. Div. 1st Dep't 2007).......................................................54

*Mkt. Am., Inc. v. Google, Inc.*,
    No. C.A. 09-494-GMS, 2011 WL 1485616 (D. Del. Apr. 19, 2011) .....................37

*Nadel v. Play-By-Play Toys & Novelties, Inc.*,
    208 F.3d 368 (2d Cir. 2000).....................................................................................38

*Nerey v. Greenpoint Mortg. Funding, Inc.*,
    144 A.D.3d 646 (N.Y. App. Div. 2016) ..................................................................48

*In re Old BPSUSH Inc.*,
    589 B.R. 524 (Bankr. D. Del. 2018) .......................................................................36

*Pimpinello v. Swift & Co.*,
    253 N.Y. 159 (1930) ...................................................................................37, 40, 48

*Plaza Penthouse LLLP v. CPS 1 Realty LP*,
    24 Misc. 3d 1238(A), (Sup. Ct. N.Y. Cnty. 2009)..................................................54

*R & A Food Servs., Inc. v. Halmar Equities, Inc.*,
    278 A.D.2d 398 (N.Y. App. Div. 2d Dep't 2000) ..................................................63

*Republic Nat'l Bank v. Hales*,
    75 F. Supp. 2d 300 (S.D.N.Y. 1999), *aff'd sub nom. HSBC Bank USA v.*
    *Hales*, 4 F. App'x 15 (2d Cir. 2001)......................................................................51

*Schenck v. State Line Tel. Co.*,
    238 N.Y. 308 (1924) ...............................................................................................62

*Silva Run Worldwide Ltd. v. Gaming Lottery Corp.*,
    No. 96 Civ. 3231(RPP), 1998 WL 167330 (S.D.N.Y. Apr. 8, 1998) ...............58, 62

*Smalls v. Eichner*,
    69 Misc. 3d 134(A), (N.Y. App. Div. 1st Dep't 2020).............................................63

*Smith v. Smith*,
    No. 13-CV-1635 (SJF)(ARL), 2014 WL 4425807 (E.D.N.Y. Sept. 5, 2014)........57

*Sorenson v. Bridge Cap. Corp.*,
    52 A.D.3d 265 (N.Y. App. Div. 1st Dep't 2008)........................................49, 51, 56

*In re Toscano*, 799 F. Supp. 2d 230 (E.D.N.Y. 2011) ......................................40, 42, 43

*Travelers Indem. Co. of Ill. v. CDL Hotels USA, Inc.*,
    322 F. Supp. 2d 482 (S.D.N.Y. 2004) ....................................................................52

*U.S. Bank Nat'l Ass'n v. Ables & Hall Builders*,
    696 F. Supp. 2d 428 (S.D.N.Y. 2010) ....................................................40, 48, 54

*United States Postal Serv. v. Phelps Dodge Refining Corp.*,
    950 F.Supp. 504 (E.D.N.Y. 1997) .........................................................................62

*UST Priv. Equity Invs. Fund, Inc. v. Salomon Smith Barney*,
    288 A.D.2d 87 (N.Y. App. Div. 1st Dep't 2001) ...................................................48

*VGS, Inc. v. Castiel*,
    No. C.A. 17995, 2003 WL 723285 (Del. Ch. March 10, 2003) ............................36

*Votta v. Votta Enters.*,
    249 A.D.2d 536 (N.Y. App. Div. 2d Dep't 1998) ..................................................58

*Vulcan Power Co. v. Munson*,
    89 A.D.3d 494 (N.Y. App. Div. 1st Dep't 2011) .......................................37, 41, 49

*Waggoner v. Caruso*,
    68 A.D.3d 1 (N.Y. App. Div. 1st Dep't 2009), *aff'd*, 14 N.Y.3d 874 (2010) .........................54

*Zanett Lombardier, Ltd. v. Maslow*,
    29 A.D.3d 495 (N.Y. App. Div. 1st Dep't 2006) ...................................................54

<div align="center">Statutes and Codes</div>

28 United States Code
    Section 157(b)(2)(A) ..............................................................................................36
    Section 1334(b) ......................................................................................................35
    Section 1408 ...........................................................................................................35
    Section 1409 ...........................................................................................................35

<div align="center">Rules and Regulations</div>

Federal Rules of Bankruptcy Procedure
    Rule 7052 .................................................................................................................3

**CHRISTOPHER S. SONTCHI, United States Bankruptcy Judge**

Plaintiff is the Debtors' duly court appointed chapter 7 trustee ("Trustee") and seeks to enforce a share purchase agreement dated February 22, 2016 (the "SPA") between Decade, S.A.C., LLC ("Decade SAC"), Decade, S.A.C. Contracts, LLC ("Decade Contracts"), and defendants Aaron Goodwin ("Aaron") and Eric Goodwin ("Eric," together with Aaron, the "Goodwins") regarding the sale and purchase of Goodwin Associates Management Enterprises, Inc. ("GAME") and Goodwin Sports Management, Inc. ("GSM"). Pursuant to the SPA, Decade Contracts was to acquire 100% of the issued and outstanding shares of GAME and GSM, together with the assets of those companies. These assets were, primarily, athlete representation agreements entered into between the Goodwins and their professional basketball player clients, along with the revenue streams associated with those contracts.

In exchange, the Goodwins were to receive $9.5 million in initial consideration together with a promissory note for the balance of the $35 million purchase price. The Goodwins were also to become employees of Debtor Decade Executives, entitling them to salary and other benefits, including a share in the profits of the combined business.

In essence, the Trustee asserts the SPA and its related agreements, including the executive employment agreements (the "Decade Employment Agreements") between the Goodwins and Decade Executives are valid, binding agreements between the parties that should be enforced according to their terms. For their part, the Goodwins claim that the transactions contemplated by the SPA are void due to alleged fraud by the Debtors. This alleged fraud has two components: first, the Goodwins allege that the Debtors misrepresented to them the terms of the SPA itself and that the Goodwins signed a signature page for the SPA without first reading the underlying contract in reliance on those misrepresentations; second, the Goodwins assert that their signatures on the Decade Employment Agreements were removed from the versions of those agreements to which

they agreed and, instead, were attached to alternate versions that included provisions to which they did not agree, but rather consistently objected to.

The Court conducted a trial in this adversary proceeding on seven non-consecutive days from October 12 through November 16, 2021. The Court received into evidence testimony from 10 witnesses via their deposition testimony and entered 162 exhibits into evidence. The Court also heard testimony from 4 witnesses, with certain witnesses testifying live in the courtroom and others remotely.

In sum, the Court concludes that the evidence introduced at trial and relevant governing law warrant entry of judgment for the Plaintiff in all respects. As set forth more fully below, the law is clear that the Goodwins' failure to read the SPA before signing it alone defeats their fraud claims. In addition, the Goodwins failed to introduce sufficient evidence concerning the misrepresentations that were made to them concerning the SPA's terms and their reasonable reliance on those misrepresentations. As stated, the Goodwins also assert that the SPA transactions are void due to fraud in connection with the Decade Employment Agreements. These claims also fail, but for a different reason.

The Goodwins cannot establish that their signature pages were attached to versions of the Decade Employment Agreement to which they did not agree because the evidence at trial shows that Aaron told Decade and its counsel that he agreed to the reinsertion of certain provisions he had excised from the version of the Decade Employment Agreement he and his brother signed. Aaron made this agreement because he understood that the provisions were very important to the lender who was financing Decade's acquisition of GAME and GSM and that the lender would not make its loan without them. In short, Aaron understood that unless he changed his stance on the Decade Employment Agreement there would be no deal and he and his brother would not receive

an immediate cash infusion of $9.5 million. Because Aaron agreed to the relevant terms, Decade did not commit fraud by attaching the Goodwins' signature pages to versions of the Decade Employment Agreement that included those agreed upon terms.

## FINDINGS OF FACT[3]

### I.    THE PARTIES

#### A.    Plaintiff Chapter 7 Trustee of the Debtors

1.    Debtor Gotham S&E Holdings, LLC ("Gotham") was formed on or about August 25, 2016. Amended Joint Pre-Trial Memorandum, Statement of Uncontested Facts (D.I. 222) ("Stip. Fact") ¶ 1.

2.    Debtor Decade SAC was formed on or about January 4, 2016. Stip. Fact ¶ 2.

3.    Debtors Decade Contracts, Decade, S.A.C. II, LLC ("Decade II") and Decade, S.A.C. Executives, LLC ("Decade Executives," together with Gotham, Decade SAC, Decade Contracts and Decade II, "Decade" or "Debtors") were formed on or about January 21, 2016. Stip. Fact ¶ 3.

4.    Gotham and Decade SAC filed for bankruptcy on July 16, 2018. Decade Contracts, Decade II and Decade Executives filed for bankruptcy on October 16, 2018. Stip. Fact ¶¶ 4-5.

5.    Plaintiff David W. Carickhoff was appointed as the chapter 7 trustee for each of the Debtors and their estates ("Estates"). Stip. Fact ¶ 6.

---

[3] Where appropriate, findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact. *See* Fed. R. Bankr. P. 7052.  The parties have agreed to the following citation styles to be used herein: references to the docket ("D.I. __"); deposition designations ("[name] Dep. Tr. xx:yy-xx:yy"); trial transcripts ("[date] Trial Tr. xx:yy-xx:yy [name of witness] [direct/cross/redirect]"); Trustee's trial exhibits ("PX"); Goodwins' trial exhibits ("DX"); Amended Joint Pre-Trial Memorandum, Statement of Uncontested Facts (D.I. 222) ("Stip. Fact ¶ __").

4864-9756-2882

6.      Non-parties Christopher Aden ("Aden") and Dorsey James ("James") are citizens and residents of New Jersey, and were the Debtors' principals prior to the Debtors' bankruptcy filings. Stip. Fact ¶¶ 8-9.

**B.      Defendant Aaron Goodwin**

7.      Defendant Aaron Goodwin is a citizen and resident of California. Stip. Fact ¶ 10.

8.      Aaron attended the University of California, Berkeley to obtain a degree in physiology (10/12/21 Trial Tr. at 49:2-9 (A. Goodwin direct)) and has been a basketball agent, registered with the National Basketball Players Association ("NBPA"), for thirty-two years, beginning in 1988 (10/12/21 Trial Tr. at 50:4-12 (A. Goodwin direct)). This registration means that Aaron is permitted by the National Basketball Association ("NBA") and NBPA rules and regulations to represent professional basketball players in negotiating contracts with professional NBA basketball teams.

9.      Prior to the transactions at issue in this case, Aaron owned 100% of the issued and outstanding shares of GAME. Stip. Fact ¶¶ 13, 46.

**C.      Defendant Eric Goodwin**

10.     Defendant Eric Goodwin is a citizen and resident of Washington. Stip. Fact ¶ 15.

11.     Eric has a business marketing degree from the University of Puget Sound in Tacoma, Washington. 10/26/21 Trial Tr. at 81:9-10 (E. Goodwin direct).

12.     Eric is a basketball agent, but, prior to the transactions at issue in this case, Eric was not registered with the NBPA. Stip. Fact ¶ 16. Eric works as a sports marketing agent for Aaron's clients. 10/26/21 Trial Tr. at 80:21-25 (E. Goodwin direct).

13.     Prior to the transactions at issue in this case, Eric owned 100% of the issued and outstanding shares of GSM. Stip. Fact ¶¶ 17, 46.

## II.    THE GOODWINS' ATHLETE MANAGEMENT BUSINESSES

14.    As sports agents, the Goodwins broker two distinct types of agreements on behalf of their NBA player clients: (i) contracts between players and the teams they play for ("Player Contracts"); and (ii) endorsement contracts between players and companies who use the player's likeness for purposes of advertising products ("Endorsement Contracts"). PX116, p. 14 ¶ 25.

15.    Aaron entered into agency agreements with each of his clients ("Agency Agreements") authorizing him to negotiate Player Contracts on the player's behalf. 10/13/21 Trial Tr. at 27:3-8.  Pursuant to NBA rules and regulations, each of the Agency Agreements was between a professional NBA player and Aaron, individually. 10/12/21 Trial Tr. at 51:1-7 (A. Goodwin direct).

16.    Under the Agency Agreements, Aaron is entitled to commission income on the Player Contracts he negotiates. Stip. Fact ¶ 25. PX116, p.14 ¶ 24.

17.    Aaron then deposits the commission income on Player Contracts into GAME. 10/12/21 Trial Tr. at 52:11-14 (A. Goodwin direct).

18.    Aaron's rights under the Player Contracts have been assigned or otherwise transferred to GAME such that GAME "owns certain rights to revenue streams arising out of sports agent agreements that [Aaron] procured as a sports agent representing professional athletes." PX128 ¶ 5; 10/26/21 Trial Tr. at 55:4-5 (A. Goodwin cross) ("Q. And GAME is the entity that has the player contracts? A. Yes."); PX128 ¶ 5 ("GAME is a corporation that we own that in turn owns certain rights to revenue streams arising out of sports agent agreements I have procured as a sports agent representing professional athletes, primarily players in the National Basketball Association . . . ."); PX132, p. 41 ¶ 22 ("As of February 2016, the value of the Goodwins' and their related entities' rights to commissions from their current and former players NBA and endorsement contracts was approximately $30 million."); PX133 ¶ 1 (GAME "is the entity which negotiates the

players' NBA contracts."); *see also* 10/12/21 Trial Tr. at pp. 130-175 (A. Goodwin direct) (testifying at length about payments remitted to Decade that "Decade was entitled to" under the SPA in connection with payments Aaron's player clients sent him under their respective Agency Agreements).

19.     GSM entered into marketing representation agreements with the Goodwins' clients ("Marketing Representation Agreements"). Stip. Fact ¶ 26. Each of the Marketing Representation Agreements was between a professional NBA player and GSM. Stip. Fact ¶ 26. PX116, p. 14 ¶ 24; 10/26/21 Trial Tr. at 80:14-17 (E. Goodwin direct).

20.     Pursuant to the Marketing Representation Agreements, GSM is entitled to commission income on Endorsement Contracts negotiated between the Goodwins' clients and third-parties. 10/12/21 Trial Tr. at 52:20-23, 53:3-11 (A. Goodwin direct); 10/26/21 Trial Tr. at 54:23-55:3 (A. Goodwin cross) ("Q. And just so that I understand the nature of the business is it correct that GSM is the entity that houses the marketing agreements? A. Agreements? Q. Yes. A. Yes.").

21.     As of February 2016, GAME and GSM collectively were valued by the Goodwins at approximately $30 million. PX132, p. 41, ¶ 22 ("As of February 2016, the value of the Goodwins' and their related entities' rights to commissions from their current and former players NBA and endorsement contracts was approximately $30 million.").

22.     Together, the Goodwins have represented more than 60 current or former NBA players including such household names as Lebron James, Gary Payton, Jason Kidd, Kevin Durant, Dwight Howard, and currently, Damian Lilliard and DeMar DeRozen, (PX116, p. 14 ¶ 24), for whom they regularly negotiated 8- and 9-figure Player Contracts. 10/12/21 Trial Tr. at 53:22-54:13 (A. Goodwin direct). The Goodwins have also represented these clients and others in connection

with major Endorsement Contracts, including with such companies as Nike, Coke, Pepsi, Toyota, and McDonald's. 10/12/21 Trial Tr. at 49:20-50:3 (A. Goodwin direct).

## III.    THE FAILED STEALTH DEAL

23.    In or around 2014, Aden and James co-founded Stealth SME Holdings, LLC ("Stealth"). Stip. Fact ¶ 18.

24.    Around that time, Aden and James participated in a series of discussions with the Goodwins concerning Stealth's purchase of GAME and GSM as part of Stealth's mission-statement to be an African-American-led sports and entertainment management company (the "Stealth Deal"). Stip. Fact ¶ 19; PX116, p. 14 ¶¶ 27-28.

25.    On September 12, 2014, Stealth and the Goodwins entered into a letter of intent regarding the sale of GAME and GSM to Stealth. PX001. Throughout 2014 and early 2015, Aden, James and the Goodwins, through their respective counsel, negotiated the terms of the Stealth Deal. Stip. Fact ¶ 21.

26.    The terms of the proposed Stealth Deal called for Stealth to purchase GAME and GSM at a price determined by valuing "GAME's and GSM's receivables and overall value." PX116, pp. 14-15, ¶ 29.  Stealth and the Goodwins would share in revenues from existing and new clients based on an agreed-upon ratio. PX116, pp. 14-15, ¶ 29.

27.    During the Stealth Deal negotiations in 2014 and 2015, Aaron sent Aden copies of Agency Agreements, Player Contracts, Marketing Representation Agreements, and Endorsement Contracts for all of his athlete clients. *See* PX002; PX003.

28.    Among other things, the terms of the proposed Stealth Deal called for the Goodwins to become employed by Stealth pursuant to executive employment agreements (the "Stealth Employment Agreements"). DX002.

29.     The negotiations between Stealth and the Goodwins ultimately broke down due to lack of financing for the transaction and disagreement over the terms of the deal. 10/12/21 Trial Tr. at 59:16-20, 70:23-71:4 (A. Goodwin direct) ("Q. What happened to this Stealth deal? A. For some reason, they weren't able to get it all the way done and they just kind of dropped off and we continued to move on.").

## IV.    THE DECADE DEAL

### A.    The Parties Construct a New Deal

30.     Some time after the failure of the Stealth Deal, Aden and James approached Aaron to discuss a different deal for the sale and purchase of GAME and GSM with a new structure (the "Decade Deal"). 10/12/21 Trial Tr. at 72:17-18 (A. Goodwin direct) ("Well, I told him at that point that everything was different. We needed a different agreement."); DX145, p. 183 ("The LOI is under Stealth Chris which is not happening. Means nothing at this point.").

31.     On August 20, 2015, the Goodwins entered into a letter of intent for Decade's purchase of GAME and GSM through the SPA. Stip. Fact ¶¶ 30, 35; PX006; DX003. The Goodwins' counterparty for this letter of intent was called Newco Ventures LLC, but all parties agree that the letter of intent was effectively between Decade and the Goodwins.

32.     On November 3, 2015, Aden sent Aaron a substantively identical version of that letter of intent, substituting Decade SAC as the purchaser for the placeholder entity, and attaching a Summary of Terms ("Decade LOI"). Stip. Fact ¶ 33; PX009.

### B.    Terms of the Decade Deal

33.     The Decade LOI provided that Decade would purchase GAME and GSM from sellers "Aaron Goodwin (sole shareholder of GAME) and Eric Goodwin (sole shareholder of GSM)." PX009, p. 6.

34.     One day after Aaron received the Decade LOI, on November 4, 2015, Aden sent Aaron a "term sheet for a facility to be entered into between XXIII Capital Ltd. ["23 Capital"] and Gotham S&E Holdings," (the "Indicative Term Sheet"), along with a proof of funds showing 23 Capital's liquidity for purposes of financing the Decade Deal.  DX006, p. 10; Stip. Fact ¶ 36.

35.     The Indicative Term Sheet provided that 23 Capital, as "lender," would be providing Decade, as "borrower," with $25,000,000 in "acquisition finance" and "working capital" for Gotham's purchase of GAME and GSM. DX006, p. 11.  The Indicative Term Sheet provided that 23 Capital would have "security (by way of absolute assigning or other) over all contracted receivables" valued at "a minimum of $35.5m from 2016 onwards," as well as "[s]ecurity over all future receivables of the various' businesses" as collateral for its loan. DX006, p.12.

36.     The next day, November 5, 2015, Aden sent Aaron an email with the following attachments: (i) a revised Decade LOI, including the Decade Summary to the term sheet, (ii) the Indicative Term Sheet, and (iii) 23 Capital proof of funds that Aden sent the day before. DX003.

37.     Pursuant to the Indicative Term Sheet, 23 Capital obtained a "positive legal opinion on the strength of the security" of the receivables of GAME and GSM (DX006, p. 12) from Proskauer Rose LLP.  *See* DX009, p. 5. The Proskauer legal opinion provided, among other things, that "[m]any player representation agreements are between an individual agent and an individual athlete. Consequently, it is important for an agency to memorialize an assignment by each of its agents of all of such agent's interests in athlete commissions to the agency." DX009, p. 9.

38.     The Decade Deal was structured such that 23 Capital would have "the rights to collect all gross income received by the company ahead of any other connected or 3rd party interest." DX006, p. 12. Thus, 23 Capital required "all future receivables of the various

business[es]" to be placed in "Locked Box accounts with [23 Capital] having sole transfer mandate." DX019, p. 4; Stip. Fact ¶ 49.

39.     Having received the Indicative Term Sheet and proof of funds and loan term sheet (DX003, DX006, DX019), Aaron was aware of 23 Capital's involvement in financing the Decade Deal, including 23 Capital's assignment over all future receivables, and the requirement that all such receivables be placed in a Locked Box account ("Lockbox"). *See* DX003; DX006; DX019; DX145, p. 216 (2/2/16: "Accounts open. Lockbox open. Use of Proceeds submitted." "OK."); DX145, pp. 231-232 (2/15/16: "Also, all fees from everyone goes into their respective lockbox account at JP Morgan Chase."); DX145, p. 232 (2/15/16: "The players (or business managers) need to know where to send money. Everyone payments go to the lockbox. . . or from your hands into the lockbox address."); DX145, p. 232 (2/15/16: "All that's fine, wherever it's supposed to go Lynn will send it.").

## C.     The Goodwins Are Desperate for Cash

40.     During the period of time that the parties were discussing the Decade Deal, the Goodwins, particularly Eric, had an urgent need for cash in order to pay off existing debts. 11/16/21 Tr. 12:24-13:3 (C.A. Mulrain direct) ("Q. And with respect to the transaction, did Aaron Goodwin ever express to you, Mr. Mulrain, an urgency to complete the transaction? A. He did. He said that his brother Eric had some tax problems and that was the urgency.").

41.     In August 2015, the Goodwins explored a partnership with City National Bank through which they would obtain a $10,000,000 loan. DX145, p. 177-78 ("They are offering to do a partnership and loan Game/GSM $10,000,000. If we commit, they will give us $500k up front . . . .").

42.    In November 2015, the Goodwins also considered taking a loan out at a high interest rate from Aden's connections in order to obtain $500,000 immediately. DX145, p. 181 ("Ask them for $500k and see how quickly and how much for the loan please.").

43.    On November 3, 2015, Aaron asked Chris to explore obtaining an immediate $500,000 loan for Eric at high interest in an attempt to alleviate Eric's need for cash. Stip. Fact ¶ 43. Also on November 3, 2015, Chris sent Aaron a to-be-completed application for this loan. Stip. Fact ¶ 44; DX145, p. 181.  In order to obtain quick financing, Aaron used the Decade LOI to show that he was about to obtain significant cash from his sale of GAME and GSM.  DX145, pp. 181-82.

44.    The Goodwins ultimately opted not to obtain a loan and, instead, to proceed with the Decade Deal. DX145, p. 177.

45.    Aaron constantly reiterated to Aden his and his brother's need for money as negotiations over the Decade Deal progressed. DX145, p. 180 (11/3/15: "Still waiting on . . . an actual closing date please. Every day I don't have anything just makes my brother push further away and me have to compromise."); DX145, p. 183 (11/3/15: "I am trying to keep Eric in. . . . Still need that hard closing date."); DX145, p. 185 (11/5/15: "Any update on actual closing?"); DX145, p. 186 (11/9/15: "[A]nything concrete on timing?'); DX145, p. 194 (12/28/15: "Just checking in to see if we are any closer to closing."); DX145, p. 197 (1/13/16: "[A]bsent [] a deal and a deposit, we are out. I have too much at stake this year and I have been holding everyone at bay since September. I know it isn't your fault, but each month I am telling them the next 15th, then the next 15, then in December it was the investors said it HAD to be told, as told by you and Tony. . . . I may have to move on our back up plan.").

46.    In January 2016, Aaron again asked Aden if Decade had access to cash it could forward to the Goodwins; he also asked that 23 Capital advance a portion of the loan for payment to the Goodwins. Stip. Fact 45.

47.    Aaron's perception that the closing of the Decade Deal was being delayed led him to threaten to terminate the deal unless he obtained immediate funds, in particular so that Eric could satisfy outstanding debts.  DX145, p. 198 (1/13/16: "Do you guys have access to any immediate money? We have a contingency plan for the 15th, and I have my word they could move forward if you guys pushed back again."; "[I]f they are indeed closing after all this time, can't they advance money based on you, and Dorsey's signature?"); DX145, p. 213 (2/1/16: "[W]e are running [in]to a problem, I gave them my word that this was closing the 29th, and they ha[ve] something in place to get Eric immediate income which was needed as you know 2 months ago. I may not be able to stall much longer."); DX145, p. 216 (2/2/16: "[I]f this going to push on, I may have to honor my word and allow Eric and GSM out. . . . I just can't keep him waiting when I know he has a solution which would relieve his stress. He's worked to[o] hard to allow one financial mishap to create so much stress and negativity."); DX145, p. 221 (2/10/16: "I understand and appreciate all that you are doing, but does that mean funding Monday? I have to give them a drop dead date. I'm 2 weeks past what we said and the other money is threatening to walk away."); DX145, p. 222 (2/10/16: "I can't hold them another week, I'm sorry. I've tried my best to weather this but it's not fair to Eric and the rest of the team involved for me to continue to drag them out."); DX145, p. 233 (2/15/16: "But seriously, I just need to manage Eric and Craig. That's why I am hoping it funds tomorrow."); DX145, p. 234 (2/17/16: "Anything on wires?"); DX145, p. 235 (2/17/16: "Also and unfortunately, I am having a letter prepared to excuse us from this opportunity if this doesn't happen today. I am not holding Eric up any longer."); DX145, p. 237 (2/17/16:

"[R]espectfully Chris we have been 'there' for a few weeks."); DX145, p. 238 (2/17/16: "I need execution. They need to send the wires."); DX145, p. 240 (2/21/16: "Truly need this completed.").

### D. The Goodwins Lack Legal Representation

48.    The Goodwins were represented by Perkins Coie while negotiating the Stealth Deal, but were not represented by counsel while negotiating the Decade Deal. Instead, Aaron represented himself and his brother in those negotiations, although neither of the Goodwins had legal experience. 10/12/21 Tr. 79:22-80:3 (A. Goodwin direct) ("THE COURT: And who – I'm sorry, who were you represented [by] at the time – who represented you at the time, someone at Perkins Coie?  THE WITNESS: Prior to[,] Perkins Coie had represented us; at this time, I was talking to them directly.  THE COURT: Directly, solo? THE WITNESS: Yes, sir.").

49.    The Goodwins did not re-engage Perkins Coie until December 2016. 10/12/21 Trial Tr. at 165:5-8 (A. Goodwin direct).

50.    The Decade Debtors were represented by attorneys C. Anthony Mulrain ("Mulrain") and Alonzo Llorens ("Llorens"), formerly of Gordon & Rees LLP ("Gordon & Rees"). Mulrain has approximately 20 years of experience in the entertainment industry and approximately 15 years of experience in the sports industry. 11/16/21 Tr. 7:19-23 (C.A. Mulrain direct).  He is currently a law partner at Mintz Levin where he is the co-chair of Mintz Levin's sports and entertainment practice. 11/16/21 Tr. 7:13-18 (C.A. Mulrain direct).  In that capacity, Mulrain represents professional athletes, professional sports teams and sports leagues. 11/16/21 Tr. 8:8-14 (C.A. Mulrain direct).

51.    23 Capital was represented by Loeb & Loeb LLP ("Loeb & Loeb"), namely Channing Johnson. 10/15/21 Trial Tr. at 20:15-18 (D. James direct).

52.    Aaron and Mulrain had known each other prior to the Decade Deal, and had worked with each other previously on other matters; in fact, Aaron sought legal advice from Mulrain on

numerous occasions prior to the Decade Deal.  *See* PX113 at pp. 1-6.  Given their prior

relationship, Mulrain, in negotiating the SPA on behalf of Decade, spoke often with Aaron

informally by phone, email and text message concerning the Decade Deal. 11/16/21 Tr. 10:10-19

(C.A. Mulrain direct). Mulrain communicated changes to the deal documents to the Goodwins.

11/16/21 Trial Tr. at 39:20-24 (C.A. Mulrain cross). ("A. Did I have any responsibilities for

communicating changes to documents to the Goodwins? I'm going to say the answer is yes because

I did send some stuff to the Goodwins.").

     E.     **The Goodwins' Employment Agreements with Decade**

     1.     **The Importance of Section 28, the Assignment Provision, to 23 Capital**

53.     The terms of the Decade Deal provided that, following Decade's acquisition of

GAME and GSM, Aaron and Eric were to be employed by Decade, pursuant to near-identical

Employment Agreements—namely, the Decade Employment Agreements.  10/12/21 Trial Tr. at

77:3-18 (A. Goodwin direct).

54.     The Stealth Employment Agreements were used as the templates for the Decade

Employment Agreements. 11/16/21 Trial Tr. at 19:23-21:5 (C.A. Mulrain direct).  Counsel for 23

Capital required that an assignment provision be included that would secure its loan to Decade

with the revenue streams from the Goodwins' Agency Agreements and Marketing Representation

Agreements. 11/16/21 Trial Tr. at 19:23-21:5 (C.A. Mulrain direct); 11/16/21 Trial Tr. at 33:14-

22 (C.A. Mulrain direct).

55.     Under NBPA rules and regulations, sports agents like the Goodwins are permitted

to assign the revenue streams from both Marketing Representation Agreements and Agency

Agreements. 11/16/21 Trial Tr. at 13-18 (C.A. Mulrain direct) ("Q. And do you know whether the

assignment of those revenue streams was something that the parties could accomplish in the

transaction? A. The assignment of those revenues? Q. Yes. A. Yes. Yeah, absolutely."); 11/16/21

Trial Tr. at 15:22-25 (C.A. Mulrain direct) ("Q. Are you aware of any prohibition on the assignment of those revenue streams? A. There's no prohibition on the assignment of the revenue streams.").

56.     In connection with their transactions with Decade, Encore Sports and Entertainment, Inc. ("Encore") and Sports Management Partners LLC ("SMP") each executed assignment and assumption agreements assigning to Decade Contracts, "free and clear of all Encumbrances, all of Assignor's rights, title and interest in, to and under" the assets transferred pursuant to their respective asset purchase agreements. Stip. Fact ¶ 58.

57.     Accordingly, on January 29, 2016, Mulrain sent an email to Channing Johnson, counsel for 23 Capital, attaching a revised version of the Decade Employment Agreements for the Goodwins that dealt with the "assignment concerns." 11/16/21 Trial Tr. at 19:23-20:5 (C.A. Mulrain direct).

58.     In that version of the Decade Employment Agreements, Gordon & Rees edited Section 28 to provide for an assignment of the revenue streams that the Goodwins were to receive from their clients.  11/16/21 Trial Tr. at 20:16-21:5 (C.A. Mulrain direct).

59.     23 Capital's lawyers at Loeb & Loeb made clear to Mulrain that Section 28 was an "essential part of the transaction from their perspective" and that 23 Capital would not agree to fund the loan without that assignment. 11/16/21 Trial Tr. at 33:14-22 (C.A. Mulrain direct).

60.     Decade, too, was aware that if 23 Capital did not get the collateral it wanted then it would not agree to make the loan. 10/28/21 Trial Tr. at 17:4-22 (D. James cross) ("Q. Do you know whether securing all of the receivables, including any receivables that might be owed to Mr. Goodwin individually was an important part of the loan from 23 Capital's perspective? A. Yes, it was an important part. Yes. Q. And, in fact, you understand that 23 Capital would not have made

the loan to Decade without that? A. I would assume they would not have made the loan. We did not have assets. They were asset based loans, so collateralized loans. Yes, I would assume they would not have made a loan without appropriate collateral."); 10/28/21 Trial Tr. at 14:8-15 (D. James cross) ("Q. Would you agree with me that if the documents did not provide for 23 Capital to receive the collateral it wanted it would not agree to make the loan? . . . A. I thought I answered it. It was yes.").

61.    Without the loan from 23 Capital, the deal would not have been able to close. 10/28/21 Trial Tr. at 17:4-22 (D. James cross) ("Q. Without the loan from 23 Capital Decade would not have been able to fund the transaction, is that correct? A. Without a loan we would not have been able to fund this transaction. If 23 Capital did not make the loan we could have gone and borrowed the money from somewhere else, but there needed to be a loan to make this transaction happen. That is correct."); 11/16/21 Tr. 15:4-12 (C.A. Mulrain direct) ("[T]here is no transaction unless you get the revenue streams from the contracts. There's no point in paying somebody if you're not – if you're not going to get the revenue stream. It's like I'll give you this amount of money, so you enjoy that up front, but as consideration for that, I get this long-term revenue stream. Like, otherwise, there's no – there's no deal, there's no business.").

### 2.    Decade and the Goodwins Negotiate the Decade Employment Agreements

62.    After 23 Capital and Decade agreed to terms of the Goodwins' Decade Employment Agreements, on February 9, 2016 at 6:58 p.m., Mulrain sent Aaron drafts of those agreements. DX040; PX016; Stip. Fact ¶ 59. This was the first time Aaron received the draft Decade Employment Agreements.  DX040; 10/12/21 Trial Tr. at 77:16-78:4 (A. Goodwin direct).

63.    Aaron responded that night by emailing Mulrain and texting Aden saying that the Decade Employment Agreements were different than those governing the Stealth Deal. DX041;

PX017; DX046; DX145, p. 218. Specifically, Aaron stated that "In reviewing this agreement[,] it was agreed upon that one we will do a non compete for one calendar year, not two. Also, sections 27-28 were not a consideration. If in the event we sever ties, Decade is entitled to all fees negotiated for clients that were obtained while performing with the company ONLY, throughout the life of those contracts. They are not entitled to fees for any client signed after any separation between [D]ecade and Goodwin." DX046; Stip. Fact ¶ 62.

64.     Mulrain responded to Aaron that night saying he would discuss the issue with Aden, but he "didn't fool with non-competes or anything. *All I did was alter the form to deal with the Assignment Concerns that 23 [Capital] had.*" DX050 (emphasis added); PX18; Stip. Fact ¶ 64. Aaron responded by reiterating to Mulrain that he just needed the deal "completed or not soon. These continued delays really are attacking my credibility and relationships." DX050.

65.     Later that night, Aden emailed Aaron a revised version of the Decade Employment Agreements saying, "[p]er discussions they have made the changes as discussed." DX047; DX051. This version of the Decade Employment Agreements removed the employee restrictive covenants to a separate exhibit and, per Aaron's comment, changed the term of the non-compete from two years to one year. DX047; DX051. Sections 27 and 28 remained unchanged from the previous version. DX047; DX051; Stip. Fact ¶ 65.

66.     The next morning, February 11, 2016, Aaron texted Mulrain stating "Tony Can you talk? Sects 27 and 28 have only been amended not deleted and I [don't] agree to the amendments. The agreement should read that after the term is completed[,] if we do not extend the agreement, Decade, 23 or anyone else is ONLY ENTITLED to what ever money is owed from players signed while we are working together. I [am] [n]ot giving them anything [in] any form on player[s] that I sign AFTER I leave Decade for any reason. That's what we agreed upon and that's what I am

staying with" PX113, p. 17; Stip. Fact ¶ 68.  From February 11-12, 2016, Aaron was attending the NBA All-Star weekend in Toronto. The Goodwins were "very busy" during this time. 10/12/21 Trial Tr. at 97:12-13 (A. Goodwin direct).

67.     Mulrain responded: "They sent me that employment agreement in a drop box. *The only changes I made to what they sent me (and I understood was agreed to with you) was language to protect the lender on the issue of assignment.* That's its bruh. Nothing else. . . . I'm telling Chris to call you. I'm cool with whatever business agreement you guys have." PX113, p. 18 (emphasis added).

68.     That same day, Aaron texted Aden saying: "Chris[,] Section 27 and 28 concerning fee tails remain in this agreement as it did before. As we have agreed[,] [D]ecade receive[s] money on any and all players under contract while agreement exist[s] or [is] close to completion. Decade recei[v]es the 40 and 50% of the agreements for as long as revenue is generated for the existing contract. An[y] thing by any player[,] old or new, that works with the Goodwin's after a separation from Decade, Decade is not entitled to any revenues. I am NOT paying anyone for 3 years if I leave for any reason. That makes no sense and we agreed upon this over a year ago in Los Angeles."  DX145, p. 223; Stip. Fact ¶ 69.  Aden instructed Aaron to "[m]ake the change in the document and send it back redline." Stip. Fact ¶ 70.  Aden then forwarded to Aaron revised Decade Employment Agreements that incorporated comments from Aden, Llorens and James. PX144; DX055; DX057.

69.     This version of the Decade Employment Agreements struck Section 27(a)(iii), per Aaron's comment that he would not agree to remit funds from clients he signed after he left Decade's employ.  PX144, p. 35.

70.    Aaron responded via email saying: "It[] still reads where[e] Decade has entitlements after any separations and the rights to previous clients before the partnership. I will make the changes as I understand them as soon as I reach the hotel and [send] them back ASAP[.] The easiest solution would have been to eliminate 27 and 28, as honestly, I will not agree to pay anything after separation OTHER [than] the current fee owed and future fees [if] client signed while with Decade. That is fair and what we agreed on."  DX055; Stip. Fact ¶ 71.

71.    The then most recent versions of the Decade Employment Agreements that had been sent to Aaron, however, did *not* provide that Decade had entitlements after separation with Aaron with respect to new clients he signs after he leaves Decade's employ; rather, Aaron misunderstood the legal verbiage of the Decade Employment Agreements. Regardless, Aden forwarded Aaron's comments to Decade's counsel, Llorens. DX055.

72.    In addition to emailing Aden, Aaron texted Aden saying there were still issues with Sections 27 and 28 and he was trying to call Mulrain to discuss the issue. DX145, p. 225.

73.    Aden then responded to Aaron's prior email saying, "Alonzo is updating the Employment Agreement per your texted comments this evening." DX054.

### 3.    The Events on the Evening of February 11, 2016, and February 12, 2016

74.    On the evening of February 11, 2016 at 11:49pm EST, Aden emailed Aaron the revised Decade Employment Agreements, revising Section 27(a)(i) and striking 27(a)(ii)(1)-(2) and 27(e).  PX150, pp. 36-38; DX058.  One minute later at 11:50pm EST, Aden emailed Aaron the blank signature pages for the SPA and the Decade Employment Agreements. DX056; PX020; Stip. Fact ¶ 76.

75.    On February 12, 2016 at 1:13am EST, Aaron texted Aden "Still too much I didn't agree upon, but now [it's] in 27 as opposed to 28 . . . I will make the changes and send you all

signed copies in the am." DX145, p. 225; Stip. Fact ¶ 77. Aden tells him to "fax to my home fax." DX145, p. 225. At 12:00pm EST, Aaron texts Aden saying, "Sent, 42 pages. I just printed, had signed and sent." DX145, p. 226.

76.    Aaron's February 12, 2016 fax to Aden included: (i) revised executed Decade Employment Agreements for Aaron and Eric that struck Sections 27 and 28; (ii) extra executed signature pages for the Decade Employment Agreements for both Aaron and Eric; and (iii) executed signature pages for the SPA for both Aaron and Eric (the "<u>Fax</u>"). DX149; Stip. Fact ¶ 81. Aden forwarded the Fax to Llorens, Mulrain and other attorneys at Gordon & Rees. DX150; DX151.

77.    Sections 27 and 28 in the versions of the Decade Employment Agreements contained in the Fax provided as follows:

> 27.    Fee Tails.    Executive and Company further acknowledge and agree that no other employee of the Company whose primary function is to serve as a basketball agent will receive a higher salary or title than Executive during the first five(5) years of this Agreement.
>
> 28.    Indemnification.    The Company shall indemnify and hold Executive harmless from and against all claims and demands to the maximum extent permitted under the Delaware Limited Liability Company Act, as amended.

DX149, p. 10.

78.    Aaron made these changes to the Decade Employment Agreements himself while at the hotel in Toronto. 10/12/21 Trial Tr. at 97:23-98:18, 99:14-21, 102:19-21 (A. Goodwin direct); 10/26/21 Trial Tr. at 70:24-71:2 ("I deleted 27 and 28.").

79.    Decade had not agreed to the removal of Sections 27 and 28. 11/16/21 Trial Tr. at 25:2-4 (C.A. Mulrain direct).

80.    The versions of the Decade Employment Agreements that Aaron sent in the Fax were the only versions of the Decade Employment Agreements circulated between Aaron and

Decade or 23 Capital that had Sections 27 and 28 deleted. *Compare* DX149 *with* DX40; DX047; DX050; DX051; DX055; DX057; DX058; DX061; DX117; PX144; PX147; PX149.

81.     In addition, the versions of the Decade Employment Agreements that Aaron sent in the Fax that struck Sections 27 and 28 were *never* signed by Decade. *Compare* DX149 *with* DX40; DX047; DX050 DX051; DX055; DX057; DX058; DX061; DX117; PX144; PX147; PX149. There exists no *fully executed* version of the Decade Employment Agreements striking Sections 27 and 28, as sent in the Fax. See DX40; DX047; DX050 DX051; DX055; DX057; DX058; DX061; DX117; DX149; PX144; PX147; PX149.

82.     Aaron admitted that, in addition to executed versions of the Decade Employment Agreements, the Fax contained additional executed signature pages for the Decade Employment Agreements. 10/12/21 Trial Tr. at 107:24-108:3 (A. Goodwin direct).  No written correspondence exists where Decade or 23 Capital agreed to these changes to the Decade Employment Agreements. *Cf.* 10/26/21 Trial Tr. at 30:7-19 (A. Goodwin cross).

83.     A little over an hour later, Aden texted Aaron and said "Call me . . . The Employment Doc is wrong." DX145, p. 226; Stip. Fact ¶ 82.

84.     That afternoon, Aaron spoke with Aden and Mulrain regarding Aaron's changes to Sections 27 and 28. 10/26/21 Trial Tr. at 31:6-18 (A. Goodwin cross) ("Q. On February 12th, 2016, you faxed copies of the employment agreement and certain other documents to Chris Aden at his home, right? A. Yes, sir. Q. Okay. And then, after you faxed it, Chris texted you and said that – he asked you to call him because the document was wrong. A. That is correct, sir. Q. Okay. And after that, you spoke to him, right? A. Yes, I did, sir. Q. And you spoke to Tony Mulrain, right? A. Yes. Different times, but I spoke to Chris directly when he said call him, sir.").

85.     Mulrain discussed with Aaron the importance of the Assignment to 23 Capital. 11/16/21 Trial Tr. at 21:6-16 (C.A. Mulrain direct) ("Q. Did you ever discuss that concept with Aaron Goodwin? A. Absolutely. We talked – I mean, we talked – we talked about it. It's like I can remember saying to Aaron, Aaron, if you're not going to assign the revenue, then there's no deal, there's no reason why Decade would give you whatever the number was, $10 million, without getting something in return. Like you don't – you don't do this deal and hand somebody $10 million today, unless you're expecting that you're going to enjoy a revenue stream that exceeds that number tomorrow. I mean, if – yes, we talked about it.").

86.     During these calls it was explained to Aaron that the deal would not proceed unless he agreed to include Sections 27 and 28 as revised to reflect Aaron's concerns and circulated the night prior at 11:56pm EST. 11/16/21 Trial Tr. at 27:5-12 (C.A. Mulrain direct) ("I seem to recall that there was some discussion between Aaron and Chris where Chris told Aaron this isn't what we agreed to, like you can't take this section out of the agreement, something to that effect."); 11/16/21 Trial Tr. at 21:6-16 (C.A. Mulrain direct) ("Q. Did you ever discuss that concept with Aaron Goodwin? A. Absolutely. We talked – I mean, we talked – we talked about it. It's like I can remember saying to Aaron, Aaron, if you're not going to assign the revenue, then there's no deal, there's no reason why Decade would give you whatever the number was, $10 million, without getting something in return. Like you don't – you don't do this deal and hand somebody $10 million today, unless you're expecting that you're going to enjoy a revenue stream that exceeds that number tomorrow. I mean, if – yes, we talked about it.").

87.     Aaron told Mulrain that he understood the importance of that provision to 23 Capital. 11/16/21 Trial Tr. at 21:17-18 (C.A. Mulrain direct) ("Q. Did Aaron ever tell you he understood that? A. Yeah, he did. Absolutely.").

88.    Aaron then accepted the reinsertion of Sections 27 and 28 back into the Decade Employment Agreements. 11/16/21 Trial Tr. at 28:24-29:11(C.A. Mulrain direct); 11/16/21 Trial Tr. at 40:16-20 (C.A. Mulrain cross); 11/16/21 Trial Tr. at 43:4-21 (C.A. Mulrain cross) ("Q. Mr. Aaron Goodwin never agreed to an assignment provision or a fee tail provision in his employment agreement. Isn't that correct? A. That's not – that's not correct. . . . we talked about it. And ultimately, Aaron understood that he couldn't get the payment from Decade without assignment the revenue streams from the contracts."); 11/16/21 Trial Tr. at 48:5-21 (C.A. Mulrain cross) ("Q. Did you have any conversation with Mr. Aaron Goodwin where he accepted paragraphs 27 and 28 in the employment agreement? A. Yeah, because Aaron knew that the transaction wasn't going to – Q. Let's try – maybe I can ask the question – THE COURT: Mr. Miller – Mr. Miller, you don't interrupt the witness. If you have a problem with that, talk to co-counsel; he'll let you know that's a rule here. Mulrain, you may finish. THE WITNESS: The answer was yes, because Mr. Goodwin came to understand that unless there was an assignment of revenue, there was no deal, there was no business. And so we talked about it, and I admit we talked about it a lot, but, ultimately, he understood that that assignment if you're not doing that, it's a nonstarter; this transaction cannot close."). Aaron "certainly said, I understand that this assignment is absolutely critical, I get it, and that's why the transaction moved forward, because he understood that that had to happen in order for him to get what he was looking for in the deal, which was the 10 million or whatever the payment was. Aaron understood it." 11/16/21 Trial Tr. at 48:23-49:11 (C.A. Mulrain cross).

89.    Llorens then revised the Decade Employment Agreements to conform to the version circulated on February 11, 2016 at 11:49pm EST and circulated it to Aden, copying Mulrain. PX149. Either Llorens or Rebecca Barnes at Gordon & Rees attached Aaron's signature

pages that he faxed over earlier that morning.  11/16/21 Trial Tr. at 49:24-50:5 (C.A. Mulrain cross).

90.    Llorens then immediately sent that version of the Decade Employment Agreements to Channing Johnson at Loeb & Loeb, copying Aden and Mulrain, stating, "As discussed, *we made a couple of revisions to the Fee Tail section which has been approved by the Goodwins.* Please see the attached." DX060 (emphasis added).  Llorens wrote to 23 Capital's counsel that the Goodwins' signature pages "correspond[]" with versions of the employment agreements that included draft Sections 27 and 28. DX061; PX147; Stip. Fact ¶ 83.

91.    Later that day, on February 12, 2016, 23 Capital received a recommendation letter from Tim Le Page at Saffery Champness, describing 23 Capital's loan to Decade to fund the Decade Deal as one with a revenue stream of "unconditional agency receivables" and with a security value of $72,394,775 representing "contracted revenue due to the Borrower post acquisition . . . owing from a pool of underlying MLB and NBA players (alongside a smaller % of Nike and Adidas payments)." DX062.  The security was also described therein as "[f]irst ranking position over ALL revenue due to the Borrower (contracted and projected)." DX062, p. 4.

92.    The Decade Employment Agreements were never modified after February 12, 2016. 10/28/21 Trial Tr. at 24:5-12 (D. James cross) (testifying that his text message to Aaron on February 23, 2016 stating "XXIII accepted all the changes" (DX146, p. 14 # 365) had to do with changes to the "Encore APA"). Indeed, Section 12.13 of the SPA provided that the SPA was fully integrated, and Section 12.15 of the SPA provided that the agreement could not be "amended, modified, altered or supplemented except by means of a written instrument executed on behalf of Purchaser, Decade, Game, GSM, XXII Capital and each Seller." DX117, pp. 36-37.  No such writing exists.

4.  **The Goodwins Never Read the SPA Before Signing the Signature Pages; Eric Goodwin Also Never Read His Decade Employment Agreement Before Signing its Signature Page**

93.     When Aaron and Eric signed the SPA signature pages on February 12, 2016 and faxed them to Aden in the Fax, Aaron and Eric had not seen the SPA. *See* 10/26/21 Trial Tr. at 70:24-71:9 (A. Goodwin cross) ("Q. You hadn't seen the SPA, had you, at that point in time? A. No. Q. So you didn't make any changes to the SPA because you hadn't seen it yet? A. No, I did not."). Aaron did not review the SPA until December 1, 2016. 10/12/21 Trial Tr. at 117:22-118:1 (A. Goodwin direct) ("Q. Prior to 12/1/2016, had you ever reviewed the share purchase agreement? A. The one that they sent, sir, or in the beginning? Q. The one that was attached to this email. A. No, sir."); 10/12/21 Trial Tr. at 118:8-11 (A. Goodwin direct) ("Q. So had anyone ever sent you a copy of this share purchase agreement that was attached to you – to this email on 12/1/2016? A. No, sir."); 10/13/21 Trial Tr. at 14:5-9 (A. Goodwin direct) ("Q. And prior to December 1st, 2016, had you ever received a copy of the SPA from Mr. Aden? A. No, sir. Q. From anyone else? A. No, sir."); 10/15/21 Trial Tr. at 57:25-59:4 (D. James direct); Stip. Fact ¶ 109; DX117.

94.     Aaron and Eric did not ask for nor did they receive fully executed versions of the Decade Employment Agreements on or before the Decade Deal closing on February 22, 2016. Eric testified that he did not read the Decade Employment Agreement before signing it. 10/26/21 Trial Tr. at 92:9-93:5 (E. Goodwin direct) PX139 at 235:13- 237:12 ("Q. On the signature page it states 'The Parties sign this Employment Agreement intending to be bound by its terms, to be effective as of the consummation of the Purchase Transaction.' Prior to signing this page, did you request from anyone at Decade a copy of the employment agreement? A. No. Can I state for the record, I also don't remember seeing it on top of it when I signed it.").

95.     In fact, Eric testified that he "never signed an agreement with Decade." PX139 at 47:2-17 ("Q. Did you ever enter into an employment agreement with Decade? A. Not to my

knowledge. . . . Q. Did you enter into any signed agreement — A. Not — Q.—with Decade? A. I never signed an agreement with Decade.").

## V.    THE DECADE DEAL CLOSES ON FEBRUARY 22, 2016 AND THE GOODWINS RECEIVE $9.5 MILLION IN CASH, PLUS A $25.5 MILLION PROMISSORY NOTE

96.    On or about February 22, 2016, Decade and 23 Capital executed a loan agreement pursuant to which 23 Capital agreed to make a loan to Decade and Decade agreed it would use the loan proceeds to fund initial payments to the sellers for its acquisitions of GAME, GSM, Encore, and SMP (the "Loan Agreement"). Stip. Fact ¶ 84.

97.    The SPA provides that Decade Contracts would pay the Goodwins $35,000,000 in exchange for 100% of the issued and outstanding shares of GAME and GSM. Stip. Fact ¶ 86.

98.    The payments were divided between a $9,500,000 upfront payment (subject to certain defined holdbacks) with the balance to be paid over time pursuant to a promissory note (the "Note," together with the Guaranty and the Decade Employment Agreements, the "Other Transaction Documents"). Stip. Fact ¶ 87.

99.    Decade made the initial $9.5 million payment required by the SPA with $4,372,548.49 paid to Aaron, $2,490,042.10 paid to Eric, and the remaining amount paid to third-parties on their behalf. *See* Stip. Fact ¶ 88; 10/26/21 Trial Tr. at 104:25-105:2 (E. Goodwin direct).

100.    Section 2.4(f) of the SPA conditioned the closing of Decade Contracts' purchase of the GAME and GSM shares on the closing of Decade's transactions with Encore and SMP. Stip. Fact ¶ 57.  Both of those transactions closed.  DX072; DX075; DX076; Stip. Fact ¶¶ 89-90.

101.    In connection with the sale of GAME and GSM to Decade Contracts, Aaron and Eric assigned, released and quitclaimed to Decade any and all interest each of them had in any contract with the players they represent, and any payment owed under such contract. *See* SPA Disclosure Sch. (DX117, pp. 132-134) ¶ 3.10 titled "Material Contracts" (listing Aaron's player

clients' Agency Agreements and Marketing Representation Agreements as "Material Contracts";

SPA § 3.10(b) (DX117, pp.18-19) (providing that "each Material Contract is a valid and binding

agreement of either GAME or GSM"; SPA Disclosure Sch. (DX117, pp. 136-138) ¶ 3.7

Attachment (listing "aging of all accounts receivable for GAME").

## VI.   DECADE AND THE GOODWINS PERFORM UNDER THE SPA FOR ONE YEAR

### A.   Immediately Following the Closing, the Goodwins Inform Their Employees About the SPA, and Decade Pays Compensation to the Goodwins and Former GAME and GSM Employees

102.    Following the closing, on April 4, Eric emailed Aaron a draft message to GSM's

employees Michelle Chan ("Chan") and Mary Ford ("Ford"), 10/26/21 Trial Tr. at 83:3-9 (E.

Goodwin direct), describing the closing of the sale of GSM to Decade and stating that "Aaron and

I have agreed to a merger with Decade Sports. Under terms of this agreement GSM will essentially

close and a new company, GSM/Decade Sports, will begin."  PX034; Stip. Fact ¶ 92. Aaron

responded "that's cool." PX034; Stip. Fact ¶ 93.

103.    Eric emailed the message to Chan and Ford on April 5 under the subject heading

"GSM Announcement." Stip. Fact ¶ 94; PX035; PX036.

104.    In April 2016, the Goodwins sent Decade the GSM employees' (Chan and Ford),

*see* 10/26/21 Trial Tr. at 82:23-83:9 (E. Goodwin direct) (testifying that GSM's only employees

were Chan and Ford), and the GAME employees' (Muhammad Abdur-Rahim, Nathaniel Jones,

Oliver Muhammad, Noah Croom, Jerome Stanley) confidential personal information, completed

W4 Forms and/or W9 Forms for the purpose of Decade setting up "payroll," in addition to sending

Decade their own confidential personal information for setting up payroll. Stip. Fact ¶ 95; PX037;

PX038; PX045; PX046; PX047; PX048; PX108; PX052; PX053; PX054; PX055; PX056.

105.    Pursuant to the SPA, in April 2016 the former GAME and GSM employees began receiving compensation and employee benefits from Decade. PX041; 10/12/21 at 169:7-8 (A. Goodwin direct) ("Q. Did they pay your employees? A. Yes, sir, they did.").

106.    In accordance with the SPA, in April 2016 the Goodwins began remitting to Decade money owed under the SPA. For example, on April 8, 2016, Aaron remitted $100,000 to Decade that he received from one of his athlete clients. DX079 ($100,000 check from Aaron to Decade); Stip. Fact ¶ 91.

107.    As employees of Decade, in April 2016 the Goodwins also began participating in calls with other Decade executives to discuss strategy for building the Decade platform. PX044.

**B.    The Goodwins Receive the Executed SPA and Decade Employment Agreements – With Sections 27 and 28 Included – And Continue to Perform Under Both Agreements for Over 12 Months**

108.    On April 20, 2016, Aden sent Aaron a copy the Decade Employment Agreement between Aaron and Decade Executives that included draft Sections 27 and 28. Stip. Fact ¶ 96; PX049; PX050. Aaron had not obtained fully executed versions of the Decade Employment Agreement until then. 10/12/21 Trial Tr. at 110:23-111:6 (A. Goodwin direct); DX080. Aaron reviewed the Decade Employment Agreements and noticed that Sections 27 and 28 were in the Decade Employment Agreements. 10/12/21 Trial Tr. at 111:10-23 (A. Goodwin direct).

109.    On April 29, 2016, Lynn Elliott ("Elliott"), a CPA hired by Aaron, emailed Aaron saying that he believed Decade had changed the employment agreement. Stip. Fact ¶ 97; PX064. Specifically, Elliott told Aaron that "paragraph two" of the Employment Agreement was different. PX064. Paragraph 2 of the Decade Employment Agreements dealt with Compensation. PX049; PX050.

110.    On May 4, 2016, Mulrain texted Aaron saying "I'm sitting here talking with Chris. My man I didn't make a change to your agreement. . . . We can [t]alk about it anytime. Feel free

to call me. We can even walk through the agreements and compare them. I just don't roll like that."

Stip. Fact ¶ 98; PX113, p. 19.

111.    Aaron responded that day, saying:

I KNOW you didn't and wouldn't do anything like that I believe an OLD document was incorporated with a newer version at some point BEFORE you ever got involved and somehow that language ended up on a document. *It's not a big deal,* you guys are my partners, we will figure it out Plus, you KNOW you are my guy!!

PX113, pp. 19-20 (emphasis added); Stip. Fact ¶ 99.

112.    Mulrain was concerned at the suggestion that the versions of the Decade Employment Agreements that Decade attached to the Goodwins' signature pages differed from those to which the Goodwins agreed and conducted an inquiry. Stip. Fact ¶ 100; 11/16/21 Trial Tr. at 37:21-25, 56:4-10 (C.A. Mulrain cross). Mulrain's inquiry did not yield any specific findings, although he was concerned a signature page from earlier versions of the Decade Employment Agreements was attached to the ultimate Decade Employment Agreements. 11/16/21 Trial Tr. at 37:21-25, 38:1-8, 56:4-10 (C.A. Mulrain cross).   Regardless, Mulrain knew that Aaron "understood that he couldn't get the payment from Decade without assignment [of] the revenue streams from the [Agency Agreements and Marketing Representation Agreements]." 11/16/21 Trial Tr. at 43:17-21 (C.A. Mulrain cross).

113.    By May 4, 2016, at the absolute latest, Aaron and Eric were aware that the fully executed Decade Employment Agreements included Sections 27 and 28, and, thus, were different than the version of the Employment Agreements that Aaron sent via the Fax. *See, e.g.,* PX049; PX050; PX113, pp. 19-20; Stip. Fact ¶¶ 96, 98-99.

114.    On May 19, 2016, Elliott emailed Aaron that Aden had sent Elliott "all of the signed and executed documents." Elliott also stated that "[t]he sale has been completed and we have to stop using the GAME accounts immediately." The email did not contain any attachments. Stip.

Fact ¶ 103. That same day, Elliott emailed Eric that "Christopher Aden just forwarded me copies of the executed contracts from February 22, 2016. They seemingly include you[r] signatures. I am attaching them for your records. This is a done deal." Stip. Fact ¶ 104.

115.     On May 19, 2016, Elliott emailed Eric copies of the following: the SPA; the Decade Employment Agreements containing Sections 27 and 28; a promissory note from Decade SAC to the Goodwins for the $25,500,000 balance due under the SPA; and a Guaranty from Decade SAC to the Goodwins of the amounts due under the Note; non-compete agreements executed by each of the Goodwins; a schedule to the SPA identifying Aaron and Eric as the sellers under the SPA; and a disclosure schedule. Stip Fact. ¶ 105.

116.     Eric testified that after receiving the SPA: "I didn't read the document . . . I didn't go through it because I didn't see it . . . So I didn't review it." PX139 at 239:3-20. He even testified that he might have "ignored it" entirely. PX139 at 229:17-230:3.

117.     After their receipt of the fully executed versions of the SPA, Decade Employment Agreements with Sections 27 and 28 included, Note and other transaction documents, the Goodwins continued to at least partially perform their obligations under those contracts by remitting some, but not all, of the amounts owed to Decade SAC and Decade Contracts under the SPA. Stip. Fact ¶ 91.  From May 2016 to May 2017, the Goodwins made eleven different payments to Decade, in accordance with the SPA, totaling over $1.6 million:

| Date | Amount |
|------|--------|
| 4/8/16 | $100,000 |
| 5/17/16 | $345,000 |
| 6/14/16 | $200,000 |
| 9/6/16 | $262,012.67 |

| | |
|---|---|
| 10/17/16 | $99,500 |
| 12/1/16 | $99,500 |
| 12/2/16 | $99,500 |
| 12/20/16 | $230,000 |
| 1/9/17 | $66,000 |
| 2/28/17 | $91,000 |
| 3/31/17 | $84,000 |
| 5/1/17 | $71,000 |
| **TOTAL: $1,747,512.67** | |

Stip. Fact ¶ 91; DX083 (check from Aaron to Decade for $345,000); DX090 (check from Aaron to Decade for $200,000); DX104 (screenshot of UBS account showing $99,500 wire transfer from Aaron to Decade); DX115 (screenshot of UBS account showing $200,00 wire transfer from Aaron to Decade).

118.    These funds consisted of commission payments the Goodwins received from the players pursuant to Agency Agreements and Marketing Representation Agreements – funds that Aaron testified Decade was entitled to under the SPA. 10/12/21 Trial Tr. at pp. 130-175 (A. Goodwin direct) (testifying at length about payments remitted to Decade under the SPA from April 2016 to May 2017 that "Decade was entitled to").

119.    The Goodwins also continued to accept their salary and other benefits from Decade, *see* PX070; PX072; PX079; as did the former GAME and GSM employees. On May 24, 2016, Eric emailed Aden confirming that he "received a transfer into [his] account at the start of April for wages." PX070.  Eric continued, "based on the conversations with Aaron[,] the deal was completed in February[.] I am due a payment of an additional of $16,372.39 (net wages), which

would reflect wages for March 2016." PX070. Eric also requested "reimbursement for March wage payments [he] made to Michelle Chan and Mary Ford, plus the corresponding employee tax payments (941) which were all made prior to [him] closing the GSM accounts." PX070.

120.    On June 11, 2016, Eric received his "wage deposit of $16,000" and followed up on "reimbursement on expenses I paid out on behalf of GSM after the agreement began." PX072.

121.    On August 3, 2016, Eric emailed James seeking "reimburse[ment] for any expenses [he] paid for after the GSM/DSE deal went through," including "wages, health benefits, 401k, taxes, etc." as well as reimbursement for amounts paid to Ford and Chan for their "health benefits" and "401k benefits." PX079.  Eric also requested a meeting with James in NYC "to determine how [he] can best assist on building marketing partners for the incoming football players that Aaron has spoken to me about." PX079.

122.    During this period, the Goodwins continued to participate in strategy calls with Decade executives, including "social media calls" to help market Decade. PX069. For example, on August 16, 2016, Eric emailed James to arrange a meeting that day to discuss potential college players to recruit to Decade.  PX080.

123.    On September 27, 2016, Elliott continued to advise former GAME and GSM employees that the companies were "sold to Decade last February" and that "DECADE now owns 100% of the common stock of GSM" and to stop using the GAME and GSM letterheads on their billing invoices. PX082. Four months after Eric received the SPA, he further ratified its terms by telling Elliott "GSM is now closed and no longer taking in fees, those Decade guys purchased all the 'stock' in GSM . . . ." PX082. That day, Eric responded to Elliott by saying "so far all these guys have done is the equivalent of making an[] advance on fees we have due. I'm not going to worry about them or fees or legal ramifications until [they] have at least paid over half of the so-

called purchase price which to my knowledges they have not." PX082. Elliott told Eric "not to vent in writing." PX082.

124.    On December 21, 2016, Aaron emailed Aden and James detailing certain amounts he asserted were owed to himself and Eric under the Decade Employment Agreements, which Aaron claimed included: $150,000 (retention bonus to Aaron); $116,667.12 (Aaron's salary for September through December 2016); $350,000 (reimbursement for Aaron's expenses); $25,000 (Eric's salary for December 2016); $19,938.24 (reimbursement for Eric's expenses); and $499,000 (total cash loaned to Decade in 2016). Stip. Fact ¶ 113; PX092.

125.    On February 27, 2017, Aden sent Aaron an email confirming payroll for the following day sent to Eric and the former GAME and GSM employees. DX128.

126.    Through the end of 2016 and through April 2017, Aaron continued to send his Agency Agreements and Marketing Representation Agreements with his clients to Aden. PX083; PX084; PX085; PX086; PX087; PX089; PX090; PX094; PX095.

## VII.    DECADE DEFAULTS ON THE LOAN AGREEMENT AND FILES FOR BANKRUPTCY

127.    In November 2016, Decade began experiencing liquidity issues and was unable to service the 23 Capital loan used to fund the Decade Deal, pursuant to the terms of the Loan Agreement, or pay Decade's employees. This was due, in large part, to Aaron's failure to remit all of the funds he received from his player clients to the Lockbox. 10/12/21 Trial Tr. at pp. 119:13-120:2 ("Q. Did you pay 37.5 percent of all revenue entitlement that you or your business received from Damian Lillard to Decade? A. Yes, sir. Q. Did you pay 37.5 percent of all revenue entitlement that you or your business received from DeMar DeRozan? A. Yes, sir. Q. Did you pay 50 percent of all the revenue entitlement that you or your business received from other clients aside from Mr. Lillard, Mr. DeRozan, and Kevin Durant? A. Yes, sir. Q. Did you pay 15 percent of all royalties

that you or your business received from any other clients during this period to Decade? A Yes, sir."); *see also* 10/12/21 Trial Tr. at pp. 130-175 (A. Goodwin direct) (testifying at length about payments remitted to Decade that "Decade was entitled to" under the SPA in connection with payments Aaron's player clients sent him under their respective Agency Agreements with GAME).

128.    On March 21, 2017, 23 Capital sent a notice to Decade accelerating the loan and declaring all amounts due thereunder to be immediately due and payable. Stip. Fact ¶ 115.

129.    On December 7, 2016, 23 Capital notified Decade that the loan was in default. Stip. Fact ¶ 112; DX120.

130.    On September 12, 2017, 23 Capital commenced an action against Decade, GAME, GSM, Aden, James and the Goodwins in the United States District Court for the Southern District of New York captioned as *XXIII Capital Limited v. Decade S.A.C., LLC, et al.,* No. 1:17-cv-06910-GHW ("SDNY Action"). *See* PX130.

131.    On September 29, 2017, Perkins Coie, on behalf of the Goodwins, sent Decade SAC and Decade Executives a "Notice of Material Breaches of Promissory Note in the amount of $25,500,000 dated as February 22, 2016 made by Decade, S.A.C., LLC in favor of Aaron Goodwin and Eric Goodwin, jointly; [sic] Executive Employment Agreement between Decade, S.A.C. Executives, LLC and Aaron Goodwin dated 22nd February 2016; and Executive Employment Agreement between Decade, S.A.C. Executives, LLC and Eric Goodwin dated 22nd February 2016." Stip. Fact ¶ 117.

132.    On October 20, 2017, the Goodwins asserted crossclaims in the SDNY Action against Decade, Aden and James for Fraud, Fraud in the Inducement, Fraud in the Execution, and Breach of Contract in connection with the Decade Deal. PX131. This was the first claim the Goodwins brought against Decade, Aden or James in connection with the Decade Deal.

133.    On December 12, 2017, Aaron submitted a declaration in the SDNY Action, in which he stated under penalty of perjury that "we [the Goodwins] received a Promissory Note for the remaining $25.5 million." Stip. Fact ¶ 110; PX133, p. 3 ¶ 3. Aaron also attached to his declaration as an exhibit "a true and correct copy of the Promissory Note between Decade S.A.C., LLC and Aaron Goodwin and Eric Goodwin, dated February 22, 2016." Stip. Fact ¶ 110; PX133, pp. 62-67.

134.    On July 16, 2018, Gotham and Decade, SAC LLC filed voluntary bankruptcy petitions. PX124; PX125. Aden signed Decade SAC's July 16, 2018 voluntary bankruptcy petition, filed in this Court, as the "authorized representative of debtor." Stip. Fact ¶ 120. On October 16, 2018, Decade Executives, Decade II and Decade Contracts filed voluntary bankruptcy petitions in this Court. PX121; PX122; PX123.

135.    The Trustee was, in turn, appointed to manage and administer the Estates. Stip. Fact ¶ 120.

136.    The Goodwins filed their Answer with Counterclaims in this action on February 25, 2019. PX116.

## CONCLUSIONS OF LAW

## I.    JURISDICTION AND VENUE

1.    This Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334(b) and 157(b)(2)(A).

2.    Venue is proper before the United State Bankruptcy Court for the District of Delaware under 28 U.S.C. §§ 1408 and 1409.

3.    This Court has the statutory and constitutional authority to enter a final order in this adversary proceeding because this case concerns the administration of the Debtors' Estates and is

otherwise a core proceeding because the plaintiff's complaint seeks a declaration that non-parties GAME and GSM, together with all their assets, are property of the Debtors' Estates. *See In re Affirmative Ins. Holdings, Inc.*, 565 B.R. 566, 583 (Bankr. D. Del. 2017); 28 U.S.C. § 157(b)(2)(A) ("Core proceedings include, but are not limited to . . . matters concerning the administration of the estate . . . ."). The Goodwins' objections to the contrary are overruled.

## II.    SUBSTANTIVE GOVERNING LAW

4.    Under Delaware law, choice of law provisions are consistently held to be valid and enforceable. *See In re Old BPSUSH Inc.*, 589 B.R. 524, 531 (Bankr. D. Del. 2018) ("'Under Delaware law, express choice of law provisions in contracts are generally given effect.'") (quoting *Enzo Life Scis., Inc. v. Adipogen Corp.*, 82 F. Supp. 3d 568, 595 (D. Del. 2015)).

5.    The SPA contains a New York choice of law provision: "This Agreement shall be construed in accordance with, and governed in all respects by, the law of the State of New York (without giving effect to principles of conflicts of law that would result in the application of the laws of a jurisdiction other than the State of New York)." *See* DX117, SPA, § 12.5.

6.    The Decade Employment Agreements also contain a New York choice of law provision: "The last act of entering into this Agreement shall be deemed to have occurred in New York County, New York. Accordingly, the validity, interpretation, performance and enforcement of this Agreement shall be governed by the laws of the State of New York without regard to conflict of law principles that would result in the application of the laws of a jurisdiction other than the State of New York. . . ." *See* DX117, Decade Employment Agreements, § 15.

7.    Where, as here, the subject contract has broad choice of law language, Delaware courts have consistently applied the contract's choice of law provision even where a party has asserted fraudulent inducement and similar claims. *See, e.g., VGS, Inc. v. Castiel*, No. C.A. 17995, 2003 WL 723285, at *7 & n. 29 (Del. Ch. March 10, 2003) (enforcing choice of law clause in an

action for fraud because it provided: "for any litigation arising out of or relating to [this] Agreement and transactions contemplated hereby"); *Mkt. Am., Inc. v. Google, Inc.*, No. C.A. 09-494-GMS, 2011 WL 1485616, at *3 (D. Del. Apr. 19, 2011) (holding the choice of law clause providing "for the purposes of adjudicating **all** disputes that may arise under this Agreement" sufficiently broad enough to be applied to a fraud claim) (emphasis added). Here, the choice of law clause provides for New York law "in **all** respects" and is therefore sufficiently broad enough to be applied to this dispute. *See* DX117, § 12.5 (emphasis added).

8.      It is also true that if no conflict exists between the laws of the different states, Delaware courts enforce choice of law provisions even if the chosen jurisdiction does not have a strong relationship to the litigation. *See Deuley v. DynCorp. Int'l, Inc.,* 8 A.3d 1156, 1161 (Del. 2010) (holding "the Court should avoid the choice-of-law analysis altogether" because "the result would be the same under both Delaware and Dubai law").

9.      As relevant here, New York and California law are in lockstep in binding a party to a contract that he signs without reading. *Compare Pimpinello v. Swift & Co*., 253 N.Y. 159, 162-63 (1930) ("If the signer could read the instrument, not to have read it was gross negligence; if he could not read it, not to procure it to be read was equally negligent; in either case the writing binds him.") *with Desert Outdoor Advert. v. Super. Ct.*, 196 Cal. App.4th 866, 872 (2011) ("A cardinal rule of contract law is that a party's failure to read a contract, or to carefully read a contract, before signing it is no defense to the contract's enforcement.").  In both jurisdictions, this remains true even where the signor is given only a signature page that he signs based on misrepresentations by the counterparty. *Compare Vulcan Power Co. v. Munson*, 89 A.D.3d 494 (N.Y. App. Div. 1st Dep't 2011) *with Forreststream Holdings Ltd. v. Shenkman*, No. 16-cv-01609-LB, 2017 WL 1112963, *8 (N.D. Cal. 2017) (citing *Vulcan Power Co.*, 89 A.D.3d 494).   Accordingly, it is

unnecessary to engage in a choice-of-law analysis since the result would be the same in both New York and California.

10.    Moreover, in the SDNY Action, the Goodwins acknowledged that "[t]he parties to this action [including themselves, of course] have not disputed that New York law governs in this contractual dispute," and went on to argue why they thought New York law supports their claims of fraud in the execution and fraudulent inducement. *See XXIII Capital Limited v. Decade S.A.C., LLC, et al.*, No. 1:17-cv-06910-GHW, Dkt. No. 201, at 13.  In this proceeding, however, the Goodwins have changed their argument.  But, this change of heart is unavailing because by affirmatively representing in the SDNY Action that New York law governs their fraud claims— which are the same claims they press here—the Goodwins waived their choice of law argument that California law controls the parties' dispute.  *See Baiul v. NBC Sports*, No. 15-CV-9920 (KBF), 2016 WL 1587250, at *12 (S.D.N.Y. Apr. 19, 2016), *aff'd sub nom. Baiul v. NBC Sports, a division of NBCUniversal Media LLC*, 708 F. App'x 710 (2d Cir. 2017) ("Plaintiffs' argument that California law applies similarly fails because plaintiffs have waived their choice of law argument by affirmatively representing that New York law applies in numerous prior filings in this action.").

11.    Accordingly, New York law governs the parties' dispute.

## III.    LEGAL STANDARDS GOVERNING THE TRUSTEE'S CLAIM

### A.    <u>Declaration of Enforceability of the SPA</u>

12.    Under New York law, "[t]he requirements for the formation of a contract are: (1) at least two parties with legal capacity to contract, (2) mutual assent to the terms of the contract, and (3) consideration." N.Y. Pattern Jury Instr.—Civil 4:1.  *See also Nadel v. Play-By-Play Toys & Novelties, Inc.*, 208 F.3d 368, 382 (2d Cir. 2000) (holding the "elements necessary to find a valid express or implied-in-fact contract" are consideration, mutual assent, legal capacity, and legal subject matter).

4864-9756-2882

### 1. Element 1: Capacity to Contract

13.    It is undisputed that the Goodwins and Decade had the legal capacity to enter into the SPA and the Other Transaction Documents.

14.    Indeed, the Goodwins regularly negotiate multi-million-dollar contracts. The Goodwins have represented more than 60 current or former NBA players (PX116, p. 14 ¶ 24), for whom they regularly negotiated 8- and 9-figure Player Contracts, including, as noted previously, on behalf of such household names as Lebron James, Gary Payton, Jason Kidd, Kevin Durant, Dwight Howard, and currently, Damian Lilliard and DeMar DeRozen. 10/12/21 Trial Tr. at 53:22-54:13 (A. Goodwin direct). The Goodwins have also represented clients in connection with major Endorsement Contracts, including with such companies as Nike, Coke, Pepsi, Toyota, and McDonald's. 10/12/21 Trial Tr. at 49:20-50:3 (A. Goodwin direct).

15.    Prior to the transactions at issue in this case, Aaron owned 100% of the issued and outstanding shares of GAME, and Eric owned 100% of the issued and outstanding shares of GSM. Stip. Facts ¶¶ 13, 17.

16.    Accordingly, the Goodwins had the legal capacity to enter into the SPA and the Other Transaction Documents to sell the shares of GAME and GSM to Decade.

### 2. Element 2: Mutual Assent

17.    The Goodwins and Decade had a mutual understanding concerning the terms of the SPA and the Other Transaction Documents and agreed that those contracts form an integrated contract that is an expression of all the terms agreed upon between them. *See* DX117, SPA, § 12.13 ("This Agreement, along with the other Transaction Agreements, set forth the entire understanding of Purchaser, Decade and each seller and supersedes all other agreements and understandings between those parties relating to the subject matter hereof and thereof.").

4864-9756-2882

18.     "The manifestation or expression of assent necessary to form a contract may be by word, act, or conduct which evinces the intention of the parties to contract." *In re Toscano*, 799 F. Supp. 2d 230, 249 (E.D.N.Y. 2011).

19.     Under New York law, "[i]t is well settled that the signer of an instrument is conclusively bound by its terms regardless of whether he actually read it, and that his mind never gave assent to the terms expressed is not material." *Lansco Corp. v. N.Y. Brauser Realty Corp.*, 63 A.D.3d 513, 514 (N.Y. App. Div. 1st Dep't 2009).

20.     As far back as 1930, New York's Court of Appeals held: "Ordinarily, the signer of a deed or other instrument, expressive of a jural act, is conclusively bound thereby. ***That his mind never gave assent to the terms expressed is not material***." *Pimpinello v. Swift & Co.*, 253 N.Y. 159, 162 (1930) (emphasis added). The Court continued, "[i]f the signer could read the instrument, not to have read it was gross negligence; if he could not read it, not to procure it to be read was equally negligent; in either case the writing binds him." *Pimpinello v. Swift & Co.*, 253 N.Y. 159, 162-63 (1930).

21.     New York courts have consistently upheld this rule. *See, e.g.*, *In re Toscano*, 799 F. Supp. 2d 230, 246 (E.D.N.Y. 2011) ("Absent a justifiable excuse for a failure to read the document, for Toscano not to have read [the Assignment Agreement] was gross negligence and his apparent decision not to procure it to be read was equally negligent. . . . The law is clear that in either case the writing binds him.") (alteration in original) (citations and internal quotation marks omitted); *U.S. Bank Nat'l Ass'n v. Ables & Hall Builders*, 696 F. Supp. 2d 428, 443 (S.D.N.Y. 2010) ("Unless there is a special relationship of trust between two parties, or the representing party has vastly superior knowledge, experience, or education, courts will not grant relief in situations where simply reading the contract would have settled the issue.").

22.     The rule is not diminished merely because the party was provided with only a signature page. *See Vulcan Power Co. v. Munson*, 89 A.D.3d 494 (N.Y. App. Div. 1st Dep't 2011) (The court found that "'[a] signer's duty to read and understand that which it signed is not 'diminished merely because [the signer] was provided with only a signature page.'") 2d alteration in original) (quoting *Hotel 71 Mezz Lender LLC v. Falor*, 64 A.D.3d 430, 430 (1st Dep't 2009)). *See also Burton v. Label, LLC*, 344 F. Supp. 3d 680, 693 (S.D.N.Y. 2018) ("'[A] signer's duty to read and understand that which it signed is not diminished merely because the signer was provided with only a signature page.'") (quoting *Dasz, Inc. v. Meritocracy Ventures, Ltd.*, 108 A.D.3d 1084 (N.Y. App. Div. 4th Dep't 2013)).

23.     The record is clear that the Goodwins signed the SPA's signature pages on February 12, 2016. JTPM Stip. Fact 81. On the same day, the Goodwins also signed the Other Transaction Documents. DX149; Stip. Fact ¶ 81. This alone supports a finding of mutual assent.

24.     As described in Section IV.A., this finding is not disturbed by the fact that the Goodwins did not read the SPA. As sophisticated parties, the Goodwins provided no evidence that they lacked the ability to review the SPA before signing. What the Goodwins lacked was the will. The Goodwins did not ask to review the agreement before signing it or in the ten-day period between signing and closing.  And, post-closing, when the Goodwins received a copy of the agreement, they did not read it then either. The Goodwins' conscious decision not to read the SPA does not negate the fact that they provided genuine signatures and are therefore legally bound by the SPA's terms.

25.     This finding is also not disturbed by the Goodwins' allegations that the Decade Employment Agreements are tainted with fraud.  As described in Section IV.A., the evidence introduced at trial established that Aaron consented to the attachment of his and his brother's

signatures to a version of the Employment Agreements that included Sections 27 and 28. This consent negates any allegation of fraud in the execution concerning those agreements.

### 3. Element 3: Consideration

26.    "Consideration is defined as some right, interest, profit or benefit accruing to one party, or some forbearance, detriment, loss, or responsibility, given, suffered, or undertaken by the other." *In re Toscano*, 799 F. Supp. 2d 230, 248 (E.D.N.Y. 2011) (citations and internal quotation marks omitted).

27.    The SPA and the Other Transaction Documents are supported by ample consideration—$35 million in exchange for all the issued and outstanding shares of GAME and GSM (Stip. Fact ¶ 86). *See* 11/16/21 Tr. 15:4-12 (C.A. Mulrain direct) ("It's like I'll give you this amount of money, so you enjoy that up front, but as consideration for that, I get this long-term revenue stream.").

28.    Because the terms of the SPA and the Other Transaction Documents are "complete, clear and unambiguous[,]" they must be interpreted according to their terms. *China Privatization Fund (Del.), L.P. v. Glaxy Ent. Grp. Ltd.*, 95 A.D.3d 769, 770 (N.Y. App. Div. 1st Dep't 2012) ("a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms").

29.    In sum, the parties had the capacity to contract and, as a matter of law, are deemed to have given their mutual assent to the SPA's terms. The record also establishes that the SPA was supported by ample consideration. As a result, the Trustee established his prima facie case that the SPA and its related agreements are valid, binding contracts enforceable according to their terms.

## IV.    LEGAL STANDARDS GOVERNING THE GOODWINS' COUNTERCLAIMS

30.    The Goodwins' only defense to the validity of the SPA and the Other Transaction Documents is that the Goodwins' signatures to the SPA and the Decade Employment Agreements

were procured by fraud.   As described more fully below, the Goodwins' defenses and counterclaims sounding in fraud are not supported by the law or the facts.

### A.    <u>Fraud in the Execution</u>

31.    Fraud in the execution is a limited exception to a well-settled principle that "a party is under an obligation to read a document before he or she signs it, and a party cannot generally avoid the effect of a [document] on the ground that he or she did not read it or know its contents." *Dasz, Inc. v. Meritocracy Ventures, Ltd*., 108 A.D.3d 1084, 1084 (N.Y. App. Div. 4th Dep't 2013) (alteration in original) (citations omitted).  *See also Marciano v. DCH Auto Grp*., 14 F. Supp. 3d 322, 330 (S.D.N.Y. 2014) (a party "is under an obligation to read a document before he or she signs it, and a party cannot generally avoid the effect of a [document] on the ground that he or she did not read it or know its contents.") (alteration in original) (quoting *Brandywine Pavers, LLC v. Bombard*, 108 A.D.3d 1209 (N.Y. App. Div. 4th Dep't 2013)).

32.    "As the Second Circuit has stated, 'a party will not be heard to complain that he has been defrauded when it is his own evident lack of due care which is responsible for his predicament.'" *In re Toscano*, 799 F. Supp. 2d 230, 246 (E.D.N.Y. 2011) (citing *Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc*., 343 F.3d 189, 195 (2d Cir.2003)). *See also 88 Blue Corp. v. Reiss Plaza Assocs.,* 183 A.D.2d 662, 664 (N.Y. App. Div. 1st Dep't 1992) (finding allegations of misrepresentation deficient where discrepancies were evident in documents appended to contract and therefore "party ha[d] means available to him for discovering, by the exercise of ordinary intelligence, the true nature of a transaction he [was] about to enter into.") (internal quotation marks omitted).

33.    Fraud in the execution occurs only when: (i) a party, through misrepresentation of a changed document, is "induced to sign something entirely different than what he thought he was signing," (*see Dalessio v. Kressler*, 6 A.D.3d 57, 61 (N.Y. App. Div 2d Dep't 2004)); and (ii) that

party is "excusably ignorant" of the terms of the document that he signed (*see McCaddin v. Se. Marine Inc.*, 567 F. Supp. 2d 373, 379 (E.D.N.Y. 2008) (holding that excusable ignorance is a necessary element of the fraud in the execution defense)).

### 1.    Element 1: Inducement Based on Misrepresentation

34.    Based on the evidence adduced at trial, the Goodwins were not "induced to sign something entirely different than what [they] thought [they were] signing" based on an alleged misrepresentation regarding the transaction.  *Dalessio v. Kressler*, 6 A.D.3d 57, 61 (N.Y. App. Div. 2d Dep't 2004).

35.    At the outset, there is no evidence in the record that Decade mispresented any material facts whatsoever directly to Eric.

36.    According to the Goodwins, two alleged misrepresentations apparently flowed from Aden to Aaron. *See* 10/12/21 Trial Tr. at 31:17-18 and 33:4-6.  *First*, the Goodwins assert that Aden assured Aaron that the SPA included the exact same terms as the Stealth Deal. *See* 10/12/21 Trial Tr. at 32:6-18.   *Second*, the Goodwins assert that Aden accepted Aaron's edits to the Decade Employment Agreements that struck Sections 27 and 28. *See* 10/12/21 Trial Tr. at 33:1-19.

37.    Both alleged misrepresentations are not supported by the trial record.

#### a.    *Alleged Misrepresentation Regarding the SPA*

38.    With respect to the SPA, Aaron conceded that after the Stealth Deal fell through, James, Aden and Aaron conceptualized a *different* deal for the sale and purchase of GAME and GSM with a new structure—namely, the Decade Deal. Specifically, Aaron "told him at that point that everything was **different**. We needed a **different** agreement." 10/12/21 Trial Tr. at 72:17-18 (A. Goodwin Direct) (emphasis added). *See also* DX145, p. 183 ("The LOI is under Stealth Chris which is not happening. Means nothing at this point.").

39.     The trial evidence therefore shows the Goodwins were fully aware that the Stealth Deal was not identical to the Decade Deal.

40.     Moreover, as described more fully below, the Goodwins cannot establish their reasonable reliance on any alleged misrepresentations concerning the SPA's terms because they signed the contract without reading it.

        **b.**      ***Alleged Misrepresentation Regarding the Decade Employment Agreements***

41.     With respect to the Decade Employment Agreements, the trial evidence established that there was no fraudulent misconduct because Aaron was fully aware that the unilateral—and deal-breaking—edits he made to the Decade Employment Agreements on February 12, 2016 were not accepted by Decade or 23 Capital.

42.     On February 12, 2016, Aaron crossed out Sections 27 and 28 from the Decade Employment Agreements, signed the version with his proposed edits, and then faxed that version to Aden. DX149; Stip. Fact ¶ 81. According to the Goodwins, that is where the story ends.

43.     But the evidence shows that after Aaron sent the Fax on February 12, 2016 with his proposed edits, Aaron was expressly told that further changes were being made to the Decade Employment Agreements because Aaron's proposed edits were unacceptable. *See* Stip. Fact ¶ 82 ("Call me . . . The Employment Doc is wrong.); 10/26/21 Trial Tr. at 31:6-18 (A. Goodwin cross) ("Q. On February 12th, 2016, you faxed copies of the employment agreement and certain other documents to Chris Aden at his home, right? A. Yes, sir. Q. Okay. And then, after you faxed it, Chris texted you and said that – he asked you to call him because the document was wrong. A. That is correct, sir. Q. Okay. And after that, you spoke to him, right? A. Yes, I did, sir. Q. And you spoke to Tony Mulrain, right? A. Yes. Different times, but I spoke to Chris directly when he said call him, sir.").

44.    More specifically, Decade and 23 Capital were insisting that Sections 27 and 28 needed to be part of the overall transaction and Aaron's proposed edit to strike them was impossible to accept. *See* 11/16/21 Trial Tr. at 27:5-12 (C.A. Mulrain direct) ("I seem to recall that there was some discussion between Aaron and Chris where Chris told Aaron this isn't what we agreed to, like you can't take this section out of the agreement, something to that effect.").

45.    After discussions with Mulrain and Aden, Aaron understood the importance of Sections 27 and 28 and agreed to restore both provisions in the Decade Employment Agreements. *See* 11/16/21 Trial Tr. at 48:5-21 (C.A. Mulrain cross) ("Mr. Goodwin came to understand that unless there was an assignment of revenue, there was no deal, there was no business. And so we talked about it, and I admit we talked about it a lot, but, ultimately, he understood that that assignment if you're not doing that, it's a nonstarter; this transaction cannot close."); 11/16/21 Trial Tr. at 43:4-21 (C.A. Mulrain cross) ("[U]ltimately, Aaron understood that he couldn't get the payment from Decade without assignment the revenue streams from the contracts."); 11/16/21 Trial Tr. at 48:5-21 (C.A. Mulrain cross) ("Q. Did you have any conversation with Mr. Aaron Goodwin where he accepted paragraphs 27 and 28 in the employment agreement? A. Yeah, because Aaron knew that the transaction wasn't going to – Q. Let's try – maybe I can ask the question – THE COURT: Mr. Miller – Mr. Miller, you don't interrupt the witness. If you have a problem with that, talk to co-counsel; he'll let you know that's a rule here. Mr. Mulrain, you may finish. THE WITNESS: The answer was yes, because Mr. Goodwin came to understand that unless there was an assignment of revenue, there was no deal, there was no business. And so we talked about it, and I admit we talked about it a lot, but, ultimately, he understood that that assignment if you're not doing that, it's a nonstarter; this transaction cannot close."); 11/16/21 Trial Tr. at 21:17-18 (C.A. Mulrain direct); 11/16/21 Trial Tr. at 21:6-16 (C.A. Mulrain direct) ("Q. Did you ever

discuss that concept [the assignment] with Aaron Goodwin? A. Absolutely. We talked – I mean, we talked – we talked about it. It's like I can remember saying to Aaron, Aaron, if you're not going to assign the revenue, then there's no deal, there's no reason why Decade would give you whatever the number was, $10 million, without getting something in return. Like you don't – you don't do this deal and hand somebody $10 million today, unless you're expecting that you're going to enjoy a revenue stream that exceeds that number tomorrow. I mean, if – yes, we talked about it.").

46.    Aaron "certainly said, I understand that this assignment is absolutely critical, I get it, and that's why the transaction moved forward, because he understood that that had to happen in order for him to get what he was looking for in the deal, which was the 10 million or whatever the payment was. Aaron understood it." *See* 11/16/21 Trial Tr. at 48:23-49:11 (C.A. Mulrain cross).

47.    With Aaron's express approval, Decade restored amended versions of Sections 27 and 28. 11/16/21 Trial Tr. at 28:24-29:11(C.A. Mulrain direct); 11/16/21 Trial Tr. at 40:16-20 (C.A. Mulrain cross); 11/16/21 Trial Tr. at 43:4-21 (C.A. Mulrain cross); 11/16/21 Trial Tr. at 48:5-21 (C.A. Mulrain cross); 11/16/21 Trial Tr. at 48:23-49:11 (C.A. Mulrain cross).

48.    Decade's counsel then affixed the Goodwins' signature pages to the Decade Employment Agreements. 11/16/21 Trial Tr. at 49:24-50:5 (C.A. Mulrain cross).

49.    The Goodwins did not bother to request or review a countersigned version of the Decade Employment Agreements immediately following the closing, but they received copies of the Decade Employment Agreements on April 20, 2016.  Stip. Fact ¶ 96; PX049; PX050.

50.    The Goodwins were therefore entirely aware of the changes being made to the Decade Employment Agreements—and consented to such changes, both expressly and tacitly.

51.    Accordingly, the evidence does not support a finding that Decade misrepresented any material facts regarding the transaction to the Goodwins.

## 2.    Element 2: Excusable Ignorance

52.    The Goodwins cannot demonstrate that they were "excusably ignorant" of the terms of the SPA or the Other Transaction Documents.

53.    "Excusable ignorance" is most commonly found when the signatory is "illiterate, blind, or not a speaker of the language in which the document is written." *Ackerman v. Ackerman*, 120 A.D.3d 1279, 1280 (N.Y. App. Div. 2d Dep't 2014).   Nevertheless, Courts require even these parties to demonstrate that they endeavored to have the contract read to them and simply did not rely on the misrepresentation of others.  *See Nerey v. Greenpoint Mortg. Funding, Inc.*, 144 A.D.3d 646, 648, 40 N.Y.S.3d 510 (N.Y. App. Div. 2016) ("An inability to understand the English language, without more, is insufficient to avoid this general rule.") (citing *Holcomb v. TWR Express, Inc.*, 11 A.D.3d 513, 514 (N.Y. App. Div. 2d Dep't 2004)).

54.    "That his mind never gave assent to the terms expressed is not material. If the signer could read the instrument, not to have read it was gross negligence; if he could not read it, not to procure it to be read was equally negligent; in either case the writing binds him." *Pimpinello v. Swift & Co.*, 253 N.Y. 159, 162-63 (N.Y. 1930).

55.    This notion applies with even greater force in the commercial space; a signatory's execution of an agreement without reading it can be viewed as gross negligence, making it highly unlikely a court would refuse to enforce a contract because of fraud. *See Gillman v. Chase Manhattan Bank, N.A.*, 73 N.Y.2d 1, 11-12 (1988).  Accordingly, New York courts are particularly unsympathetic towards sophisticated parties that allege fraud in the execution. *See U.S. Bank Nat'l Ass'n v. Ables & Hall Builders*, 696 F. Supp. 2d 428, 444 (S.D.N.Y. 2010) ("When businesspeople engaged in major transactions fail to exercise care in their affairs, New York courts are particularly disinclined to entertain claims of justified reliance.") (citations and internal quotation marks omitted); *UST Priv. Equity Invs. Fund, Inc. v. Salomon Smith Barney*, 288 A.D.2d 87, 88 (N.Y.

App. Div. 1st Dep't 2001) (holding that, as a matter of law, a sophisticated plaintiff cannot establish justifiable reliance on alleged misrepresentations if plaintiff failed to make use of the means of verification); *Dasz, Inc. v. Meritocracy Ventures, Ltd.*, 108 A.D.3d at 1085 (holding that "[d]efendants have failed to proffer a valid excuse as to why the complete documents could not have been procured prior to their signing, and we conclude that the failure of [defendant], who we note is an attorney and a sophisticated party, to read the note and mortgage before singing them 'prevents him from establishing justifiable reliance, an essential element of fraud in the execution'").

56.     Accordingly, even where a party has been induced by misrepresentations to sign a contract without reading it, the law binds the signer to the contract. *See, e.g.*, *Dasz, Inc. v. Meritocracy Ventures, Ltd.*, 108 A.D.3d 1084 (reversing trial court decision and granting plaintiff's motion for summary judgment where defendant asserted plaintiff's counsel fraudulently misrepresented contents of contract, defendant did not read contract and executed only signature pages); *Vulcan Power Co. v. Munson*, 89 A.D.3d 494 (affirming trial court's grant of summary judgment to plaintiff declaring the subject contract to be legal and binding and holding that defendant's failure to read the subject contract precluded him from asserting a fraud in the execution defense). *See also Sorenson v. Bridge Cap. Corp.*, 52 A.D.3d 265, 265-66 (N.Y. App. Div. 1st Dep't 2008) (affirming grant of defendants' motion for summary judgment on plaintiff's fraud claim which sought to avoid amended agreements he signed without reading as a result of fraud by defendant); *Friedman v. Fife*, 262 A.D.2d 167, 167-68 (N.Y. App. Div. 1st Dep't 1999) (affirming grant of pre-answer motion to dismiss plaintiff's fraud claims because the contract he signed without reading contained all of the material terms plaintiff now claims were misrepresented to him).

57.     As businesspeople who routinely negotiate multi-million-dollar contracts on behalf of professional athletes, the Goodwins are decidedly sophisticated parties, who are held under New York law to a higher standard to perform due diligence prior to signing a contract. *See* PX116, p. 14 ¶ 24; 10/12/21 Trial Tr. at 49:20-50:3, 53:22-54:13 (A. Goodwin direct).

58.     Nevertheless, Eric testified that he signed the signature pages of the SPA even though he "had not seen" the agreement. *See* 10/26/21 Trial Tr. at 99:14-19 (E. Goodwin direct).

59.     Similarly, Aaron testified that he had not seen the SPA when he signed the SPA signature pages on February 12, 2016 and faxed them to Aden. *See* 10/12/21 Trial Tr. at 117:22-118:1 (A. Goodwin direct) ("Q. Prior to 12/1/2016, had you ever reviewed the share purchase agreement? A. The one that they sent, sir, or in the beginning? Q. The one that was attached to this email. A. No, sir."); 10/12/21 Trial Tr. at 118:8-11 (A. Goodwin direct) ("Q. So had anyone ever sent you a copy of this share purchase agreement that was attached to you -- to this email on 12/1/2016? A. No, sir."); 10/13/21 Trial Tr. at 14:5-9 (A. Goodwin direct) ("Q. And prior to December 1st, 2016, had you ever received a copy of the SPA from Mr. Aden? A. No, sir. Q. From anyone else? A. No, sir."); 10/26/21 Trial Tr. at 70:24-71:9 (A. Goodwin cross) ("Q. You hadn't seen the SPA, had you, at that point in time [February 2016]? A. No. Q. So you didn't make any changes to the SPA because you hadn't seen it yet? A. No, I did not.").

60.     Even assuming Decade misrepresented that the terms of the Decade Deal were identical to the terms of the earlier, aborted Stealth Deal, the Goodwins' failure to read the SPA is fatal to their fraud-based defenses and counterclaims.  As a matter of law, the Goodwins cannot establish their reasonable reliance on Decade's alleged misrepresentations where they failed to read the contract before signing it.

61.     The Goodwins' arguments concerning alleged fraud relating to the Decade Employment Agreements do not change the result.

62.     Initially, even if the Goodwins read the Decade Employment Agreements, reading only a portion of a contract falls short of the obligation to read the entire contract prior to signing it. *See Republic Nat'l Bank v. Hales*, 75 F. Supp. 2d 300, 313–14 (S.D.N.Y. 1999), *aff'd sub nom. HSBC Bank USA v. Hales*, 4 F. App'x 15 (2d Cir. 2001) ("[W]hether or not a party to an agreement has actually read and understood all portions of an agreement, the law generally assumes that he has."); *Sorenson v. Bridge Capital Corp.*, 52 A.D.3d 265, 266 (1st Dep't 2008) (holding that where a party re-read only those sections he was told changed prior to signing the agreement, he would be bound); *Matter of Barone (M & K Realty Co.)*, 143 A.D.2d 1008, 1009 (1988) (holding that a party is bound by twelve page agreement even where the party only reviewed two pages of it).

63.     However, Eric conceded that he did not read the Decade Employment Agreements either.  *See* 10/26/21 Trial Tr. at 92:9-93:5 (E. Goodwin direct); PX139 at 235:13- 237:12 ("Q. On the signature page it states, 'The Parties sign this Employment Agreement intending to be bound by its terms, to be effective as of the consummation of the Purchase Transaction.' Prior to signing this page, did you request from anyone at Decade a copy of the employment agreement? A. No. Can I state for the record, I also don't remember seeing it on top of it when I signed it."). Eric's failure to read a copy of either the SPA or the Decade Employment Agreements at any point in the execution process single-handedly defeats his fraud in the execution counterclaim.

64.     More importantly, as described in Section IV.A., the alleged fraud concerning the Decade Employment Agreements never happened.

**B.**    **Fraudulent Inducement**

65.    Under New York law, fraud in the inducement occurs only when there is evidence of: (i) "a material misrepresentation or omission that induced the party to sign the contract;" (ii) "scienter;" (iii) "reliance;" and (iv) "injury." *Davidowitz v. Patridge*, No. 08 Civ. 6962 NRB, 2010 WL 5186803, at \*7 (S.D.N.Y. Dec. 7, 2010).

### 1.    Element 1: Material Misrepresentation or Omission

66.    For the same reasons articulated in Section IV.A., the evidence falls short of establishing that Decade made any material misrepresentation or omission.

### 2.    Element 2: Scienter

67.    "Under New York law, the scienter element of fraud requires that the plaintiff [or counterclaim plaintiff] demonstrate that the defendant [or counterclaim defendant] made a false representation which was either known to be untrue or made with reckless disregard of its truth and which was made with the intent to deceive and to induce the plaintiff [or counterclaim plaintiff] to part with or refrain from obtaining something of value, thereby causing injury." *Travelers Indem. Co. of Ill. v. CDL Hotels USA, Inc.*, 322 F. Supp. 2d 482, 502 (S.D.N.Y. 2004) (internal citations and quotations omitted).

68.    With respect to the SPA, the Goodwins allege Decade misrepresented that the Decade Deal was a mirror image of the Stealth Deal.

69.    But Aaron conceded at trial that he completely understood the Decade Deal "needed a different agreement" because "everything was different." 10/12/21 Trial Tr. at 72:17-18 (A. Goodwin direct). *See also* DX145, p. 183 ("The LOI is under Stealth Chris which is not happening. Means nothing at this point."). Put simply, the record does not support the finding that Decade falsely represented that the Decade Deal and the Stealth Deal were identical because the parties clearly understood that the transactions were different.

70.     With respect to the Decade Employment Agreements, the alleged false representation relates to the inclusion of Sections 27 and 28. To prevail on this claim, the Goodwins must demonstrate that Decade expressly told the Goodwins that those provisions were <u>not</u> going to be included in the final version of the Decade Employment Agreements.  The evidence does not support this finding. Indeed, the evidence supports the opposite.

71.     Throughout the parties' negotiations concerning the Decade Employment Agreements, Decade consistently insisted on its position that Sections 27 and 28 needed to remain in the Decade Employment Agreements.  *See* 11/16/21 Trial Tr. at 27:5-12 (C.A. Mulrain direct) ("I seem to recall that there was some discussion between Aaron and Chris where Chris told Aaron this isn't what we agreed to, like you can't take this section out of the agreement, something to that effect."). Decade's reasoning was simple: Sections 27 and 28 were required by Decade's lender, 23 Capital, who would not agree to make the loan Decade needed to consummate its purchase of GAME and GSM unless the underlying transaction documents contained the terms the lender wanted.

72.     Every version of the Decade Employment Agreements that was sent on Decade's behalf included Sections 27 and 28.  Indeed, the only version of the Decade Employment Agreements that did *not* include Sections 27 and 28 is the one that Aaron unilaterally marked up on February 12, 2016. *Compare* DX149 *with* DX40; DX047; DX051; DX058; DX061; DX117; PX144; PX147; PX149.

73.     No written correspondence exists where Decade or 23 Capital agreed to remove Sections 27 and 28 from the Decade Employment Agreements.

74.     Because Decade did not waver from its position that Sections 27 and 28 needed to remain in the Decade Employment Agreements, the Goodwins cannot establish scienter.

### 3.    Element 3: Reliance

75.    A party seeking to avoid a contract due to fraud must demonstrate that in entering the agreement, he justifiably relied to his detriment upon a false representation of a material fact. *See Cont'l Airlines, Inc. v. Lelakis*, 943 F. Supp. 300, 305 (S.D.N.Y. 1996), *aff'd*, 129 F.3d 113 (2d Cir. 1997). *See also Waggoner v. Caruso*, 68 A.D.3d 1 (N.Y. App. Div. 1st Dep't 2009), *aff'd*, 14 N.Y.3d 874 (2010); *Meyercord v. Curry*, 38 A.D.3d 315, 316 (N.Y. App. Div. 1st Dep't 2007).

76.    Reasonable reliance is not established if "the misrepresentation could have been discovered through the exercise of due diligence." *Blue Water Env't, Inc. v. Inc. Vill. of Bayville*, N.Y., 12 Misc. 3d 1169(A), at *7 (Sup. Ct. Nassau Cnty.), *adhered to in part*, 13 Misc. 3d 1211(A) (Sup. Ct. Nassau Cnty. 2006), and *aff'd as modified sub nom.*, 44 A.D.3d 807 (N.Y. App. Div. 2d Dep't 2007).   *See U.S. Bank Nat. Ass'n v. Ables & Hall Builders*, 696 F. Supp. 2d 428, 444 (S.D.N.Y. 2010) ("When businesspeople engaged in major transactions fail to exercise care in their affairs, New York courts are particularly disinclined to entertain claims of justified reliance.") (internal citations and quotations omitted). *See also Zanett Lombardier, Ltd. v. Maslow*, 29 A.D.3d 495, 496 (N.Y. App. Div. 1st Dep't 2006) ("Nor could plaintiffs, as sophisticated investors, validly claim justifiable reliance under these circumstances, as they could have discovered the underlying condition and true nature of both companies by ordinary intelligence or with reasonable investigation"); *Colasacco v. Robert E. Lawrence Real Estate*, 68 A.D.3d 706, 708 (N.Y. App. Div. 2d Dep't 2009) ("[I]t is clear from the face of the complaint that the plaintiffs' supposed reliance upon DiCorato's alleged misrepresentations concerning the location of the property's boundary lines was unreasonable as a matter of law" because "the plaintiffs could easily have ascertained these facts through the use of ordinary means."); *Plaza Penthouse LLLP v. CPS 1 Realty LP*, 24 Misc. 3d 1238(A), at *4 (Sup. Ct. N.Y. Cnty. 2009) ("Plaintiff would not be justified on relying on any alleged misrepresentations if the facts were not peculiarly within defendants'

knowledge and plaintiff had the means to discover the truth by the exercise of ordinary intelligence.") (internal citations and quotations omitted); *Big Apple Consulting USA, Inc. v. Belmont Partners, LLC*, 20 Misc. 3d 1144(A), at *4 (Sup. Ct. Nassau Cnty. 2008) ("A party cannot claim justifiable reliance on a misrepresentation when that party could have discovered the truth with due diligence.").

77.     The record is devoid of any representations (or misrepresentations) directly flowing from Decade to Eric. *See* 10/26/21 Trial Tr. at 115:13-15 (E. Goodwin cross) ("Q. . . . Mr. Goodwin, did you ever have any communications with anyone at Decade regarding your employment agreement? A. No."). Accordingly, the only statements that Eric is alleged to have relied upon are those coming from Aaron. *See* 10/26/21 Trial Tr. at 115:13-15 (E. Goodwin cross) ("Q. Did you have communications with your brother regarding the employment agreement?  A. Yes.").

78.     As described above, despite being a sophisticated party, Eric did not read either the SPA or the Decade Employment Agreements at any phase during the execution process. *See* 10/26/21 Trial Tr. at 99:14-19 (E. Goodwin direct) (testifying that he "had not seen" the SPA when signing the signature page); 10/26/21 Trial Tr. at 92:9-93:5 (E. Goodwin direct) PX139 at 235:13-237:12 ("Q. On the signature page it states, 'The Parties sign this Employment Agreement intending to be bound by its terms, to be effective as of the consummation of the Purchase Transaction.' Prior to signing this page, did you request from anyone at Decade a copy of the employment agreement? A. No. Can I state for the record, I also don't remember seeing it on top of it when I signed it.").

79.     Similarly, Aaron testified that he had not seen the SPA when he signed the SPA signature pages on February 12, 2016 and faxed them to Aden. *See* 10/12/21 Trial Tr. at 117:22-118:1 (A. Goodwin direct) ("Q. Prior to 12/1/2016, had you ever reviewed the share purchase agreement? A. The one that they sent, sir, or in the beginning? Q. The one that was attached to this

email. A. No, sir."); 10/12/21 Trial Tr. at 118:8-11 (A. Goodwin direct) ("Q. So had anyone ever

sent you a copy of this share purchase agreement that was attached to you – to this email on

12/1/2016? A. No, sir."); 10/13/21 Trial Tr. at 14:5-9 (A. Goodwin direct) ("Q. And prior to

December 1st, 2016, had you ever received a copy of the SPA from Mr. Aden? A. No, sir. Q. From

anyone else? A. No, sir."); 10/26/21 Trial Tr. at 70:24-71:9 (A. Goodwin cross) ("Q. You hadn't

seen the SPA, had you, at that point in time [February 2016]? A. No. Q. So you didn't make any

changes to the SPA because you hadn't seen it yet? A. No, I did not.").

80.     The Goodwins' failure to read the final versions of the SPA prevents them from

asserting justifiable reliance on any alleged misrepresentations with respect to its contents. *See*

*Sorenson v. Bridge Cap. Corp*., 52 A.D.3d 265, 266 (N.Y. App. Div. 1st Dep't 2008) ("Plaintiff's

negligent failure to read the agreements prevents him from establishing justifiable reliance, an

essential element of fraud in the execution."). Indeed, had the Goodwins merely read the SPA,

they would have understood exactly where it deviated from the Stealth Deal.

81.     Turning to the Decade Employment Agreements, as described in Section IV.A., the

alleged fraud never occurred because Aaron understood that Sections 27 and 28 needed to be part

of the overall transaction in order for the deal to close.

### 4.      Element 4: Injury

82.     "To prove damage in a fraud action, a plaintiff must demonstrate that the

defendant's conduct proximately caused her economic harm." *Kaye v. Grossman*, 202 F.3d 611,

614 (2d Cir. 2000).

83.     It is axiomatic that "[a] fraud verdict may not rest on allegations of speculative or

remote injury to the [party alleging fraud]; rather, the [party alleging fraud] must have suffered

losses as a direct, immediate, and proximate result of the [other party's] misrepresentation.*" Kaye*

*v. Grossman*, 202 F.3d 611, 614 (2d Cir. 2000) (internal citation and quotation marks omitted).

*See also Kregos v. Associated Press*, 3 F.3d 656, 665 (2d Cir. 1993) ("New York law awards only 'out-of-pocket' expenses in fraud cases, entitling [the party alleging fraud] to damages solely for their actual pecuniary losses.").

84.    "An act of deception, entirely independent or separate from any injury, is not sufficient to state a fraud claim." *Smith v. Smith*, No. 13-CV-1635 (SJF)(ARL), 2014 WL 4425807, at *8 (E.D.N.Y. Sept. 5, 2014) (*quoting Small v. Lorillard Tobacco Co.*, 94 N.Y.2d 43, 57 (1999)).

85.    The Goodwins alleged no damage whatsoever in connection with their fraud claims. The Goodwins do not explain their damages except that "as a result of Debtors' fraud, the Goodwins have lost income and suffered damage to their reputation." *See* Defendants' Answer with Counterclaims and Affirmative Defenses to Trustee's Complaint for Declaratory Judgment, D.I. 7 at ¶ 123. This explanation of damages is insufficient.

86.    Thus, even assuming the Goodwins established that Decade made misrepresentations in connection with the SPA and/or the Decade Employment Agreements, the Goodwins failed to satisfy their burden to demonstrate that any injury flowed from that deception.

87.    Moreover, the record makes clear that the Goodwins received $9.5 million following the closing, and also kept most of the commission payments made by the players, which payments had effectively been sold to Decade under the SPA. *See* Stip. Fact ¶ 88 ("Decade made the $9.5 million upfront payment to the Goodwins and to third parties on the Goodwins' behalf"); 10/12/21 Trial Tr. (A. Goodwin direct) at 119:13-23 (testifying that the Goodwins kept 62.5% of the receivables from Damian Lillard and DeMar DeRozan and 50% of the receivables from other clients).

88.    The SPA required that Decade make an initial payment to the Goodwins of $9.5 million at closing. *See* PX066 (SPA § 2.3(b)) ("On the Closing Date, Purchaser shall pay Sellers

an aggregate cash amount of Nine Million Five Hundred Thousand and No/100 dollars ($9,500,000) less any Closing Indebtedness Payoff Amount  (which shall be paid by the Purchaser at the closing on behalf of GAME and GSM to the holders of the Closing Indebtedness), via wire transfer in immediately available funds for deposit in the account(s) of the Sellers as set forth in Section 2.3 of the Disclosure Schedule.").

89.     Following the closing, the Goodwins indisputably received the expected compensation.  *See* PX070, PX072, PX079.

90.     As such, the Goodwins cannot establish an essential element of their fraud claim—damages.

### 5.     Ratification

91.     Even where a party can establish all four elements of a fraudulent inducement claim, a contract that is voidable for fraud may nevertheless be "ratified by the party to whom the false representation was made." *Blue Water Env't, Inc. v. Inc. Vill. of Bayville, N.Y.*, 12 Misc. 3d 1169(A), at *7 (Sup. Ct. Nassau Cnty.), *adhered to in part*, 13 Misc. 3d 1211(A) (Sup. Ct. Nassau Cnty. 2006), and *aff'd as modified sub nom. Blue Water Env't, Inc. v. Inc. Vill. of Bayville*, 44 A.D.3d 807 (N.Y. App. Div. 2d Dep't 2007). *See McLean v. Balkoski,* 125 A.D.2d. 234, 235–36 (N.Y. App. Div. 1st Dep't 1986) ("Plaintiff's attempt to repudiate the agreement on the grounds that it was the product of fraud, duress and overreaching must also fail, since by her conduct subsequent to the execution of the agreement [—among other things, acceptance of support payments—] she ratified it."); *Silva Run Worldwide Ltd. v. Gaming Lottery Corp.*, No. 96 Civ. 3231(RPP), 1998 WL 167330, at *23 (S.D.N.Y. Apr. 8, 1998) ("[P]laintiff, in effect, further ratified the IPI subscription agreement by failing to seek rescission promptly after learning that the agreement had been finalized. . . . The IPI transaction occurred in late August 1995 . . . but plaintiff did not seek rescission for approximately six months.") (internal citations omitted); *Votta v. Votta*

*Enters.,* 249 A.D.2d 536, 537 (N.Y. App. Div. 2d Dep't 1998) (mortgage debt deemed ratified where borrowers "continu[ed] to make payments for approximately 18 months after discovery of the alleged fraud").

92.    Following the closing, both Decade and the Goodwins began to conduct themselves consistently with the obligations in the SPA and the Other Transaction Documents, and all parties accepted the benefits of the other's performance. *See Colburn Fam. Found. v. Chabad's Child. of Chernobyl,* No. 06 Civ. 2351 (RMB), 2013 WL 1870087, at *6 (S.D.N.Y. May 1, 2013) ("Plaintiff's attempt to repudiate the agreement on the grounds that it was the product of fraud, duress and overreaching must also fail, since by her conduct subsequent to the execution of the agreement [—among other things, acceptance of support payments—] she ratified it.") (internal citation and quotation marks omitted).

93.    For example, the SPA called for Decade to make an initial payment to the Goodwins of $9.5 million. *See* Stip. Fact ¶¶ 87, 88; PX066 (SPA § 2.3(b)). The Goodwins stipulate that "Decade made the $9.5 million upfront payment to the Goodwins and to third parties on the Goodwins' behalf." *See* Stip. Fact ¶ 88.

94.    The Goodwins also acted as though Decade had acquired the shares of GAME and GSM and that they were now Decade employees, just as the SPA and the Decade Employment Agreements provided. For example, on April 4, 2016, Eric and Aaron collaborated on the text of a draft e-mail to send to some of their employees, "describing the closing of the sale of GSM to Decade." *See* Stip. Fact ¶¶ 92, 93 (Eric e-mailed the draft to Aaron and Aaron responded the same day, "that's cool"). The next day, April 5, 2016, they sent the e-mail to these employees under the subject heading "GSM Announcement." Stip. Fact ¶ 94. That same month, "the Goodwins sent Decade their and their employees' confidential personal information, completed W4 Forms and/or

W9 Forms for the purpose of Decade setting up payroll." Stip. Fact ¶ 95. And, the Goodwins and their accountant discussed in May 2016 how, in light of the full execution and closing of the SPA and Other Transaction Documents, "we have to stop using the GAME accounts immediately" and "[t]his is a done deal." Stip. Fact ¶¶ 103, 104

95.    On April 20, 2016, Aden sent Aaron a copy the Decade Employment Agreement between Aaron and Decade Executives that included Sections 27 and 28. Stip. Fact ¶ 96; PX049; PX050.

96.    Significantly, in April 2016, even after noticing that Sections 27 and 28 were in the Decade Employment Agreements – that the versions of the Decade Employment Agreements differed from those Aaron sent in the Fax (10/12/21 Trial Tr. at 111:10-23 (A. Goodwin direct)) – *the Goodwins continued to perform in accordance with those agreements for nearly a year*. The Goodwins did not object to its terms and continued to remit some, but not all, of the amounts owed to Decade S.A.C and Decade Contracts under the SPA. Stip. Fact ¶ 91 (stipulating that the Goodwins made payments to Decade between April 2016 and May 2017, on an approximately bimonthly basis, totaling $1,747,512.67).

97.    Both Aaron and Eric admitted at their depositions that these payments were in satisfaction of obligations owed by the Goodwins to Decade under the parties' agreements. *See* PX134, A. Goodwin Dep. Tr. 348:9-16 ("From April to October [2016] we never focused on anything other than we paid them what they were owed and we continued to move forward."); PX139, E. Goodwin Dep. Tr. 238:7-21 ("We provided payments to them based on the agreement that we had with them. . . . I don't think we missed payments as of this date, so I would guess that we were still sending them their shares of what we agreed upon with them.").

98.     The Goodwins also continued to accept compensation from Decade as employees. *See* PX070; PX072; PX079.  Decade also paid former GAME and GSM employees in salary, expense reimbursement, and other expenses for at least several months following the closing of the SPA. PX070.

99.     On September 27, 2016, Elliott continued to advise former GAME and GSM employees that the companies were "sold to Decade last February" and that "Decade now owns 100% of the common stock of GSM" and to stop using the GAME and GSM letterheads on their billing invoices. PX082.

100.     Four months after Eric received the SPA, he further ratified its terms by telling Elliott, "GSM is now closed and no longer taking in fees[.] [T]hose Decade guys purchased all the 'stock' in GSM . . . ." PX082.

101.     In November 2016 and through April 2017, Aaron sent his clients' contracts to Aden. PX083; PX084; PX085; PX086; PX087; PX089; PX090; PX094; PX095.

102.     The Goodwins are estopped from arguing they justifiably relied on any alleged misrepresentations because they accepted the benefits of the SPA and the Other Transaction Documents (including the Decade Employment Agreements), and continued to perform under those agreements even after noticing the alleged misrepresentations. *See, e.g.*, *Banque Nationale de Paris v. 1567 Broadway Ownership Assocs.*, 214 A.D.2d 359, 361 (N.Y. App. Div. 1st Dep't 1995) (holding that "the equitable doctrines of estoppel, waiver and ratification bar appellants from withdrawing their assent to the 1992 mortgage modification, where, as here, appellants waited two years before seeking to repudiate their contractual commitments to the plaintiff bank, after the appellants had enjoyed the financial benefits of the modification"); *McLean v. Balkoski*, 125 A.D.2d 234, 236 (N.Y. App. Div. 1st Dep't 1986) (holding that plaintiff's "course of conduct

served to ratify the agreement" where she "accepted support payments from defendant for over six years without raising any objections and received 80% of the proceeds of the sale of their cooperative apartment pursuant to the terms of the agreement").

103.    Relatedly, the Goodwins are estopped from seeking rescission of the SPA and/or the Decade Employment Agreements because, as discussed above, they continued to perform for over a year before seeking recission and unreasonably delayed in asserting their claim for rescission. "Rescission claims have consistently been dismissed due to failure to seek the relief in less than one year." *Asset Mgmt. Assocs. of N.Y., Inc. v. Emerson Telecomm. Prods. LLC*, No. 08-CV-2506 (TCP) (ARL), 2011 WL 318100, at *4 (E.D.N.Y. Jan. 25, 2011); *accord Silva Run Worldwide Ltd. v. Gaming Lottery Corp.,* No. 96 CIV. 3231 (RPP), 1998 WL 167330, at *23 (S.D.N.Y. April 8, 1998) (dismissing rescission claims in part because Plaintiff "did not seek rescission for approximately six months"); *88 Blue Corp. v. Reiss Plaza Assocs.,* 183 A.D.2d 662, 664 (N.Y. App. Div. 1st Dep't 1992) (affirming order of summary judgment in part because of the "eleven month delay between the time that plaintiff first acquired knowledge of the [alleged fraud] and [when Plaintiff] took any steps to rescind the agreement").

104.    "[R]escission to be effective must be announced without unreasonable delay." *Schenck v. State Line Tel. Co.*, 238 N.Y. 308, 313 (1924) (Cardozo, J.); *accord Allen v. WestPoint–Pepperell, Inc*., 945 F.2d 40, 47 (2d Cir. 1991)*; United States Postal Serv. v. Phelps Dodge Refining Corp.,* 950 F.Supp. 504, 517–18 (E.D.N.Y. 1997). This requirement of promptness is not an affirmative defense; it is "an element of a *prima facie* rescission action and the burden of proof is on plaintiff." *Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank,* 850 F. Supp. 1199, 1211 (S.D.N.Y.1994), *aff'd,* 57 F.3d 146 (2d Cir. 1995).

105.    The evidence establishes that the Goodwins failed to promptly seek rescission of the SPA or Decade Employment Agreements after discovery of the alleged fraudulent misrepresentations made by Decade. The evidence showed that the Goodwins received the final SPA and Decade Employment Agreements in April 2016, and, by their own admission, discovered the alleged fraud in or around April 2016, but continued to perform under those agreements for over a year and waited nearly 18 months, until October 20, 2017, to commence an action. PX131. As a matter of law, this unreasonable delay precludes a claim of rescission. *See, e.g., Smalls v. Eichner,* 69 Misc. 3d 134(A), at *1 (N.Y. App. Div. 1st Dep't 2020); *R & A Food Servs., Inc. v. Halmar Equities, Inc.,* 278 A.D.2d 398, 399 (N.Y. App. Div. 2d Dep't 2000) ("The complaint alleges that the plaintiff was fraudulently induced to enter into a lease by certain representations made by the defendant. However, after learning of the alleged fraud, the plaintiff waited more than one year before commencing this action, and failed to take any other action to rescind the lease. Because the plaintiff failed to promptly seek rescission after learning of the alleged fraud, it has waived its claim.").

### C.    Fraudulent Misrepresentation

106.    Like a fraudulent inducement claim, "[t]he elements of fraudulent misrepresentation are: (1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiffs thereby, (3) the plaintiffs reasonably relied upon the representation, and (4) the plaintiffs suffered damage as a result of their reliance." *J.A.O. Acquisition Corp. v. Stavitsky*, 18 A.D.3d 389, 390 (N.Y. App. Div. 1st Dep't 2005). These two causes of action are distinguished, however, by *when* they occur—fraudulent inducement, unlike fraudulent misrepresentation, must "[p]recede the formation of a contract." 37 C.J.S. Fraud § 13 (2019).

107.    The Goodwins' fraudulent misrepresentation defense fails for the same reasons that the fraudulent inducement defense fails.

###    D.    <u>Declaration of Unenforceability</u>

108.    The Goodwins allege the SPA should be deemed unenforceable because there was no mutual assent as to its terms.

109.    For the same reasons articulated in Sections III.A. and IV.A., the Goodwins are bound to the terms of the SPA. *See Lansco Corp. v. N.Y. Brauser Realty Corp.*, 63 A.D.3d 513, 514 (N.Y. App. Div. 1st Dep't 2009) ("It is well settled that the signer of an instrument is conclusively bound by its terms regardless of whether he actually read it, and that his mind never gave assent to the terms expressed is not material.").

110.    The Goodwins also argue that, even if the SPA was validly entered into, it is unenforceable because certain closing transactions purportedly did not occur, including the execution and delivery of a promissory note from Decade SAC, execution and delivery of a guaranty of payment of that promissory note from Decade Contracts, and, in consequence of these delivery obligations from Decade SAC and Decade Contracts, delivery of the shares of GAME and GSM.  Those assertions necessarily fail.

111.    In a related proceeding, the Goodwins already admitted the Note and the Guaranty were enforceable. The Goodwins sued Decade, and filed a proof of claim here against the Debtors, based on non-payment of the Note and Guaranty. In the SDNY Action, Aaron admitted under oath that "we [the Goodwins] received a Promissory Note for the remaining $25.5 million." Stip. Fact ¶ 110. Aaron also attached to his declaration as an exhibit "a true and correct copy of the Promissory Note between Decade S.A.C., LLC and Aaron Goodwin and Eric Goodwin, dated February 22, 2016." Stip. Fact ¶ 110.

112.     Setting aside the related proceedings, even if these conditions were components of the SPA, the Goodwins presented no evidence that the contract was contingent on these terms.

113.     What is more, the undisputed facts are that Decade *did* deliver the Note and Guaranty to the Goodwins. The Goodwins stipulated that the Goodwins' accountant, Elliott, received fully-executed copies of the Note and Guaranty and provided those copies to Eric via e-mail on May 19, 2016. *See* Stip. Fact ¶ 105 (stipulating that Elliott e-mailed Eric on May 19, 2016 that "Christopher Aden just forwarded me copies of the executed contracts from February 22, 2016. They seemingly include you[r] signatures. I am attaching them for your records. This is a done deal."); Stip. Fact ¶ 105 (stipulating that two of the "executed contracts" attached to Elliott's e-mail to Eric were "a promissory note from Decade S.A.C. to the Goodwins for the $25,500,000 balance due under the SPA[ ] and a Guaranty from Decade S.A.C. to the Goodwins of the amounts due under the Note").

114.     Moreover, Aaron himself requested and received fully executed copies of the SPA and Other Transaction Documents (including the Note and Guaranty) on December 1, 2016. *See* Stip. Fact ¶ 109 ("At Aaron's request, on December 1, 2016, Mr. Aden sent Aaron copies of the SPA and other transactional documents, including the Note and Guaranty."). It is undisputed that the Note and Guaranty were delivered to the Goodwins (including to their agent, Elliott) via e-mail multiple times following the execution of the SPA.

115.     Accordingly, the conditions to closing that the Goodwins now complain about were complied with, or at the very least, waived.

## CONCLUSION

For the reasons stated in this Court's findings of fact and conclusions of law, judgment is entered in favor of the Trustee.  The Goodwins' four counterclaims are dismissed with prejudice. Pursuant to the Court's Order, dated October 29, 2021 (D.I. 259), a status conference is to be set on _____ regarding further proceedings concerning the Trustee's damages.

The Clerk is directed to enter a separate judgment consistent with the foregoing.

Dated:_____

_____
THE HONORABLE CHRISTOPHER S. SONTCHI
UNITED STATED BANKRUPTCY JUDGE

WE ASK FOR THIS:

Dated:        December 17, 2021                    **ASHBY & GEDDES, P.A.**

By: */s/ Ricardo Palacio*_____
Ricardo Palacio (DE Bar No. 3765)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, Delaware 19899-1150
Tel: (302) 654-1888
Fax: (302) 654-2067
Email: RPalacio@ashbygeddes.com

-and-

**PILLSBURY WINTHROP SHAW
PITTMAN LLP**
Patrick E. Fitzmaurice (admitted *pro hac vice*)
Brian L. Beckerman (admitted *pro hac vice*)
Stephanie M. Coughlan (admitted *pro hac vice*)
31 West 52nd Street
New York, New York 10019
Tel: (212) 858-1000
Fax: (212) 858-1500
Email: patrick.fitzmaurice@pillsburylaw.com
    brian.beckerman@pillsburylaw.com
    stephanie.coughlan@pillsburylaw.com

*Special Counsel to David W. Carickhoff as
Chapter 7 Trustee*

4864-9756-2882