**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| DECADE. S.A.C., LLC, et. al., | ) | |
| | ) | Case No. 18-11668 (CSS) |
| Debtors. | ) | (Jointly Administered) |
| _____ | ) | |
| DAVID W. CARICKHOFF., solely in his | ) | |
| capacity as chapter 7 trustee for the estates of | ) | |
| DECADE, S.A.C., LLC., et al., | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Adv. Proc. No.: 19-50095 (CSS) |
| | ) | |
| AARON GOODWIN, and ERIC GOODWN, | ) | |
| | ) | |
| Defendants. | ) | |

*Acts of injustice done*
*Between the setting and the rising sun*
*In history lie like bones, each one.*

W.H. Auden

Aaron and Eric Goodwin did nothing wrong except pursue a dream of creating a sports agency to represent African American professional athletes run by African American agents. In the process, they were defrauded by Christopher Aden, aided and abetted by his partner, Dorsey James, as well as Aden's attorneys, his lender, and his lender's attorneys. At best, James, the lender, and the attorneys were grossly negligent. At worst, they were downright fraudsters. In any event, the Goodwins were the innocent victims.

Aden repeatedly lied to the Goodwins and, in the end, fraudulently altered the Employment Agreements - switching out the signature pages of the documents that had been agreed for documents containing provisions that Aden knew were unacceptable to the Goodwins - at a sham closing with the lender to which the Goodwins were not invited. As

the various contracts were an integrated transaction (the Goodwins would never have agreed to the Share Purchase Agreement without acceptable Employment Agreements) the entire business arrangement was void and unenforceable from its inception due to Aden's fraud.

As for the trustee, he is not a wrongdoer in his own right, but he stands in the shoes of fraudsters. He cannot ignore this fact. The Goodwins are not the proper source of recovery for creditors in this case and the trustee's pursuit of them should be abandoned.

As such, the Court finds in favor of the Goodwins on all claims and counter claims and against the Trustee on his claims. The Court will conduct a further trial as to damages and equitable subordination.[1]

## **FINDINGS OF FACT AND CONCLUSIONS OF LAW**

The Court, having reviewed the record, and after due deliberations, enters the following findings of fact and conclusions of law with respect to the Trustee's *Complaint for Declaratory Judgment Determining Property of the Debtors' Estates* (D.I. 1); the Goodwins' *Answer with Counterclaims and Affirmative Defenses to Trustee's Complaint for Declaratory Judgment* (D.I. 7); and the Trustee's *Answer to Defendants' Counterclaims with Defenses* (D.I. 21).[2]

---

[1] *See* 11 U.S.C. §510(c)(1) ("after notice and a hearing, the court may— (1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest.").

[2] The findings of fact and conclusions of law set forth herein constitute the findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, as made applicable herein by Rule 7052 of the Federal Rules of Bankruptcy Procedure. To the extent that any of the findings of fact herein are determined to be conclusions of law, they are adopted, and shall be construed and deemed, conclusions of law. To the extent that any of the conclusions of law herein are determined to be findings of fact, they are adopted, and shall be deemed, findings of fact.

## PROCEDURAL BACKGROUND

1.     On July 16, 2018 (the "Petition Date"), Decade, S.A.C., LLC and its affiliated debtors (collectively, the "Debtors") filed voluntary petitions for relief under chapter 7 of title 11 of the United States Code (the "Bankruptcy Code").

2.     On January 23, 2019, David W. Carickhoff, solely in his capacity as chapter 7 trustee (the "Trustee") for the estates of the Debtors (the "Estates"), commenced the above-captioned adversary proceeding by filing the *Complaint for Declaratory Judgment Determining Property of the Debtors' Estates* (D.I. 1).  The Trustee asserted two claims for relief: (i) a declaratory judgment that the sale of shares in GAME and GSM (each defined below) was validly consummated pursuant to a share purchase agreement between certain of the Debtors and Aaron and Eric Goodwin (the "SPA") and that Decade S.A.C. Contracts, LLC ("Decade Contracts") is thereby the rightful owner of all shares in those companies; and (ii) imposition of a constructive trust over any valid GAME and/or GSM shares held by the Goodwins and, pursuant to 11 U.S.C. § 542(a), turnover of such shares to the Trustee.

3.     On February 25, 2019, Aaron Goodwin, Regina Goodwin, and Eric Goodwin (collectively, the "Goodwins") filed the *Answer with Counterclaims and Affirmative Defenses to Trustee's Complaint for Declaratory Judgment* (D.I. 7).  The Goodwins asserted four counterclaims: (i) fraud in the execution; (ii) fraudulent misrepresentation; (iii) fraudulent inducement; and (iv) a declaratory judgment that the SPA is unenforceable due to, *inter alia*, (a) a lack of meeting of the minds as to the terms of the parties' agreement, (b) the Debtors' failure to satisfy required closing conditions, and (c) the Debtors' material breach of the SPA.

4.      On March 18, 2019, the Trustee filed the *Answer to Defendants'*
*Counterclaims with Defenses* (D.I. 21).

5.      On August 23, 2019, the Trustee filed the *Motion for Summary Judgment*
(D.I. 86).  The Trustee requested that the Court grant the requested relief as to his claim for
a declaratory judgment and dismiss each of the Goodwins' counterclaims.

6.      On January 29, 2020, the Court entered an Opinion (D.I. 132) and Order
(D.I. 133) with respect to the Trustee's motion for summary judgment.  The Court denied the
Trustee's motion as to his claim for a declaratory judgment and granted the motion in part
as to the Goodwins' counterclaims, dismissing the counterclaims for fraud in the execution,
fraudulent misrepresentation, and fraudulent inducement.

7.      The Court conducted a trial on October 12, 13, 14, 15, 26, and 28 and
November 16, 2021.[3]  At trial, counsel presented opening statements; the Goodwins offered
the testimony of Aaron Goodwin and Debtors' principal Dorsey James; and the Trustee
offered the testimony of Aaron Goodwin, Eric Goodwin, and the Debtors' attorney, C.
Anthony Mulrain.  The Goodwins also called as a trial witness Debtors' principal Christopher
Aden, and the Court took judicial notice of his absence from the courtroom.  Additionally, the
Goodwins called as a rebuttal trial witness the Debtors' attorney, Alonzo Llorens, who
attended the trial remotely on November 16, 2021, but declined to testify when called by the
Goodwins (D.I. 230, 234, 236, 239, 241, 253, 258, 266).

8.      On October 12, 2021, the Court ordered the immediate dismissal, with
prejudice, of all claims against Regina Goodwin (D.I. 230).

---

[3] Except for November 16, 2021, the Court heard live testimony in court.

9.     On October 13, 2021, the Court ordered the immediate vacatur of its summary judgment order and opinion, and further ordered that the trial proceed on the merits of the complaint and all counterclaims (D.I. 232).

10.    On October 22, 2021, the Goodwins filed the *Motion to Bifurcate Issues of Liability and Damages at Trial* (D.I. 246).

11.    On October 29, 2021, the Court entered an order granting the Goodwins' motion to bifurcate issues of liability and damages and further ordered that, if the Court finds liability, the Court will schedule a damages trial "at a time of mutual convenience to the Court and the parties" (D.I. 259).

## FINDINGS OF FACT

### *The Goodwins and Their Sports Management Businesses*

12.    Aaron Goodwin is one of the NBA's premiere player agents (10/12/21 Trial Tr. 49:20-50:12, 53:22-54:13 (A. Goodwin direct); 10/15/21 Trial Tr. 6:23-7:5 (D. James direct)).

13.    From 1988 to present, Aaron Goodwin has been a licensed NBA agent (10/12/21 Trial Tr. 50:4-12 (A. Goodwin direct); Stip. Facts ¶¶ 11-12).

14.    Aaron Goodwin has represented several of the most celebrated players in the NBA, including, to name a few, LeBron James, Kevin Durant, Dwight Howard, Jason Kidd, Gary Payton, and Chris Webber (10/12/21 Trial Tr. 54:3-9 (A. Goodwin direct)).

15.    Aaron Goodwin currently represents NBA star players Damian Lillard and DeMar DeRozan (10/12/21 Trial Tr. 54:10-13 (A. Goodwin direct)).

16.    Goodwin Associates Management Enterprises, Inc. ("GAME") is a holding company in whose bank accounts Aaron Goodwin used to deposit fees he earned from player representations (10/12/21 Trial Tr. 52:8-16, 52:24-53:2 (A. Goodwin direct)).

17.    Prior to the transactions at issue in this case, Aaron Goodwin owned 100% of the issued and outstanding shares of GAME (Stip. Fact ¶ 13).

18.    At all relevant times, Aaron Goodwin was a resident and citizen of California (Stip. Fact ¶ 10).

19.    GAME is a California corporation (D.I. 1, p. 3 at ¶ 12).

20.    Eric Goodwin is Aaron Goodwin's brother and business partner (10/12/21 Trial Tr. 53:3-11 (A. Goodwin direct); 10/15/21 Trial Tr. 7:6-7 (D. James direct); 10/26/21 Trial Tr. 80:4-6 (E. Goodwin direct)).

21.    Eric Goodwin negotiates and cultivates marketing relationships for Aaron Goodwin's clients (10/26/21 Trial Tr. 80:4-6 (E. Goodwin direct); 10/12/21 Trial Tr. 53:3-11 (A. Goodwin direct)).

22.    Goodwin Sports Management, Inc. ("GSM") is a company that administers and holds certain marketing contracts negotiated on behalf of Aaron Goodwin's clients (10/12/21 Trial Tr. 53:3-6 (A. Goodwin direct); 10/26/21 Trial Tr. 80:14-20 (E. Goodwin direct)).

23.    Prior to the transactions at issue in this case, Eric Goodwin owned 100% of the issued and outstanding shares of GSM (Stip. Fact ¶ 17).

24.     At all relevant times, Eric Goodwin was a resident and citizen of the State of Washington (Stip. Fact ¶ 15).

25.     GSM is a Washington corporation (D.I. 1, p. 4 at ¶ 13).

*The Stealth Agreement Negotiations*

26.     In early 2014, a newly formed company named Stealth SME ("Stealth") expressed interest in purchasing GAME and GSM (together, the "Goodwin Entities") (10/15/21 Trial Tr. 6:2-13, 8:3-17 (D. James direct); 10/12/21 Trial Tr. 54:17-22, 58:8-10 (A. Goodwin direct)).

27.     Stealth's objective was to create an African American led sports conglomerate, encompassing leading sports agencies from across the country (10/12/21 Trial Tr. 54:17-55:10 (A. Goodwin direct)).

28.     Stealth and its principals—Christopher Aden, Dorsey James, and Harvey Newkirk—had no prior sports management experience (10/15/21 Trial Tr. 6:20-22 (D. James direct); C. Aden Dep. Tr. 36:13-16, 39:20-24).

29.     Stealth's principals sought to associate with the Goodwins on the belief that the Goodwins' track record of success in the industry would lend credibility to Stealth and attract other agencies to join the sports conglomerate (10/12/21 Trial Tr. 57:9-19, 71:13-21 (A. Goodwin direct)).

30.     Stealth's principals told Aaron Goodwin that they viewed the Goodwin Entities as the best African American agencies in the country and noted that they needed the Goodwin Entities to associate with the Stealth conglomerate to build Stealth's business and attract other agencies to join (10/12/21 Trial Tr. 69:3-8 (A. Goodwin direct)).

7

31.     The Goodwins had previously received multiple offers to sell the Goodwin Entities, including from Creative Artists Agency and other large conglomerates that lacked a strong African American ownership presence (10/12/21 Trial Tr. 55:1-6 (A. Goodwin direct)).

32.     Aaron Goodwin was specifically interested in a prospective transaction with Stealth because of its professed vision of establishing an African American led conglomerate (10/12/21 Trial Tr. 55:1-23, 57:9-19 (A. Goodwin direct)).

33.     During 2014 and early 2015, Stealth and the Goodwins, through their respective counsel, negotiated the terms of Stealth's prospective purchase of the Goodwin Entities (10/12/21 Trial Tr. 55:25-56:16, 58:3-10, 59:12-20 (A. Goodwin direct); 10/15/21 Trial Tr. 8:3-9:21 (D. James direct)).

34.     The Goodwins were represented during the Stealth negotiations by outside counsel, Craig Gilbert of Perkins Coie LLP (10/12/21 Trial Tr. 56:11-18 (A. Goodwin direct)).

35.     Stealth was represented by its in-house counsel and principal, Harvey Newkirk (10/12/21 Trial Tr. 61:2-8 (A. Goodwin direct); C. Aden Dep. Tr. 51:20-52:8).

36.     Eric Goodwin was not directly involved in the Stealth negotiations, but Aaron Goodwin kept him apprised of significant developments (10/12/21 Trial Tr. 57:13-15, 58:16-19 (A. Goodwin direct); 10/26/21 Trial Tr. 110:8-15 (E. Goodwin direct)).

37.     The negotiations between Stealth and the Goodwins culminated in a February 2015 draft share purchase agreement (the "Stealth Agreement") (DX2, pp. 6-52; 10/12/21 Trial Tr. 65:21-66:19 (A. Goodwin direct)).

8

38.     The Stealth Agreement provided, among other things, for the Goodwins to receive $35 million (including $15 million at closing) in partial consideration for the sale to Stealth of all shares outstanding in the Goodwin Entities (DX2, p. 17 (§§ 2.1, 2.2)).

39.     Section 10.4 of the Stealth Agreement further provided that in the event Stealth failed to "make any payment when the same shall be due and payable pursuant to this Agreement" and failed to cure within seven days of the breach, "GAME's beneficial ownership in any Standard Player Agent Contracts (each an '*SPAA*') entered into by and between A[aron] Goodwin and any National Basketball Association player prior to or after the Closing, including but not limited to all of GAME's right, title and interest to receive all indebtedness, monetary obligations and amounts owed by a player in connection with any such SPAA ('*Contract Receipts*'), shall immediately terminate, and that A[aron] Goodwin shall thereafter be the legal and beneficial owner of all rights, title and interest in each SPAA, including but not limited to all rights to collect and retain the Contract Receipts" (DX2, p. 36 (§ 10.4)).

40.     Section 10.4 of the Stealth Agreement reflected Aaron Goodwin's consistent position since the outset of discussions with Stealth's principals, who understood and agreed with this approach (10/12/21 Trial Tr. 67:4-69:2 (A. Goodwin direct); 10/15/21 Trial Tr. 14:23-15:13 (D. James direct)).

41.     Additionally, in a provision entitled **No Third-party Beneficiaries**, the Stealth Agreement provided that "this Agreement is for the sole benefit of the parties hereto . . . and nothing herein, express or implied, is intended to or shall confer upon any other

Person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement" (DX2, p. 39 (§ 12.2)).

42.     The absence of third-party beneficiaries in any purchase transaction was particularly important to the Goodwins because the collective bargaining agreement in place between the NBA Players' Association and the NBA forbid the assignment of player contracts without a player's expressed consent (10/12/21 Trial Tr. 69:16-70:22 (A. Goodwin direct); 10/15/21 Trial Tr. 65:7-10 (D. James direct)).

43.     On February 23, 2015, Mr. Newkirk emailed Aaron Goodwin (copying Messrs. James and Aden) to advise that the Stealth Agreement reflected Stealth's comments and further noted: "Upon your review, we are prepared to execute the documents" (DX2, p. 1).

### *Messrs. Aden and James' Continued Pursuit of the Goodwin Entities*

44.     Aaron Goodwin sought multiple updates from Stealth with respect to the purchase transaction in the weeks after Mr. Newkirk's February 23, 2015 email (DX145, pp. 88-93).

45.     Aaron Goodwin advised Mr. Aden via text message that the Goodwins had not heard back from Mr. Newkirk concerning the closing of the stock purchase transaction (DX145, pp. 88-89, 93, 97).

46.     In the spring of 2015, Mr. Newkirk was arrested—and later convicted—on charges relating to his alleged fraudulent conduct (C. Aden Dep. Tr. 52:9-14, 52:25-53:6).

47.    Mr. Aden was aware of Mr. Newkirk's arrest even before he surrendered to authorities (C. Aden Dep. Tr. 53:13-21).

48.    The Goodwins were never told by Mr. Aden or anyone from Stealth of Mr. Newkirk's arrest, which Aaron Goodwin discovered several months after the fact (10/12/21 Trial Tr. 56:19-57:8 (A. Goodwin direct)).

49.    To finance its prospective purchase of the Goodwin Entities, Stealth had engaged a lender named Brevet Capital Management ("Brevet") (10/15/21 Trial Tr. 18:12-19 (D. James direct)).

50.    Stealth defaulted on a $10 million loan extended by Brevet (10/15/21 Trial Tr. 18:20-19:8 (D. James direct)).

51.    Stealth's principals never advised the Goodwins of the financing arrangement with Brevet (10/12/21 Trial Tr. 60:2-5 (A. Goodwin direct)).

52.    In August 2015 (after Mr. Newkirk's arrest and Stealth's default on the Brevet loan), Mr. Aden sought to re-engage with Aaron Goodwin regarding a prospective purchase agreement, now on behalf of a newly formed entity, owned by Messrs. Aden and James, named NewCo Ventures, LLC ("NewCo") (DX145, pp. 161-64).

53.    Aaron Goodwin made clear, in a text message response to Mr. Aden, that the Goodwins were "not negotiating new terms" and that any purchase transaction would need to be "the same deal as we had before" with Stealth (DX145, p. 164 (Aug. 9, 2015 at 1:31 pm)).

54.     On August 21, 2015, NewCo and the Goodwins executed a letter of intent and attached summary of terms with respect to NewCo's purchase of the Goodwin Entities (the "Executed LOI") (DX3, at pp. 1-8).

55.     The Executed LOI provided, among other things, that "nothing in this LOI, express or implied, is intended to or shall be construed to confer upon or give any person other than the parties . . . any legal or equitable right, remedy or claim under or with respect to this Agreement" and further provided that "[t]he provisions of this Section 5 shall survive the termination or expiration of this LOI" (DX3, at p. 2 (§ 5); Stip. Fact ¶ 32).

56.     The parties further agreed that the terms of the Executed LOI would be governed by California law, and that the choice of law provision "shall survive the termination or expiration of this LOI" (DX3, at p. 2 (§ 7)).

57.     The Executed LOI provided for the Goodwins to receive $35 million (including $9.5 million in cash at closing, $2.4 million in current receivables, and the balance to be paid in cash over a seven-year period after closing in accordance with an agreed-upon payment schedule) in partial consideration for the sale to NewCo of all shares outstanding in the Goodwin Entities (DX3, at pp. 5-6).

58.     The Executed LOI specified that the Goodwins would maintain a 62.5% equity interest in "new player contract entitlements from [Damian] Lillard and [DeMar] DeRozan," and a 50% equity interest in revenue entitlements from the Goodwins' "current clients other than Lillard and DeRozan" and "for a seven year period post-closing, any person or entity that is not currently a client of GSM or GAME" (DX3, at p. 6).

59.    In addition to the prescribed cash payments, the parties agreed that Aaron and Eric Goodwin each "shall enter into an Executive Employment Agreement containing [certain] material terms," including salary and bonus payments and executive benefits (DX3, at p. 7).

60.    The contemplated Executive Employment Agreements were not attached to the Executed LOI (DX3, at pp. 1-8).

61.    The parties agreed that "[p]ost-closing of the Transaction, Aaron Goodwin will continue to have sole control on day-to-day operations of GAME and GSM" (DX3, at p. 8).

62.    Additionally, in a section of the Executed LOI entitled ***Post-Closing Operations***, the parties agreed that "[a]ll commissions and/or fees will be billed and collected by, GSM and GAME, and forwarded to NewCo" (DX3, at p. 8).

63.    Aaron Goodwin understood the Post-Closing Operations provision of the Executed LOI to signify that he would continue to collect any fees owed to him by clients and would then remit to NewCo its agreed-upon share of such proceeds (10/14/21 Trial Tr. 16:16-24 (A. Goodwin direct)).

64.    The fee collection structure reflected in the Executed LOI differs from payment of receivables to a lender-controlled lockbox, which would have required that fees and commissions owed to the Goodwins be remitted directly by players to a lender (10/14/21 Trial Tr. 16:25-17:3 (A. Goodwin direct)).

65.     The Goodwins never agreed to assign fees they were owed to a prospective purchaser or lender (10/14/21 Trial Tr. 16:25-17:3 (A. Goodwin direct); 10/15/21 Trial Tr. 64:10-65:10 (D. James direct)).

66.     Throughout September 2015, Aaron Goodwin asked Mr. Aden multiple times to update him on the status of the purchase transaction governed by the Executed LOI (DX145, pp. 167-70).

67.     On September 22, 2015, Aaron Goodwin emphasized, in a text message to Mr. Aden, that he "need[ed] closure" (DX145, p. 167 (Sept. 22, 2015 at 2:50 pm)).

68.     Mr. Aden assured Aaron Goodwin that he was in the process of finalizing a term sheet with an investor, and further noted, "Your agreements (done)" (DX145, p. 170 (Sept. 22, 2015 at 3:12 pm)).

69.     On November 3, 2015, Aaron Goodwin texted Mr. Aden to advise: "Will need some form of letter from Gotham or Tony [Mulrain] saying somehow that Goodwin Sports [sic] is involved in this deal . . . . Still need that hard closing date" (DX145, pp. 182-83 (Nov. 3, 2015 at 3:36 pm)).

70.     Mr. Aden replied: "Aaron, the above is what I am providing.  You have a LOI that is under the deal.  Then there are the deal docs.  There isn't anything further for us to provide" (DX145, p. 183 (Nov. 3, 2015 at 3:37 pm)).

71.     Aaron Goodwin understood Mr. Aden's response to signify that everything had been agreed upon and that the purchase transaction would proceed on the terms reflected in the Executed LOI and the Stealth Agreement (10/14/21 Trial Tr. 20:9-11 (A. Goodwin direct)).

14

72.     When Aaron Goodwin advised Mr. Aden that the Executed LOI was signed on behalf of Stealth, a now-defunct entity, Mr. Aden responded, "[j]ust added Gotham and Decade to match up the term sheet" (DX145, p. 183 (Nov. 3, 2015 at 5:35 pm)).

73.     On November 4, 2015, Mr. Aden emailed Aaron Goodwin and attached a substantively identical term sheet to the Executed LOI summary of terms that identified two newly formed companies, "Gotham S&E, LLC/Decade S.A.C., LLC," as the Goodwin Entities' purchasers (DX6, pp. 1, 6-9; Stip. Facts ¶¶ 33-35).

74.     Decade had no business prior to the Goodwin Entities' transaction and was created to complete this transaction (J. Traub Dep. Tr. 61:13-17; C. Johnson Dep. Tr. 104:8-17; 23 Capital Dep. Tr. 20:17-21:5).

75.     Mr. Aden also attached to the November 4, 2015 email an unexecuted indicative term sheet (the "Indicative Term Sheet") dated October 13, 2015 for a prospective facility between Gotham S&E Holdings and XXIII Capital Ltd ("23 Capital") (DX6, pp. 10-12).

76.     The Indicative Term Sheet did not reference the Goodwins, the Goodwin Entities, or Decade (DX6, pp. 10-12; Stip. Facts ¶¶ 38-39).

77.     Mr. Aden described 23 Capital as "our investor" in the November 4, 2015 email to Aaron Goodwin (DX6, p. 1).

78.     Aaron Goodwin did not review the Indicative Term Sheet as he was under the impression it had nothing to do with him (10/26/21 Trial Tr. 49:18-50:2, 51:11-18 (A. Goodwin cross)).

79.     On November 5, 2015, Mr. Aden emailed Aaron Goodwin an updated letter of intent, dated November 1, 2015, that was substantively identical to the Executed

LOI except that it identified the new purchaser entities as "Gotham S&E, LLC/Decade S.A.C., LLC" (DX3, pp. 10-15).

80.     On receiving the updated letter of intent dated November 1, 2015, Aaron Goodwin was assured that the terms of the proposed transaction with Decade were consistent with the Stealth Agreement (10/14/21 Trial Tr. 25:7-11 (A. Goodwin direct)).

*Decade's Negotiation of a Loan with 23 Capital*

81.     23 Capital was not an investor in Decade, but rather a London-based lender from which Decade sought financing for its prospective purchase of the Goodwin Entities (10/15/21 Trial Tr. 19:16-21 (D. James direct)).

82.     Shortly after Decade was formed in or about January 2016, Mr. Aden introduced Mr. James to 23 Capital's principals, Jason Traub and Stephen Duval (10/15/21 Trial Tr. 19:22-20:9 (D. James direct)).

83.     23 Capital was represented in connection with the Goodwin Entities financing transaction by the law firm Loeb & Loeb LLP ("Loeb") (10/15/21 Trial Tr. 20:10-14 (D. James direct)).

84.     The lead attorneys who represented 23 Capital were Channing Johnson and Kevin Eisenberg of Loeb (10/15/21 Trial Tr. 20:15-18 (D. James direct)).

85.     In the weeks preceding the closing of the Goodwin Entities purchase transaction, 23 Capital's principals and attorneys were in regular contact with both Mr. Aden and Mr. James (10/15/21 Trial Tr. 20:19-22:16 (D. James direct)).

86.    On January 13, 2016, Mr. Duval emailed Messrs. Aden and James (copying Channing Johnson and his colleagues at 23 Capital), attaching a revised loan term sheet between and among Decade and 23 Capital (DX14, p. 1).

87.    Mr. Duval advised, "[i]n addition to the term sheet, we will be required to have a call with each of the acquisition parties prior to completion," and requested that Decade "begin organising these from the 20th Jan." (DX14, p. 1; Stip. Fact ¶ 51).

88.    23 Capital believed it was important to convene a conference call with each of the acquisition parties—including Aaron and Eric Goodwin— "[s]o that everyone knew what was going on" (23 Capital Dep. Tr. 67:6-68:6).

89.    The Goodwins were not recipients of Mr. Duval's January 13, 2016 email (DX14).

90.    23 Capital never communicated with the Goodwins prior to the closing of the Goodwin Entities share purchase transaction (23 Capital Dep. Tr. 131:9-15; J. Traub Dep. Tr. 90:4-17).

91.    Loeb never communicated with the Goodwins or their counsel prior to the closing of the Goodwin Entities share purchase transaction (C. Johnson Dep. Tr. 45:23-46:21; K. Eisenberg Dep. Tr. 36:13-19).

92.    Decade made minor, non-substantive edits to the proposed loan term sheet and attached an executed version (the "Executed Loan Term Sheet"), signed and initialed by Messrs. Aden and James, to a January 17, 2016 email addressed to 23 Capital's principals and counsel (DX18; Stip. Fact ¶ 48).

93.     The Goodwins were not recipients of Mr. Aden's January 17, 2016 email (DX18).

94.     The Executed Loan Term Sheet required, as "Salient Conditions," that the Goodwins be "expressly advised" of 23 Capital's security interest in the Goodwin Entities and of other aspects of the financing arrangement, and that the Goodwins were to "acknowledge[]" that "anticipated payments per the proposed acquisition documents would breach" certain "covenants" to which Decade and 23 Capital had agreed (DX18, p. 5; Stip. Fact ¶ 50).

95.     23 Capital's transactional counsel explained that his understanding of the Executed Loan Term Sheet's salient condition was that "we were to secure a written acknowledgment by the sellers [*i.e.*, the Goodwins] of our position" (C. Johnson Dep. Tr. 85:3-10).

96.     The Goodwins were never informed of the financing arrangement memorialized in the Executed Loan Term Sheet (10/26/21 Trial Tr. 49:18-20 (A. Goodwin cross); 10/15/21 Trial Tr. 29:22-30:21 (D. James direct)).

97.     The Goodwins did not acknowledge, in writing or otherwise, any aspect of the financing arrangement memorialized in the Executed Loan Term Sheet (C. Johnson Dep. Tr. 85:11-21; K. Eisenberg Dep. Tr. 48:9-49:2; C. Aden Dep. Tr. 150:6-151:24).

98.     On January 26, 2016, 23 Capital's transactional counsel emailed Decade's principals and transactional counsel, attaching, among other things, "initial drafts of the loan agreement and pledge agreement" (DX23, pp. 1, 12-129).

99.     The Goodwins were not recipients of Mr. Eisenberg's January 26, 2016 email (DX23).

100.    Two days after 23 Capital's counsel circulated the draft loan agreement, on January 28, 2016, Decade's transactional counsel, Alonzo Llorens, of the law firm Gordon Rees Scully Mansukhani, LLP ("Gordon Rees"), instructed Mr. Aden, "please be sure to forward a draft of the loan documents to Aaron" (DX25, p. 1; Stip. Fact ¶ 52).

101.    Mr. Aden committed to Decade's counsel that he would send the loan agreement to Aaron Goodwin "once all of the redlines are out" (DX25, p. 1; Stip. Fact ¶ 52).

102.    Neither Mr. Aden nor anyone else transmitted the executed loan agreement, or any draft thereof, to the Goodwins prior to the closing of the Goodwin Entities share purchase transaction (10/26/21 Trial Tr. 49:18-20 (A. Goodwin cross); C. Aden Dep. Tr. 135:21-136:6, 140:22-142:2, 150:6-151:24; 23 Capital Dep. Tr. 131:9-15; J. Traub Dep. Tr. 90:4-17; C. Johnson Dep. Tr. 45:23-46:21; K. Eisenberg Dep. Tr. 36:13-19).

*23 Capital's Proposed Revisions to the Goodwin/Decade Share Purchase Agreement (Relayed to Decade but Not to the Goodwins)*

103.    In late January and early February 2016, 23 Capital's transactional attorneys relayed substantive edits to the draft share purchase agreement between and among Decade S.A.C. and Decade Contracts, on one hand, and the Goodwin Entities and the Goodwins individually, on the other (the "SPA Edits"), to Decade's principals and transactional attorneys, C. Anthony (Tony) Mulrain and Alonzo Llorens of Gordon Rees

(DX21, DX22, DX23, DX30, DX32, DX35, DX36, DX37, DX38, DX39, DX42, DX44, DX49; 10/15/21 Trial Tr. 55:19-23 (D. James direct)).

104.   Among other revisions, 23 Capital, through its attorneys, inserted an un-lettered paragraph after Section 2.4 of the SPA (the section detailing the revenue splits agreed upon in the Executed LOI), which read: "In the event Sellers [the Goodwins] shall receive any payment hereunder when Sellers are not permitted to receive such payment in accordance with the terms of this Section 2.4, then Sellers shall forthwith deliver, or cause to be delivered, to Lender in precisely the form held by Sellers (except for any necessary endorsement) and until so delivered the same shall be held in trust by Sellers as property of Lender" (DX44, p. 1).

105.   23 Capital also removed a provision in the Stealth Agreement preserving the Goodwins' right to "rescission" in the event of a breach by the Goodwin Entities' purchaser and further providing that in the event the Goodwin Entities' purchaser failed to "make any payment when the same shall be due and payable pursuant to this Agreement" and failed to cure within seven days of the breach, "GAME's beneficial ownership in any Standard Player Agent Contracts (each an '*SPAA*') entered into by and between A[aron] Goodwin and any National Basketball Association player prior to or after the Closing, including but not limited to all of GAME's right, title and interest to receive all indebtedness, monetary obligations and amounts owed by a player in connection with any such SPAA ('*Contract Receipts*'), shall immediately terminate, and that A[aron] Goodwin shall thereafter be the legal and beneficial owner of all rights, title and interest in each SPAA, including but not limited to all rights to collect and retain the Contract Receipts" (DX2, p. 36 (Stealth Agreement § 10.4); DX21, p. 2; DX30, p. 76).

106.    Additionally, 23 Capital inserted a provision in the SPA recognizing 23 Capital as a third-party beneficiary to the parties' agreement (DX30, p. 79).

107.    Decade's principals were aware that the SPA Edits were unacceptable to the Goodwins (10/12/21 Trial Tr. 67:4-69:2 (A. Goodwin direct); 10/15/21 Trial Tr. 14:23-15:11 (D. James direct)).

108.    Decade's principals and attorneys agreed that Mr. Aden would be responsible for relaying the SPA Edits to Aaron Goodwin for his review (11/16/21 Trial Tr. 36:11-40:3 (C.A. Mulrain cross); A. Llorens Dep. Tr. 62:18-63:5, 63:24-64:4, 64:9-65:2, 65:17-66:7).

109.    Mr. Aden intentionally concealed the SPA Edits from the Goodwins as he knew the Goodwins would never accept the changes that were being made by 23 Capital and Decade.  (C. Aden Dep. Tr. 170:23-173:25; A. Llorens Dep. Tr. 61:3-62:5, 66:9-14).

110.    Neither 23 Capital nor Decade nor any other person or entity relayed the SPA Edits to the Goodwins prior to the closing of the SPA (10/13/21 Trial Tr. 14:5-9 (A. Goodwin direct); 10/14/21 Trial Tr. 28:7-19 (A. Goodwin direct); 10/15/21 Trial Tr. 55:19-58:10 (D. James direct); 11/16/21 Trial Tr. 39:20-40:12 (C.A. Mulrain cross); C. Aden Dep. Tr. 170:23-173:25; 23 Capital Dep. Tr. 131:9-15; J. Traub Dep. Tr. 90:4-17; K. Eisenberg Dep. Tr. 36:13-19).

111.    The Goodwins never accepted the SPA Edits (10/13/21 Trial Tr. 14:5-9 (A. Goodwin direct); 10/14/21 Trial Tr. 28:7-19 (A. Goodwin direct); 10/15/21 Trial Tr. 55:19-58:10 (D. James direct); 11/16/21 Trial Tr. 39:20-40:12 (C.A. Mulrain cross); C. Aden

Dep. Tr. 170:23-173:25; 23 Capital Dep. Tr. 131:9-15; J. Traub Dep. Tr. 90:4-17; K. Eisenberg

Dep. Tr. 36:13-19).

112.    Had the Goodwins been advised of the SPA Edits prior to the closing of

the SPA, they would not have agreed to a transaction on those terms (DX145, p. 164 (Aug. 9,

2015 at 1:31 pm); 10/12/21 Trial Tr. 67:4-69:2, 69:16-70:22 (A. Goodwin direct); 10/15/21

Trial Tr. 14:23-15:13, 65:7-10 (D. James direct)).

*Christopher Aden's Misrepresentations to Obtain the Goodwins' Signatures*

113.    From February 10, 2016 through and including February 15, 2016, the

Goodwins were in Toronto for the NBA All-Star Weekend (10/12/21 Trial Tr. 83:6-14 (A.

Goodwin direct); 10/26/21 Trial Tr. 72:19-73:2 (A. Goodwin re-direct)).

114.    On February 10, 2016, Aaron Goodwin advised Mr. Aden, via text

message, that he had spoken with his attorney, Mr. Gilbert, whom Aaron Goodwin had

"assured . . . that all the documents, per our discussion remain the same, just the name change

from Stealth to Decade.  And there is no reason to reopen these discussion [sic].  This includes

the previously negotiated purchase agreement, promissory note, executive employment

agreement, nominee agreement, pledge agreement etc.  is this accurate?" (DX145, p. 219

(Feb. 10, 2016 at 10:35 am)).

115.    Mr. Aden confirmed, in a telephone call to Aaron Goodwin on or about

February 10, 2016, that all the transactional documents remained the "exact same" as had

been previously negotiated and agreed upon (10/12/21 Trial Tr. 82:1-83:1 (A. Goodwin

direct)).

116.    The next day, on February 11, 2016, Mr. Aden emailed blank signature blocks to Aaron Goodwin in connection with the share purchase transaction, which Mr. Aden advised the Goodwins to "sign and scan . . . back" (DX56, p. 1).

117.    Mr. Aden's February 11, 2016 email did not attach the SPA and did not identify the existence of the SPA Edits (DX56).

118.    The following morning, on February 12, 2016, Aaron Goodwin inquired, via text message, of Mr. Aden: "Up working on this doc.  You indicated that you switched the number in the agreement to $35,000,000.  Where is that reflected?  Last LOI I can locate is from Aug, 2015" (DX145, p. 225 (Feb. 12, 2016 at 8:06 am)).

119.    In response to Aaron Goodwin's inquiry regarding the terms of the share purchase transaction, Mr. Aden intentionally concealed from Aaron Goodwin the revised share purchase agreement.  Instead, Mr. Aden responded, "From 11/2/2015," and forwarded to Aaron Goodwin an email Mr. Aden had sent him on November 4, 2015, re-attaching the updated letter of intent dated November 1, 2015, that was substantively identical to the Executed LOI except that it identified the Goodwin Entities' purchaser as "Gotham S&E, LLC/Decade S.A.C., LLC" (DX59, pp. 1, 3-6, 10-13).

120.    Mr. Aden re-sent the November 4, 2015 email to Aaron Goodwin on February 12, 2016 to persuade the Goodwins that the transactional terms remained the same as those reflected in the Executed LOI and the Stealth Agreement (10/14/21 Trial Tr. 30:15-31:1 (A. Goodwin direct)).

121.    On receiving the email from Mr. Aden re-attaching the letter of intent dated November 1, 2015, Aaron Goodwin believed that the transactional terms remained the

same as those reflected in the Executed LOI and the Stealth Agreement (10/14/21 Trial Tr. 33:16-19 (A. Goodwin direct)).

*The Goodwins' Edits to the Employment Agreements*

122.    The Goodwins were asked to sign agreements governing their prospective employment as Decade executives (the "Employment Agreements") (DX40; Stip. Fact ¶ 59).

123.    The Employment Agreements were an integral component of the Goodwin Entities purchase transaction, without which the transaction would not have occurred (10/15/21 Trial Tr. 31:3-11 (D. James direct)).

124.    The Goodwins first received drafts of the Employment Agreements on February 9, 2016, when Decade's lead transactional counsel, Mr. Mulrain of Gordon Rees, transmitted the drafts via email to Aaron Goodwin, copying Messrs. Aden, James, and Llorens (DX40; 10/12/21 Trial Tr. 77:16-78:4 (A. Goodwin direct)).

125.    When he reviewed the draft Employment Agreements, Aaron Goodwin immediately identified two provisions therein as inconsistent with the parties' agreement and entirely unacceptable: (a) Section 27, which prescribed "Fee Tails" that would entitle Decade to certain fees owed to the Goodwins even in the event of Decade's "material breach of this Agreement," and (b) Section 28, which provided for the assignment, release, and quitclaim to Decade of "all and any interest" that the Goodwins maintained in contracts with the Goodwins' pre-existing clients and any payment owed to the Goodwins thereunder (together, "Sections 27 and 28") (10/12/21 Trial Tr. 78:5-23 (A. Goodwin direct)).

126.    From February 9, 2016 through and including February 11, 2016, Aaron Goodwin repeatedly advised Mr. Aden, Mr. James, and Mr. Mulrain—via emails, text messages, and phone calls—that Sections 27 and 28 were unacceptable to the Goodwins and demanded that they be stricken from the Employment Agreements in their entirety (10/12/21 Trial Tr. 78:7-12, 78:24-79:12 (A. Goodwin direct); Stip. Facts ¶¶ 60-63, 68-69, 72, 77).

127.    Among other communications concerning the Employment Agreements, Aaron Goodwin explained to Mr. Aden, via text message on the evening of February 9, 2016, that the draft Employment Agreements that Mr. Mulrain "sent [are] not what we agreed to," and further advised, "I am not going to change anything that I didn't agree to a year ago" during the Stealth Agreement negotiations (DX145, p. 218 (Feb. 9, 2016 at 11:01 pm); Stip. Fact ¶ 61).

128.    Aaron Goodwin explained to Mr. Aden that 23 Capital's attorneys were not authorized to make edits to any agreement between Decade and the Goodwins (DX145, pp. 218-19 (Feb. 9, 2016 at 11:01 pm)).

129.    The next morning, on February 10, 2016, Aaron Goodwin explained, in an email to Mr. Mulrain, that, with respect to the Employment Agreements, "sections 27-28 were not a consideration.  If in the event we sever ties, Decade is entitled to all fees negotiated for clients that were obtained while performing with the company ONLY, throughout the life of those contracts.  They are not entitled to fees for any client signed after any separation between decade and Goodwin.  This was discussed and agreed upon more than once between Dorsey Chris and myself . . . . I am not making changes after 16 months" (DX50, p. 1).

130.    Later that day, on February 10, 2016, Mr. Aden transmitted to Aaron Goodwin (copying Messrs. James, Mulrain, and Llorens) revised versions of the Employment Agreements, which, Mr. Aden advised, reflected "the changes as discussed" (DX47, p. 1; Stip. Fact ¶ 65).

131.    The Employment Agreements attached to Mr. Aden's February 10, 2016 email contained Sections 27 and 28, to which Aaron Goodwin had previously objected (DX47, pp. 12-15, 39-41, 64-66, 89-91; Stip. Fact ¶ 65).

132.    The following day, on February 11, 2016, Aaron Goodwin reiterated, via text messages, phone calls, and emails to Mr. Aden and Mr. Mulrain, that the Employment Agreements remained unacceptable to the Goodwins and that the Goodwins would not agree to the Employment Agreements unless Sections 27 and 28 were removed in their entirety (10/12/21 Trial Tr. 87:16-91:15 (A. Goodwin direct); PX113, p. 17 (Feb. 11, 2016 at 11:03 am); DX145, pp. 223 (Feb. 11, 2016 at 11:14 am), 224 (Feb. 11, 2016 at 5:31 pm); DX57, p. 1; Stip. Facts ¶¶ 68, 69, 71, 72).

133.    Specifically, Aaron Goodwin wrote to Mr. Mulrain: "Sects 27 and 28 have only been amended not deleted and I do t [sic] agree to the amendments.  The agreement should read that after the term is completed, [sic] if we do not extend the agreement, Decade, 23 or anyone else is ONLY ENTITLED to what ever money is owed from players signed while we are working together.  I an. [sic] Not [sic] giving them anything I [sic] any form on player that I sign AFTER I leave Decade for any reason.  That's what we agreed upon and that's what I am staying with" (PX113, p. 17 (Feb. 11, 2016 at 11:03 am); Stip. Fact ¶ 68).

134.    That same day, Aaron Goodwin further advised Mr. Mulrain, with respect to Sections 27 and 28, "I am not changing on any of these employment issues" (PX113, p. 17 (Feb. 11, 2016 at 11:03 am); Stip. Fact ¶ 68).

135.    Mr. Aden instructed Aaron Goodwin, via text message and phone call, to "[m]ake the change [striking Sections 27 and 28] in the document and send it back redline" (10/12/21 Trial Tr. 96:12-14 (A. Goodwin direct); DX145, p. 223 (Feb. 11, 2016 at 11:16 am); Stip. Fact ¶ 70).

136.    Later that afternoon, on February 11, 2016, Aaron Goodwin responded to Mr. Aden, via text message, that he would delete Sections 27 and 28 in the Employment Agreements, which he "didn't and wouldn't agree to[,] and sign the Doc's and send the [sic] back ASAP" (DX145, p. 224 (Feb. 11, 2016 at 5:31 pm); Stip. Fact ¶ 72).

137.    Aaron Goodwin reiterated, via text message to Mr. Aden early the following morning, February 12, 2016, that he would "make the changes [in the Employment Agreements] and send you all signed copies in the am" (DX145, p. 225 (Feb. 12, 2016 at 1:13 am); Stip. Fact ¶ 77).

138.    At no time did either of Decade's principals or any of Decade's attorneys indicate to the Goodwins that Decade objected to the removal of Sections 27 and 28 from the Employment Agreements (10/12/21 Trial Tr. 96:12-14 (A. Goodwin direct); 10/15/21 Trial Tr. 51:25-52:10 (D. James direct)).

139.    After reviewing the Employment Agreements with his brother Eric, Aaron Goodwin deleted Sections 27 and 28 from the Microsoft Word version of the Employment Agreements and replaced the substance of the section entitled "Fee Tails" in his

own employment agreement with language that the parties had agreed upon guaranteeing that Aaron Goodwin would earn the highest salary and bear the highest title of any basketball agent employed by Decade for the first five years of the parties' agreement (10/12/21 Trial Tr. 95:20-96:9, 97:23-98:7, 99:14-20 (A. Goodwin direct); 10/26/21 Trial Tr. 87:24-88:4 (E. Goodwin direct); 10/26/21 Trial Tr. 115:16-18 (E. Goodwin cross); DX149, pp. 10, 26).

140.    Aaron Goodwin inquired of Mr. Aden, via text message, whether he would prefer to receive the revised Employment Agreements via DocuSign or fax (DX145, p. 225 (Feb. 12, 2016 at 9:54 am); Stip. Fact ¶ 80).

141.    Mr. Aden instructed Aaron Goodwin, via text message, to "[f]ax to my home fax" number, which Mr. Aden provided (DX145, p. 225 (Feb. 12, 2016 at 9:54 am)).

142.    At approximately 12:38 pm on February 12, 2016, Aaron Goodwin faxed a 43-page transmittal to Mr. Aden at Mr. Aden's home fax number, encompassing the revised versions of the Employment Agreements that omitted Sections 27 and 28, with Aaron Goodwin's initials "AG" on the bottom-right-hand corner of the first page of the Employment Agreements and on each page that contained revisions; the Goodwins' signed Employment Agreement signature blocks; and the Goodwins' signed SPA signature blocks (10/12/21 Trial Tr. 99:22-103:21 (A. Goodwin direct); DX149, pp. 1, 10, 11, 17, 26, 27, 32-34).

143.    Aaron Goodwin included signed SPA signature blocks in the February 12, 2016 fax transmittal to Mr. Aden because Mr. Aden had assured him earlier that day, via email and phone calls, that the SPA's terms remained the same as those reflected in the Executed LOI and the Stealth Agreement and that the Goodwins' signature pages would be held in escrow by the law firms involved in the transaction until such time as an in-person

28

closing was held (10/12/21 Trial Tr. 107:24-109:6 (A. Goodwin direct); 10/14/21 Trial Tr. 33:16-34:8 (A. Goodwin direct)).

144.   Minutes after receiving Aaron Goodwin's fax transmittal, on February 12, 2021, Mr. Aden forwarded the Goodwins' signed Employment Agreements in the form that the Goodwins had signed them (*i.e.*, removing Sections 27 and 28) to Decade's transactional attorneys at Gordon Rees, copying Mr. James (DX150; DX151).

145.   At some point between February 12 and February 22, 2016, Mr. Aden or another agent of Decade affixed the Goodwins' signature pages from the February 12, 2016 fax transmittal to a version of the Employment Agreements that contained Sections 27 and 28, to which the Goodwins had objected and never agreed (DX117, pp. 42-54, 70-82; 10/15/21 Trial Tr. 52:11-53:24, 54:11-55:15 (D. James direct); 11/16/21 Trial Tr. 49:13-50:5 (C.A. Mulrain cross)).

146.   The Goodwins never authorized or agreed, orally or otherwise, to any further revisions to the Employment Agreements after Aaron Goodwin's February 12, 2016 fax transmittal to Mr. Aden (10/12/21 Trial Tr. 109:7-10 (A. Goodwin direct)).

147.   The Goodwins never authorized or agreed, orally or otherwise, to the affixing of their signature pages to any versions of the Employment Agreements other than those included in Aaron Goodwin's February 12, 2016 fax transmittal to Mr. Aden (10/12/21 Trial Tr. 109:7-10 (A. Goodwin direct)).

*The SPA's Purported Closing*

148.    On February 15, 2016, Aaron Goodwin inquired of Mr. Aden, via text message, "is everything still good?  No changes over the weekend ?" (DX145, p. 228 (Feb. 15, 2016 at 1:51 pm)).

149.    Aaron Goodwin texted Mr. Aden to confirm that "everything was still good, there w[ere] no issues" with respect to the Employment Agreements that he had transmitted via fax to Mr. Aden (10/26/21 Trial Tr. 72:19-73:7 (A. Goodwin re-direct)).

150.    Mr. Aden responded to Aaron Goodwin, via text message, "[n]o changes" (DX145, p. 228 (Feb. 15, 2016 at 1:54 pm)).

151.    Messrs. Aden and James also confirmed via phone calls that the Goodwins' revisions to the Employment Agreements were accepted (10/12/21 Trial Tr. 110:1-5 (A. Goodwin direct)).

152.    At some point between February 12 and February 22, 2016, Decade's principals, 23 Capital's principals, and the transactional attorneys from Gordon Rees and Loeb attended two in-person closings of the Goodwin Entities share purchase transaction (10/15/21 Trial Tr. 20:19-21:5 (D. James direct)).

153.    The Goodwins were not invited to the in-person closings (10/12/21 Trial Tr. 109:11-16 (A. Goodwin direct)).

154.    Messrs. Aden and James advised Aaron Goodwin after the in-person closings that Decade would furnish the agreed-upon initial consideration payment for the purchase of the Goodwin Entities (10/12/21 Trial Tr. 109:11-16 (A. Goodwin direct)).

155.     The Goodwins were not provided a version of the Employment Agreements executed by Decade prior to or at the SPA's closing (10/12/21 Trial Tr. 122:9-11 (A. Goodwin direct)).

156.     The Goodwins were not provided an executed version of any promissory note to which they were entitled to payments prior to or at the SPA's closing (10/12/21 Trial Tr. 122:19-21 (A. Goodwin direct)).

157.     The Goodwins were not provided an executed version of any guaranty of payments prior to or at the SPA's closing (10/12/21 Trial Tr. 123:2-6 (A. Goodwin direct)).

### *The Employment Agreement Discrepancies*

158.     On April 20, 2016, Aaron Goodwin received for the first time, via email from Mr. Aden, what Mr. Aden described as a counter-signed execution copy of Aaron Goodwin's employment agreement with Decade (DX80; 10/12/21 Trial Tr. 110:6-111:3 (A. Goodwin direct); Stip. Fact ¶ 96).

159.     The attachment to Mr. Aden's April 20, 2016 email contained Sections 27 and 28 (which the Goodwins had stricken from their Employment Agreements in Aaron Goodwin's February 12, 2016 fax transmittal to Mr. Aden) and included Aaron Goodwin's Employment Agreement signature page from his February 12, 2016 fax transmittal (DX80, pp. 12-13, 15; Stip. Fact ¶ 96).

160.     Aaron Goodwin promptly notified Messrs. Aden, James, and Mulrain—via phone calls and text messages—that the attachment to Mr. Aden's April 20, 2016 email reflected a purported employment agreement that was "either fraudulent or incorrect"

because it included Sections 27 and 28 (10/12/21 Trial Tr. 111:7-112:3 (A. Goodwin direct)).

161.   Mr. Mulrain advised Aaron Goodwin via phone call that he was upset about the Employment Agreement discrepancy and would talk with Messrs. Aden and James to ascertain what had happened (10/12/21 Trial Tr. 113:13-20 (A. Goodwin direct)).

162.   On May 4, 2016, Mr. Mulrain followed up with Aaron Goodwin via text message: "I'm sitting here taking with Chris [Aden].  My man I didn't make a change to your agreement.  I don't roll like that and even if I did, I would never do something like that to you" (PX113, p. 19 (May 4, 2016 at 7:21 pm); 11/16/21 Trial Tr. 54:2-55:12 (C.A. Mulrain cross); Stip. Fact ¶ 98).

163.   Aaron Goodwin understood Mr. Mulrain's May 4, 2016 text message to signify that Mr. Mulrain had not made any changes to the Employment Agreements and would restore the versions that the Goodwins had signed and faxed to Mr. Aden on February 12, 2016 (10/12/21 Trial Tr. 114:6-9 (A. Goodwin direct)).

164.   By May 4, 2016, Mr. Mulrain recognized that there was an issue with respect to the Employment Agreements (11/16/21 Trial Tr. 55:14-56:5 (C.A. Mulrain cross)).

165.   In or around May 2016, Mr. Mulrain launched an inquiry to address Aaron Goodwin's objection that the versions of the Employment Agreements that Decade attached to the Goodwins' signature pages differed from those to which the Goodwins agreed (the "Gordon Rees Inquiry") (11/16/21 Trial Tr. 36:11-37:25 (C.A. Mulrain cross); Stip. Fact ¶ 100).

166.    During the Gordon Rees Inquiry, Mr. Mulrain interviewed Messrs. Aden, James, Llorens, and a Gordon Rees paralegal named Rebecca Barnes who assisted Decade on the transaction (11/16/21 Trial Tr. 37:21-39:17 (C.A. Mulrain cross); Stip. Fact ¶ 101).

167.    As a result of the interviews he conducted, Mr. Mulrain learned that each of Messrs. James and Llorens and Ms. Barnes indicated that Mr. Aden was responsible for relaying to Aaron Goodwin for his review any changes to the SPA and other transactional documents (11/16/21 Trial Tr. 36:11-40:3 (C.A. Mulrain cross); A. Llorens Dep. Tr. 62:18-63:5, 63:24-64:4, 64:9-65:2, 65:17-66:7).

168.    Mr. Mulrain did not interview Aaron or Eric Goodwin during the Gordon Rees inquiry and did not relay the results of the inquiry to the Goodwins (11/16/21 Trial Tr. 37:21-39:17 (C.A. Mulrain cross)).

*The Goodwins' Consistent Overperformance of Their Contractual Obligations*

169.    From April 8, 2016 through and including May 1, 2017, the Goodwins transferred $1,747,512.67 to Decade (DX79, p. 2; DX83; DX90, p. 1; PX133, p. 69; DX104; DX115; DX145, p. 316 (Dec. 1, 2016 at 2:24 pm, 2:26 pm); DX121, p. 3; DX140, p. 22; Stip. Fact ¶ 91).

170.    Excluding royalty payments, Aaron Goodwin and the Goodwin Entities received $1,438,454 attributable to player and marketing contracts with Damian Lillard from February 22, 2016 through and including February 22, 2017 (DX121, pp. 12, 20, 24, 36; DX140, pp. 19, 22; DX141, pp. 135, 136; DX152, pp. 1, 17; DX153, pp. 31, 35; 10/12/21 Trial Tr. 132:7-174:23 (A. Goodwin direct)).

171.   Aaron Goodwin understood that under the parties' agreement, the Goodwins were required to remit to Decade 37.5% of the non-royalty receivables attributable to player and marketing contracts with Damian Lillard, totaling $539,420.25 from February 22, 2016 through and including February 22, 2017 (10/12/21 Trial Tr. 118:12-119:16 (A. Goodwin direct)).

172.   Excluding royalty payments, Aaron Goodwin and the Goodwin Entities received $1,098,158 attributable to player and marketing contracts with DeMar DeRozan from February 22, 2016 through and including February 22, 2017 (DX121, pp. 3, 8, 20, 28; DX140, p. 19; DX141, p. 134; 10/12/21 Trial Tr. 132:7-174:23 (A. Goodwin direct)).

173.   Aaron Goodwin understood that under the parties' agreement, the Goodwins were required to remit to Decade 37.5% of the non-royalty receivables attributable to player and marketing contracts with DeMar DeRozan, totaling $411,809.25 from February 22, 2016 through and including February 22, 2017 (10/12/21 Trial Tr. 118:12-119:12, 119:17-19 (A. Goodwin direct)).

174.   Excluding royalty payments, Aaron Goodwin and the Goodwin Entities received $432,831 attributable to player and marketing contracts with all clients other than Damian Lillard and DeMar DeRozan from February 22, 2016 through and including February 22, 2017 (DX121, p. 3; DX141, pp. 133, 134; 10/12/21 Trial Tr. 132:7-174:23 (A. Goodwin direct)).

175.   Aaron Goodwin understood that under the parties' agreement, the Goodwins were required to remit to Decade 50% of the non-royalty receivables attributable to player and marketing contracts with all clients other than Damian Lillard and DeMar

DeRozan, totaling $216,415.50 from February 22, 2016 through and including February 22, 2017 (10/12/21 Trial Tr. 118:12-119:12, 119:20-23 (A. Goodwin direct)).

176.    Aaron Goodwin and the Goodwin Entities received $200,000 attributable to royalty payments from February 22, 2016 through and including February 22, 2017 (DX121, p. 28; DX152, p. 17; DX141, p. 135; 10/12/21 Trial Tr. 132:7-174:23 (A. Goodwin direct)).

177.    Aaron Goodwin understood that under the parties' agreement, the Goodwins were required to remit to Decade 15% of royalty payments, totaling $30,000 from February 22, 2016 through and including February 22, 2017 (10/12/21 Trial Tr. 118:12-119:12, 119:24-120:2 (A. Goodwin direct)).

178.    At all times through and including the one-year anniversary of the SPA's closing on February 22, 2017, the Goodwins overpaid the portion of receivables payable to Aaron Goodwin or the Goodwin Entities to which Decade was entitled (10/12/21 Trial Tr. 132:7-174:23 (A. Goodwin direct)).

179.    Each of the Goodwins' transfers to Decade was a cash advance against the portions of receivables payable to Aaron Goodwin or the Goodwin Entities to which Decade was entitled under the parties' agreement (10/12/21 Trial Tr. 130:20-131:15, 134:23-25, 137:25-138:17, 141:7-21, 153:12-21 (A. Goodwin direct)).

180.    Aaron Goodwin made each of the transfers to Decade in the manner and amount requested by Mr. Aden (10/12/21 Trial Tr. 141:7-142:4, 158:5-24 (A. Goodwin direct); 10/15/21 Trial Tr. 73:1-74:15 (D. James direct)).

181.    Neither Mr. Aden nor Mr. James ever objected to the Goodwins' payments on the ground that the Goodwins' revenue entitlements should be made to a lockbox controlled by 23 Capital (10/15/21 Trial Tr. 64:20-65:10 (D. James direct)).

*Decade's Concealment of the Supposed Requirement that the Goodwins Remit Payments to a Lender-Controlled Lockbox*

182.    The Goodwins were not parties to the loan agreement between Decade and 23 Capital (Stip. Fact ¶ 85).

183.    The Goodwins were never sent a copy of the loan agreement between Decade and 23 Capital (10/26/21 Trial Tr. 49:18-20 (A. Goodwin cross); C. Aden Dep. Tr. 135:21-136:6, 140:22-142:2, 150:6-151:24; 23 Capital Dep. Tr. 131:9-15; J. Traub Dep. Tr. 90:4-17; C. Johnson Dep. Tr. 45:23-46:21; K. Eisenberg Dep. Tr. 36:13-19).

184.    The Goodwins were never copied on any communications concerning the establishment of lockbox accounts to be controlled by 23 Capital (Stip. Fact ¶ 107).

185.    The Goodwins were never invited to join conference calls between 23 Capital's and Decade's principals and attorneys concerning the establishment of lockbox accounts to be controlled by 23 Capital (Stip. Fact ¶ 107).

186.    The Goodwins were never copied on any communications concerning the drafting and delivery of letters irrevocably directing the Goodwins' clients to remit payment to 23 Capital-controlled lockbox accounts (Stip. Fact ¶ 108).

187.    The Goodwins were never invited to join conference calls between 23 Capital's and Decade's principals and attorneys concerning the drafting and delivery of

letters irrevocably directing the Goodwins' clients to remit payment to 23 Capital-controlled lockbox accounts (Stip. Fact ¶ 108).

188.    Decade accepted $1,747,512.67 in direct payments from the Goodwins without any objection (DX79, p. 2; DX83; DX90, p. 1; PX133, p. 69; DX104; DX115; DX145, p. 316 (Dec. 1, 2016 at 2:24 pm, 2:26 pm); DX121, p. 3; DX140, p. 22; Stip. Fact ¶ 91).

*Decade's Withholding of the SPA and Other Transactional Documents for Months After the SPA's Closing*

189.    In late November 2016, Aaron Goodwin received an unsolicited phone call from Matthew Spiro, who worked as an analyst for a firm that invested in 23 Capital named Candlewood Investment Group ("Candlewood") (10/12/21 Trial Tr. 178:21-179:13 (A. Goodwin direct); M. Spiro Dep. Tr. 8:7-12, 81:5-18, 81:24-82:25).

190.    Mr. Spiro advised Aaron Goodwin during the November 2016 phone call that 23 Capital had not received certain funds that, Mr. Spiro stated, 23 Capital was owed in connection with Decade's acquisition of the Goodwin Entities (10/12/21 Trial Tr. 178:21-179:13 (A. Goodwin direct); M. Spiro Dep. Tr. 94:5-11).

191.    Specifically, Mr. Spiro suggested that the Goodwins' player clients had failed to remit payments directly to a lockbox controlled by 23 Capital (M. Spiro Dep. Tr. 94:5-11).

192.    Aaron Goodwin told Mr. Spiro that he was not familiar with Mr. Spiro or with Candlewood (10/12/21 Trial Tr. 178:21-179:13 (A. Goodwin direct)).

193.     Aaron Goodwin also advised Mr. Spiro that the Goodwins had honored all their contractual obligations in connection with the Goodwin Entities share purchase transaction, including making all required payments to Decade (M. Spiro Dep. Tr. 94:12-19).

194.     After speaking with Mr. Spiro, Aaron Goodwin promptly phoned each of Messrs. Aden and James and inquired who Mr. Spiro is and for what purpose had he contacted him (10/12/21 Trial Tr. 179:14-16 (A. Goodwin direct)).

195.     Mr. Aden informed Aaron Goodwin via phone that Mr. Spiro was "somebody that is involved with the money of 23 [Capital]" and further advised him, "don't pay it any attention" (10/12/21 Trial Tr. 179:17-21 (A. Goodwin direct)).

196.     On December 1, 2016, Mr. Aden followed up, via text message, to Aaron Goodwin: "Ignore all of the XXIII bullshit" (DX145, p. 315 (Dec. 1, 2016 at 10:47 am)).

197.     Based on Mr. Aden's instruction, Aaron Goodwin did not make further contact with Mr. Spiro or 23 Capital (10/12/21 Trial Tr. 180:9-10 (A. Goodwin direct)).

198.     Following the call from Mr. Spiro, Aaron Goodwin insisted that Mr. Aden send him all the deal documents with respect to the Goodwin Entities purchase transaction (10/12/21 Trial Tr. 114:14-115:6 (A. Goodwin direct)).

199.     In response to Aaron Goodwin's request, on December 1, 2016, Mr. Aden (copying Mr. James) emailed to Aaron Goodwin the purported execution versions of the SPA, Employment Agreements, and other transactional documents, including a promissory note and guaranty agreement under the SPA (DX117; Stip. Fact ¶ 109).

200.     Aside from Aaron Goodwin's Employment Agreement (which Aaron Goodwin had received on April 20, 2016 and promptly thereafter identified discrepancies to

Decade and its counsel), Mr. Aden's December 1, 2016 email marked the first instance that Aaron Goodwin had received the SPA and other transactional documents (10/12/21 Trial Tr. 117:18-118:11, 122:9-123:6 (A. Goodwin direct)).

201.    Upon reviewing the attachments to Mr. Aden's December 1, 2016 email, Aaron Goodwin contacted Messrs. Aden and James to advise them that the SPA and other transactional documents were fraudulent (10/12/21 Trial Tr. 117:10-17 (A. Goodwin direct)).

202.    Aaron Goodwin also asked the Goodwins' attorney, Mr. Gilbert, to conduct a line-by-line review of the SPA (10/12/21 Trial Tr. 117:10-17 (A. Goodwin direct)).

203.    Mr. Gilbert's review of the documents attached to Mr. Aden's December 1, 2016 email revealed that Decade had incorporated the SPA Edits, to which the Goodwins had never agreed (10/12/21 Trial Tr. 117:10-17 (A. Goodwin direct)).

*Decade's Breaches of the SPA, Employment Agreements, and Other Transactional <u>Documents</u>*

204.    Decade agreed to remit salary and bonus payments to Aaron and Eric Goodwin and to reimburse them for business expenses (DX149, pp. 2, 4, 18, 20).

205.    As of December 21, 2016, Decade owed Aaron Goodwin a $150,000 retention bonus, $116,667.12 in salary payments, and $350,000 in expense reimbursements (PX92, p. 1; 10/12/21 Trial Tr. 176:22-178:11 (A. Goodwin direct); Stip. Fact ¶ 113).

206.    As of December 21, 2016, Decade owed Eric Goodwin $25,000 in salary payments and $19,938.24 in expense reimbursements (PX92, p. 1; 10/12/21 Trial Tr. 176:22-178:11 (A. Goodwin direct); Stip. Fact ¶ 113).

207.    At no time did Decade ever dispute that it owed the salary payments, bonuses, and expense reimbursements detailed in Aaron Goodwin's December 21, 2016 email to Messrs. Aden and James (PX92; 10/12/21 Trial Tr. 178:18-20 (A. Goodwin direct)).

208.    Decade agreed to pay the Goodwins the remainder of the $35 million consideration for the purchase of the Goodwin Entities in accordance with a prescribed payment schedule (DX6, pp. 6-7; *accord* DX117, pp. 98-99).

209.    Decade failed to make any of the payments to the Goodwins set forth in the agreed-upon payment schedule (DX6, pp. 6-7; *accord* DX117, pp. 98-99).

210.    Specifically, Decade failed to remit payment to the Goodwins of $3.5 million on or before February 22, 2017; $1.5 million on or before August 22, 2017; $3.5 million on or before February 22, 2018; $3.5 million on or before February 22, 2019; $2.5 million on or before February 22, 2020; and $2.5 million on or before February 22, 2021 (10/12/21 Trial Tr. 174:24-175:10 (A. Goodwin direct)).

211.    Aaron Goodwin continued to make advance payments to Decade until May 1, 2017, more than two months after the one-year anniversary of the SPA (10/12/21 Trial Tr. 175:11-15 (A. Goodwin direct)).

212.    Aaron Goodwin remitted additional advance payments to Decade after February 22, 2017 because Decade's principals had assured Aaron Goodwin that Decade was in the process of refinancing its loan with 23 Capital, and that the prospective financier, Arena Investors, LP ("Arena"), would address the discrepancies Aaron Goodwin had identified with the transactional documents (10/12/21 Trial Tr. 175:16-25 (A. Goodwin direct); DX145, pp. 302, 308, 315, 319-20, 324-25, 327-28).

213.    In late February 2017, Aaron Goodwin met with Arena's principal Scott Gold regarding the prospective refinancing during NBA All-Star Weekend in New Orleans (10/15/21 Trial Tr. 68:25-70:2 (D. James direct)).

214.    Ultimately, Arena declined to provide financing to Decade because Mr. Gold did not trust Mr. Aden (10/15/21 Trial Tr. 70:4-8 (D. James direct)).

*Availability of Key Documents and Fact Witnesses*

215.    The Goodwins deposed ten fact witnesses, including Mr. Aden and Mr. Llorens, in the above-captioned adversary proceeding (D.I. 222, pp. 44-47).

216.    All depositions were taken before July 31, 2019, the deadline for completion of fact discovery ordered by this Court (D.I. 64, p. 2 at ¶ 8).

217.    The Trustee failed to produce certain critical documents and communications (including, among others, DX149, DX150, and DX151) until September 9, 2019—months after the fact discovery completion deadline and all depositions in this case, and after the Trustee's filing of a motion for summary judgment (D.I. 86; D.I. 121, p. 8).

218.    The Trustee declined to call Mr. Aden as a trial witness (D.I. 230, 234, 236, 239, 241, 253, 258, 266).

219.    Mr. Aden defied the Goodwins' trial subpoena (10/15/21 Trial Tr. 78:23-79:12).

220.    Mr. Llorens attended the trial proceedings remotely to be available to testify for the Trustee (11/16/21 Trial Tr. 63:16-64:1).

221.    After eliciting trial testimony from Mr. Mulrain, the Trustee declined to call Mr. Llorens as a trial witness (11/16/21 Trial Tr. 64:11-12).

222.    Mr. Llorens refused to testify when called as a rebuttal witness by the Goodwins (11/16/21 Trial Tr. 65:2-66:18, 68:14-25).

223.    Mr. Aaron Goodwin was a completely credible, detailed, and reliable witness, unlike Mr. Dorsey and Mr. Mulrain who were vague and evasive.  The Court draws a negative inference from Mr. Llorens' refusal to testify when called by the Goodwins.  The Court found Mr. Aaron Goodwin to be completely honest and persuasive on all points.

## CONCLUSIONS OF LAW

### *Jurisdiction and Venue*

224.    This Court has subject matter jurisdiction over the present adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.

225.    Venue in the United States Bankruptcy Court for the District of Delaware was proper as of the Petition Date pursuant to 28 U.S.C. §§ 1408 and 1409.

226.    Venue in the United States Bankruptcy Court for the District of Delaware is presently proper pursuant to 28 U.S.C. §§ 1408 and 1409.

*Evidentiary Standards and Applicable Law*

227.    The Trustee bears the burden of proof with respect to his claim for a declaratory judgment.  *See In re Big V Holding Corp.*, 267 B.R. 71, 90 (Bankr. D. Del. 2001) (citing *Chi. Pneumatic Tool Co. v. Ziegler*, 151 F.2d 784, 799 (3d Cir. 1945)).

228.    Applicable state law supplies the burden of proof with the respect to the Goodwins' counterclaims sounding in fraud.  *See DeMarines v. KLM Royal Dutch Airlines*, 580 F.2d 1193, 1200 (3d Cir. 1978) (citing *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938)).

229.    In determining which state's law applies to the Goodwins' counterclaims sounding in fraud, this Court looks to the Restatement (Second) of Conflict of Laws (the "Restatement").  *See Gloucester Holding Corp. v. U.S. Tape & Sticky Prods., LLC*, 832 A.2d 116, 123-24 (Del. Ch. 2003).

230.    Applying the Restatement, this Court must determine which state "has the most significant relationship to the occurrence and the parties."  *Pa. Emp., Benefit Trust Fund v. Zeneca, Inc.*, 710 F. Supp. 2d 458, 467 (D. Del. 2010) (quoting Restatement § 148(2)).

231.    In cases of fraud or misrepresentation, the Restatement requires consideration of relevant jurisdictional contacts, including "the place where the plaintiff received the representations" and "the domicil, residence, nationality, place of incorporation and place of business of the parties."  *Pa. Emp., Benefit Trust Fund v. Zeneca, Inc.*, 710 F. Supp. 2d 458, 467 (D. Del. 2010) (quoting Restatement § 148(2)).

232.    "[T]he domicil, residence and place of business of the plaintiff are more important than are similar contacts on the part of the defendant" because "the loss is of 'greatest concern to the state with which the person suffering the loss has the closest

43

relationship.'" *Feinberg v. Saunders, Karp & Megrue, L.P.*, No. 97–207–SLR, 1998 WL 863284, at *11 (D. Del. Nov. 13, 1998) (quoting Restatement § 148(2) cmt. i).

233.    "Although the 'place of injury' factor is often determinative of the most significant relationship, this is not the case when the injury in question is fortuitous.  The place of injury is considered to be fortuitous when there is no other significant contact with the site other than the injury itself." *Caballero v. Ford Motor Co.*, C.A. No. N11C–09–170 JRJ, 2014 WL 2900959, at *3 (Del. Super. June 24, 2014) (footnotes and quotation marks omitted).

234.    California bears the most significant relationship both to the parties and to the unlawful conduct underpinning the Goodwins' counterclaims sounding in fraud.

235.    Aaron Goodwin was the lead negotiator of the Goodwin Entities purchase transaction on behalf of the Goodwins (10/12/21 Trial Tr. 57:13-15, 58:16-19 (A. Goodwin direct); 10/26/21 Trial Tr. 110:8-15 (E. Goodwin direct)).

236.    Decade, through its principals and agents, relayed material misrepresentations (via text messages, emails, and phone calls) directly to Aaron Goodwin (DX3, pp. 10-15; DX6, pp. 1, 6-9; DX56; DX59, pp. 1, 3-6, 10-13; DX145, pp. 170, 183, 225, 228; 10/12/21 Trial Tr. 82:1-83:1, 110:1-5 (A. Goodwin direct)).

237.    Aaron Goodwin relayed the fax transmittal that included the Goodwins' signed signature blocks, which Decade, through its principals or agents, fraudulently appended to transactional documents containing terms to which the Goodwins consistently objected (10/12/21 Trial Tr. 99:22-103:21 (A. Goodwin direct); DX149, pp. 1, 10, 11, 17, 26, 27, 32-34).

44

238.    Both the Executed LOI and the updated letter of intent that Mr. Aden re-sent to Aaron Goodwin for the purpose of fraudulently inducing the Goodwins' provision of signed signature blocks contained a California choice of law clause and further provided that the choice of law provision "shall survive the termination or expiration of this LOI" (DX3, pp. 2, 13).

239.    Throughout the negotiations concerning the Goodwin Entities' purchase transaction and continuing to present, Aaron Goodwin was a resident and citizen of California (Stip. Fact ¶ 10).

240.    GAME, the holding company at issue in whose bank accounts Aaron Goodwin used to deposit fees he earned from player representations, is a California corporation (D.I. 1, p. 3 at ¶ 12).

241.    The Goodwins' presence in Toronto, Ontario on February 12, 2016 to attend the NBA All Star Game was entirely fortuitous (10/12/21 Trial Tr. 83:6-14 (A. Goodwin direct); 10/26/21 Trial Tr. 72:19-73:2 (A. Goodwin re-direct)).

242.    Aside from being the location where Aaron Goodwin transmitted a fax to Mr. Aden revising the Employment Agreements and attaching signature pages, the province of Ontario had no connection to the parties, the contemplated transaction, or Decade's fraudulent conduct.

243.    Accordingly, California law applies to the Goodwins' counterclaims sounding in fraud.

244.    Applying California law, the Goodwins bear the burden of proving, by "no more than a preponderance of the evidence," the Goodwins' counterclaims sounding in

fraud.  *Sierra Nat'l Bank v. Brown*, 95 Cal. Rptr. 742, 746 (Cal. Ct. App. 1971); Cal. Evid. Code § 115.

245.    The Goodwins bear the burden of proof with respect to their alternative counterclaim for a declaratory judgment.  *See In re Big V Holding Corp.*, 267 B.R. 71, 90 (Bankr. D. Del. 2001) (citing *Chi. Pneumatic Tool Co. v. Ziegler*, 151 F.2d 784, 799 (3d Cir. 1945)).

### *The Debtors Are Liable to the Goodwins for the Debtors' Fraud in the Execution*

246.    The Trustee is the successor in interest to the Debtors' management. *Kittay v. Landegger (In re Hagerstown Fiber Ltd. P'ship)*, 277 B.R. 181, 206 (Bankr. S.D.N.Y. 2002) ("[H]e stands in the shoes of the debtor, and may bring any suit that the debtor could have brought before bankruptcy."). The Trustee manages the Debtors' estates but is not personally liable for the Debtors' debts.  *DiStefano v. Stern (In re J.F.D. Enterprises, Inc.)*, 223 B.R. 610, 628 (Bankr. D. Mass. 1998), *aff'd sub nom. DiStefano v. Stern*, 236 B.R. 112 (D. Mass. 1999), *aff'd sub nom. In re JFD Enterprises, Inc.*, 215 F.3d 1312 (1st Cir. 2000) (holding that trustees "should not be deemed to have violated their fiduciary duty and become subject to personal liability unless that are found to have acted with gross negligence.").  Any liability of the Trustee would arise from his or her own actions as trustee and not from the actions of the Debtors' management or its principals.  *Id.*  There are no facts in evidence that would support the Trustee being held liable in connection with fraud perpetrated upon the Goodwins.

247.    The evidence adduced at trial demonstrates the Debtors' liability on the Goodwins' counterclaim for fraud in the execution.

248.    Under California law, if "the fraud goes to the inception or execution of the agreement, so that the promisor is deceived as to the nature of his act, and actually does not know what he is signing, or does not intend to enter into a contract at all, mutual assent is lacking, and [the contract] is void.  In such a case it may be disregarded without the necessity of rescission." *Rosenthal v. Great W. Fin. Sec. Corp.*, 926 P.2d 1061, 1073 (Cal. 1996); *accord Gilbert v. Rothschild*, 19 N.E.2d 785, 787 (N.Y. 1939); *Hetchkop v. Woodlawn at Grassmere, Inc.*, 116 F.3d 28, 32 (2d Cir. 1997) (fraud in the execution encompasses the "substitution of a document of the same kind where the new document introduced important terms that were materially different from those to which the party had agreed").

249.    The Employment Agreements were part of an integrated contract (with the SPA and other transactional documents), which prescribed the terms of Decade's purchase of the Goodwin Entities (10/15/21 Trial Tr. 31:3-11 (D. James direct)).  *See DB Structured Prods., Inc. v. Am. Home Mortg. Holdings, Inc.*, 402 B.R. 87, 100 (Bankr. D. Del. 2009).

250.    Absent the parties' agreement to the terms that would govern the Goodwins' employment as Decade executives, the Goodwin Entities purchase transaction would not—and could not—have closed (10/15/21 Trial Tr. 31:3-11 (D. James direct); DX117, p. 29 (SPA § 8.2(c))).

251.    Aaron Goodwin made clear to Decade, including both of its principals and its transactional attorneys, that the Goodwins would not agree to the Employment Agreements unless Sections 27 and 28 were removed from the documents (10/12/21 Trial

Tr. 78:5-79:12, 87:16-91:15 (A. Goodwin direct); PX113, p. 17; DX50, p. 1; DX57, p. 1; DX145, pp. 218-19, 223-24; Stip. Facts ¶¶ 60-63, 68-69, 71, 72, 77).

252.    Sections 27 and 28 were important and material terms of the Employment Agreements (10/12/21 Trial Tr. 87:16-91:15 (A. Goodwin direct); PX113, p. 17; DX50, p. 1; DX57, p. 1; DX145, pp. 223-24).

253.    At Mr. Aden's instruction, the Goodwins signed and faxed to Mr. Aden revised Employment Agreements, removing Sections 27 and 28, along with the Goodwins' signature pages (DX145, p. 225; DX149).

254.    Through its principals and agents, Decade indicated to the Goodwins that the Goodwins' revisions to the Employment Agreements were accepted and incorporated in the final versions of the documents (DX145, pp. 225, 228; 10/12/21 Trial Tr. 110:1-5 (A. Goodwin direct)).

255.    Without the Goodwins' assent or knowledge, Mr. Aden or another agent of Decade surreptitiously affixed the Goodwins' signature pages from the February 12, 2016 fax transmittal to a version of the Employment Agreements that contained Sections 27 and 28, to which the Goodwins had objected (DX117, pp. 42-54, 70-82; 10/14/21 Trial Tr. 109:7-10 (A. Goodwin direct); 10/15/21 Trial Tr. 52:11-53:24, 54:11-55:15 (D. James direct); 11/16/21 Trial Tr. 49:13-50:5 (C.A. Mulrain cross)).

256.    Decade thereby deceived the Goodwins as to the material terms of the Employment Agreements they had signed.

257.    To the extent there is any doubt as to Decade's surreptitious actions with respect to the Goodwins' signature pages, Mr. Llorens' selective absence from trial,

(11/16/21 Trial Tr. 63:16-64:1, 65:2-66:18, 68:14-25), warrants an inference that his testimony "would have been adverse" to the Trustee. *Lin v. Rohm & Haas Co.*, 685 F. App'x 125, 132 (3d Cir. 2017) (quoting *Graves v. United States*, 150 U.S. 118, 121 (1893)).

258.    Thus, the evidence shows that the Employment Agreements are the product of fraud in the execution.

259.    Because the Employment Agreements are an indispensable part of an integrated contract that includes the SPA, Decade's fraud in the execution of the Employment Agreements renders the SPA void as a matter of law. *Rosenthal v. Great W. Fin. Sec. Corp.*, 926 P.2d 1061, 1073 (Cal. 1996).

260.    Additionally, the Goodwins are entitled to seek compensatory damages from the Estates to redress any damages they sustained because of the Debtors' fraud in the execution of the Employment Agreements. Cal. Civ. Code § 3333; *see Walker v. Signal Cos., Inc.*, 149 Cal. Rptr. 119, 125 (Cal. Ct. App. 1978) (construing Code as authorizing damages in "an amount which will compensate for all the detriment caused thereby, whether it could have been anticipated or not").

261.    The Goodwins are also entitled to seek punitive damages from the Estates with respect to the Debtors' fraud in the execution of the Employment Agreements. *See* Cal. Civ. Code § 3294 (authorizing "damages for the sake of example and by way of punishing the defendant" where "it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice").

*The Debtors Are Liable to the Goodwins for the Debtors' Fraudulent Misrepresentations*

262.    The evidence adduced at trial demonstrates the Debtors' liability on the Goodwins' counterclaim for fraudulent misrepresentation.

263.    Under California law, a defendant is liable for fraudulent misrepresentation where: "(1) the defendant misrepresents material facts; (2) with knowledge of the falsity of the representations or the duty of disclosure; (3) with intent to defraud or induce reliance; (4) which induces justifiable reliance by the plaintiff; (5) to his or her detriment." *Terra Ins. Co. v. N.Y. Life Inv. Mgmt. LLC*, 717 F. Supp. 2d 883, 890 (N.D. Cal. 2010); *accord Gomez-Jimenez v. N.Y. L. Sch.*, 103 A.D.3d 13, 18 (N.Y. App. Div, 1st Dep't 2012).

264.    The Debtors engaged in multiple material misrepresentations in connection with the Goodwin Entities purchase transaction.

### Misrepresentation #1: Transactional Terms Remain the Same as Negotiated

265.    Among other material misrepresentations, Decade, through its principal Mr. Aden, falsely represented to Aaron Goodwin—via text messages, emails, and phone calls, on February 10, 11, 12, and 15, 2016—that the terms of the Goodwin Entities share purchase transaction remained the same as those agreed to by the parties pursuant to the Executed LOI and the Stealth Agreement (DX56; DX59, pp. 1, 3-6, 10-13; DX145, pp. 219, 225, 228; 10/12/21 Trial Tr. 82:1-83:1 (A. Goodwin direct); 10/14/21 Trial Tr. 30:15-31:1 (A. Goodwin direct)).

266.    Mr. Aden knew this representation to be false, as he had been copied on numerous email communications, in late January and early February 2016, concerning the SPA Edits proposed by 23 Capital (DX21, DX22, DX23, DX30, DX32, DX35, DX36, DX37, DX38, DX39, DX42, DX44, DX49; 10/15/21 Trial Tr. 55:19-23 (D. James direct)).

50

267.    In addition, Decade's principals and attorneys had agreed that Mr. Aden would be responsible for relaying the SPA Edits to Aaron Goodwin for his review (11/16/21 Trial Tr. 36:11-40:3 (C.A. Mulrain cross); A. Llorens Dep. Tr. 62:18-63:5, 63:24-64:4, 64:9-65:2, 65:17-66:7).

268.    Mr. Aden intended to induce the Goodwins' reliance on the absence of changes to the transactional documents governing the Goodwin Entities purchase because he knew, from prior communications with Aaron Goodwin, both that the Goodwins (a) would not renegotiate the terms agreed upon in the Executed LOI and Stealth Agreement, and (b) were specifically opposed to the edits proposed by 23 Capital (DX145, p. 164; 10/12/21 Trial Tr. 67:4-69:2, 69:16-70:22 (A. Goodwin direct); 10/15/21 Trial Tr. 14:23-15:13, 65:7-10 (D. James direct)).

269.    To the extent there is any doubt with respect to Mr. Aden's intention in making false representations to Aaron Goodwin concerning the Goodwin Entities purchase transaction, Mr. Aden's absence from trial (D.I. 230, 234, 236, 239, 241, 253, 258, 266; 10/15/21 Trial Tr. 78:23-79:12) warrants an inference that his testimony "would have been adverse" to the Trustee. *Lin v. Rohm & Haas Co.*, 685 F. App'x 125, 132 (3d Cir. 2017) (quoting *Graves v. United States*, 150 U.S. 118, 121 (1893)).

270.    Mr. Aden's false representations that the terms of the Goodwin Entities share purchase transaction remained the same induced the Goodwins' justifiable reliance (10/14/21 Trial Tr. 25:7-11 (A. Goodwin direct)).

271.    The misrepresentation concerning the terms of the transaction was to the Goodwins' detriment as the SPA Edits concealed by Mr. Aden resulted in a materially

worse and economically unacceptable transaction to the Goodwins (DX145, p. 164; 10/12/21 Trial Tr. 67:4-69:2, 69:16-70:22 (A. Goodwin direct); 10/15/21 Trial Tr. 14:23-15:13, 65:7-10 (D. James direct)).

> **Misrepresentation #2: Mr. Aden Committed to His Business Partner and to Decade's Attorneys That He Would Send the SPA Edits and the Executed Loan Agreement to Aaron Goodwin, But Acknowledges He Never Did**

272.    Mr. Aden falsely represented to Mr. James and Decade's transactional attorneys, Messrs. Mulrain and Llorens, that he would send the SPA Edits to Aaron Goodwin for his review and comment (11/16/21 Trial Tr. 36:11-40:3 (C.A. Mulrain cross); A. Llorens Dep. Tr. 62:18-63:5, 63:24-64:4, 64:9-65:2, 65:17-66:7).

273.    Mr. Aden also falsely represented to Messrs. Mulrain and Llorens that he would send the executed loan agreement between 23 Capital and Decade to Aaron Goodwin for his review (DX25; 10/26/21 Trial Tr. 49:18-20 (A. Goodwin cross); C. Aden Dep. Tr. 135:21-136:6, 140:22-142:2, 150:6-151:24; 23 Capital Dep. Tr. 131:9-15; J. Traub Dep. Tr. 90:4-17; C. Johnson Dep. Tr. 45:23-46:21; K. Eisenberg Dep. Tr. 36:13-19).

274.    Mr. Aden knew these misrepresentations to be false and further knew that absent Mr. Aden's disclosure of the SPA Edits, the Goodwins would have no knowledge of their existence (11/16/21 Trial Tr. 36:11-40:3 (C.A. Mulrain cross); A. Llorens Dep. Tr. 62:18-63:5, 63:24-64:4, 64:9-65:2, 65:17-66:7).

275.    Mr. Aden intended to induce the Goodwins' reliance on the absence of changes to the transactional documents governing the Goodwin Entities purchase because he knew, from prior communications with Aaron Goodwin, both that the Goodwins (a) would not renegotiate the terms agreed upon in the Executed LOI and Stealth Agreement and (b)

were specifically opposed to the edits proposed by 23 Capital (DX145, p. 164; 10/12/21 Trial Tr. 67:4-69:2, 69:16-70:22 (A. Goodwin direct); 10/15/21 Trial Tr. 14:23-15:13, 65:7-10 (D. James direct)).

276.   To the extent there is any doubt with respect to Mr. Aden's intention in making false representations to Mr. James and Decade's counsel concerning the Goodwin Entities purchase transaction, Mr. Aden's absence from trial (D.I. 230, 234, 236, 239, 241, 253, 258, 266; 10/15/21 Trial Tr. 78:23-79:12) warrants an inference that his testimony "would have been adverse" to the Trustee. *Lin v. Rohm & Haas Co.*, 685 F. App'x 125, 132 (3d Cir. 2017) (quoting *Graves v. United States*, 150 U.S. 118, 121 (1893)).

277.   The purported absence of changes to the transactional documents governing the Goodwin Entities purchase, which stemmed from Mr. Aden's false representations that he would send the SPA Edits and executed loan agreement to Aaron Goodwin, induced the Goodwins' justifiable reliance (DX145, pp. 219, 225, 228; 10/14/21 Trial Tr. 25:7-11 (A. Goodwin direct)).

278.   Mr. Aden's misrepresentation was to the Goodwins' detriment as the SPA Edits concealed by Mr. Aden resulted in a materially worse and economically unacceptable transaction to the Goodwins (DX145, p. 164; 10/12/21 Trial Tr. 67:4-69:2, 69:16-70:22 (A. Goodwin direct); 10/15/21 Trial Tr. 14:23-15:13, 65:7-10 (D. James direct)).

### Misrepresentation #3: Goodwins' Signature Pages to Be Held in Escrow

279.   Decade, through its principal Mr. Aden, falsely represented to Aaron Goodwin—via phone calls on February 11 and 12, 2016—that the Goodwins' signature

pages would be held in escrow by the law firms involved in the transaction until such time as an in-person closing was held (10/12/21 Trial Tr. 107:24-109:6 (A. Goodwin direct); 10/14/21 Trial Tr. 33:16-34:8 (A. Goodwin direct)).

280.    Mr. Aden knew this representation to be false, as he promptly forwarded the Goodwins' signature pages to Decade's counsel, who in turn represented, in an email communication on which Mr. Aden was copied, that the Goodwins' signatures corresponded both with the Employment Agreements (which contained terms to which the Goodwins objected) and other transactional documents (which the Goodwins were never afforded an opportunity to review) (DX150; DX151).

281.    Mr. Aden intended to induce the Goodwins' reliance on the false representation that the Goodwins' signature pages would be held in escrow, as he knew that the Goodwins did not authorize their signatures to be affixed to a version of the Employment Agreements containing Sections 27 and 28 or to the SPA Edits (DX145, p. 164; 10/12/21 Trial Tr. 67:4-69:2, 69:16-70:22, 109:7-10 (A. Goodwin direct); 10/15/21 Trial Tr. 14:23-15:13, 65:7-10 (D. James direct)).

282.    To the extent there is any doubt with respect to Mr. Aden's intention in making false representations to Aaron Goodwin concerning the Goodwin Entities purchase transaction, Mr. Aden's absence from trial (D.I. 230, 234, 236, 239, 241, 253, 258, 266; 10/15/21 Trial Tr. 78:23-79:12) warrants an inference that his testimony "would have been adverse" to the Trustee. *Lin v. Rohm & Haas Co.*, 685 F. App'x 125, 132 (3d Cir. 2017) (quoting *Graves v. United States*, 150 U.S. 118, 121 (1893)).

283.    Mr. Aden's false representations that the Goodwins' signature pages would be held in escrow induced the Goodwins' justifiable reliance (10/12/21 Trial Tr. 107:24-109:6 (A. Goodwin direct); 10/14/21 Trial Tr. 33:16-34:8 (A. Goodwin direct)).

284.    The misrepresentation that the Goodwins' signature pages would be held in escrow was to the Goodwins' detriment because it deprived the Goodwins of any opportunity to review the final versions of the transactional documents that Decade ultimately attached to the Goodwins' signature pages (10/12/21 Trial Tr. 117:18-118:11. 122:9-123:6 (A. Goodwin direct)).

285.    Decade's fraudulent misrepresentations render the SPA voidable at the Goodwins' option.  *See Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1138 (9th Cir. 2000).

286.    Additionally, the Goodwins are entitled to seek compensatory damages from the Estates to redress any damages they sustained because of the Debtors' fraudulent misrepresentations concerning the Goodwin Entities purchase transaction.  Cal. Civ. Code § 3333; *see Walker v. Signal Cos., Inc.*, 149 Cal. Rptr. 119, 125 (Cal. Ct. App. 1978) (construing Code as authorizing damages in "an amount which will compensate for all the detriment caused thereby, whether it could have been anticipated or not").

287.    The Goodwins are also entitled to seek punitive damages from the Estates with respect to the Debtors' fraudulent misrepresentations concerning the Goodwin Entities purchase transaction.  *See* Cal. Civ. Code § 3294 (authorizing "damages for the sake of example and by way of punishing the defendant" where "it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice").

*The Debtors Are Liable to the Goodwins for the Debtors' Fraudulent Inducement*

288.    The evidence adduced at trial demonstrates the Debtors' liability on the Goodwins' counterclaim for fraudulent inducement.

289.    Under California law, a defendant is liable for fraudulent inducement where the following elements are met: "(a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge or falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage." *Lazar v. Super. Ct.*, 909 P.2d 981, 984 (Cal. 1996); *accord Laduzinski v. Alvarez & Marsal Tax and LLC*, 132 A.D.3d 164, 167 (N.Y. App. Div., 1st Div. 2015).

290.    "An active concealment has the same force and effect as a representation which is positive in form." *Lovejoy v. AT&T Corp.*, 111 Cal. Rptr. 2d 711, 720 (Cal. Ct. App. 2001) (emphasis omitted).

291.    Each of the misrepresentations identified with respect to the Goodwins' counterclaim for fraudulent misrepresentation separately gives rise to liability for fraudulent inducement.

292.    As to each of Misrepresentations 1, 2, and 3, this Court finds that Decade's principal Mr. Aden acted with knowledge of falsity.

293.    As to each of Misrepresentations 1, 2, and 3, this Court finds that Decade's principal Mr. Aden acted with intent to defraud.

294.    As to each of Misrepresentations 1, 2, and 3, this Court finds that the Goodwins justifiably relied on Decade's misrepresentation.

295.    As to each of Misrepresentations 1, 2, and 3, this Court finds that Decade's conduct resulted in damage to the Goodwins.

296.    Additionally, Decade through its principal Mr. Aden, actively concealed from the Goodwins the SPA Edits.

297.    Mr. Aden acted with scienter, as he had been copied on numerous email communications, in late January and early February 2016, concerning the SPA Edits proposed by 23 Capital and Aaron Goodwin had sought to confirm on multiple occasions that the terms of the Goodwin Entities share purchase transaction remained the same as those agreed to by the parties pursuant to the Executed LOI and the Stealth Agreement (DX21, DX22, DX23, DX30, DX32, DX35, DX36, DX37, DX38, DX39, DX42, DX44, DX49; 10/15/21 Trial Tr. 55:19-23 (D. James direct)).

298.    Mr. Aden intended to induce the Goodwins' reliance on the absence of changes to the transactional documents governing the Goodwin Entities purchase because he knew, from prior communications with Aaron Goodwin, both that the Goodwins (a) would not renegotiate the terms agreed upon in the Executed LOI and Stealth Agreement, and (b) were specifically opposed to the edits proposed by 23 Capital (DX145, p. 164; 10/12/21 Trial Tr. 67:4-69:2, 69:16-70:22 (A. Goodwin direct); 10/15/21 Trial Tr. 14:23-15:13, 65:7-10 (D. James direct)).

299.    To the extent there is any doubt with respect to Mr. Aden's intention in concealing the SPA Edits from Aaron Goodwin, Mr. Aden's absence from trial (D.I. 230, 234, 236, 239, 241, 253, 258, 266; 10/15/21 Trial Tr. 78:23-79:12) warrants an inference that his

testimony "would have been adverse" to the Trustee. *Lin v. Rohm & Haas Co.*, 685 F. App'x 125, 132 (3d Cir. 2017) (quoting *Graves v. United States*, 150 U.S. 118, 121 (1893)).

300.    Mr. Aden's active concealment of the SPA Edits induced the Goodwins' justifiable reliance that the terms of the Goodwin Entities share purchase transaction remained the same as those the parties had negotiated and agreed upon (10/14/21 Trial Tr. 25:7-11 (A. Goodwin direct)).

301.    Decade's active concealment of the SPA Edits resulted in a materially worse and economically unacceptable transaction to the Goodwins (DX145, p. 164; 10/12/21 Trial Tr. 67:4-69:2, 69:16-70:22 (A. Goodwin direct); 10/15/21 Trial Tr. 14:23-15:13, 65:7-10 (D. James direct)).

302.    Decade's fraudulent inducements render the SPA voidable at the Goodwins' option. *See Duffens v. Valenti*, 74 Cal. Rptr. 3d 311, 321-22 (Cal. Ct. App. 2008).

303.    Additionally, the Goodwins are entitled to seek compensatory damages from the Estates to redress any damages they sustained because of the Debtors' fraudulent inducements concerning the Goodwin Entities purchase transaction. Cal. Civ. Code § 3333; *see Walker v. Signal Cos., Inc.*, 149 Cal. Rptr. 119, 125 (Cal. Ct. App. 1978) (construing Code as authorizing damages in "an amount which will compensate for all the detriment caused thereby, whether it could have been anticipated or not").

304.    The Goodwins are also entitled to seek punitive damages from the Estates with respect to the Debtors' fraudulent inducements concerning the Goodwin Entities purchase transaction. *See* Cal. Civ. Code § 3294 (authorizing "damages for the sake

of example and by way of punishing the defendant" where "it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice").

### *Alternatively, The Goodwins Are Entitled to a Judgment of Unenforceability*

305.    The Goodwins are entitled to a judicial declaration that the SPA is legally unenforceable.

### Unenforceability Ground #1: Absence of Meeting of the Minds

306.    Under California law, a validly formed contract requires mutual consent, which "cannot exist unless the parties agree upon the same thing in the same sense. If there is no evidence establishing a manifestation of assent to the 'same thing' by both parties, then there is no mutual consent to contract and no contract formation." *Bustamante v. Intuit, Inc.*, 45 Cal. Rptr. 3d 692, 698-99 (Cal. Ct. App. 2006); *accord Express Indus. & Term. Corp. v. N.Y.S. Dep't of Transp.*, 715 N.E.2d 1050, 1053 (N.Y. 1999) ("To create a binding contract, there must be a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms.").

307.    The evidence adduced at trial demonstrates that the Goodwins did not manifest assent to Sections 27 and 28 of the Employment Agreements (10/12/21 Trial Tr. 95:20-96:9, 97:23-98:7, 99:14-20 (A. Goodwin direct); 10/26/21 Trial Tr. 87:24-88:4 (E. Goodwin direct); 10/26/21 Trial Tr. 115:16-18 (E. Goodwin cross); DX149, pp. 10, 26).

308.    The evidence adduced at trial further demonstrates that the Goodwins did not manifest assent to the SPA Edits (10/13/21 Trial Tr. 14:5-9 (A. Goodwin direct); 10/14/21 Trial Tr. 28:7-19 (A. Goodwin direct); 10/15/21 Trial Tr. 55:19-58:10 (D. James direct); 11/16/21 Trial Tr. 39:20-40:12 (C.A. Mulrain cross); C. Aden Dep. Tr. 170:23-

173:25; 23 Capital Dep. Tr. 131:9-15; J. Traub Dep. Tr. 90:4-17; K. Eisenberg Dep. Tr. 36:13-19).

309.    The evidence adduced at trial further demonstrates that the Goodwins did not manifest assent to other transactional documents with respect to the Goodwin Entities purchase transaction, which Decade, acting through its principals and agents, concealed from the Goodwins (10/12/21 Trial Tr. 122:9-11, 122:19-21 (A. Goodwin direct)).

310.    Accordingly, there was no mutual consent to contract and no contract formation as between Decade and the Goodwins with respect to the purchase of the Goodwin Entities.  *Bustamante v. Intuit, Inc.*, 45 Cal. Rptr. 3d 692, 698-99 (Cal. Ct. App. 2006).

311.    The SPA is therefore legally unenforceable.

### Unenforceability Ground #2: Decade's Material Breaches of the SPA

312.    "[I]n contract law a material breach excuses further performance by the innocent party." *Plotnik v. Meihaus*, 146 Cal. Rptr. 3d 585, 596 (Cal. Ct. App. 2012); *accord Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 500 F.3d 171, 186-87 (2d Cir. 2007) ("[A] party's performance under a contract is excused where the other party has substantially failed to perform its side of the bargain or, synonymously, where that party has committed a material breach.").

313.    The SPA expressly conditions the Goodwins' obligations thereunder "upon the satisfaction or completion of the following conditions on or prior to Closing," including: (1) "Employment Agreements for A. Goodwin and E. Goodwin, respectively, shall have been duly executed by the parties thereto and delivered to Sellers"; (2) "the Note shall have been duly executed by Purchaser and delivered to Sellers"; and (3) "the Guaranty in the

form of <u>Exhibit C</u> . . . shall have been duly executed by Decade and delivered to Sellers" (DX117, p. 29 (§ 8.2(c), (d), (e))).

314.    The Trustee concedes that Decade failed to satisfy each of the closing conditions on or prior to the SPA's closing (10/12/21 Trial Tr. 14:1-9 (Trustee opening statement)).

315.    The evidence adduced at trial demonstrates that Decade did not deliver to the Goodwins duly executed Employment Agreements on or prior to the SPA's closing (DX117, pp. 42-54, 70-82; 10/12/21 Trial Tr. 109:7-10, 122:9-11 (A. Goodwin direct); 10/15/21 Trial Tr. 52:11-53:24, 54:11-55:15 (D. James direct); 11/16/21 Trial Tr. 49:13-50:5 (C.A. Mulrain cross)).

316.    The evidence adduced at trial demonstrates that Decade did not deliver to the Goodwins duly executed promissory note on or prior to the SPA's closing (10/12/21 Trial Tr. 122:19-21 (A. Goodwin direct)).

317.    The evidence adduced at trial demonstrates that Decade did not deliver to the Goodwins duly executed guaranty agreement on or prior to the SPA's closing (10/12/21 Trial Tr. 123:2-6 (A. Goodwin direct)).

318.    There is no evidence that the Goodwins waived any of the closing conditions.

319.    Additionally, the SPA required that Decade remit payment to the Goodwins of $35,000,000 (*i.e.*, $9,500,000 on or prior to the SPA's closing and $25,500,000 in accordance with a schedule set forth in a promissory note attached to the SPA) in partial

consideration for the Decade's purchase of the Goodwin Entities (DX117, p. 13 (§§ 2.2, 2.3(b), (c))).

320.    The Trustee concedes that Decade failed to make any of the $25.5 million in "payments owed to the Goodwins under the SPA and Note," including, among others: (1) $3.5 million owed to the Goodwins on or about February 22, 2017; (2) $1.5 million owed to the Goodwins on or about August 22, 2017; (3) $3.5 million owed to the Goodwins on or about February 22, 2018; (4) $3.5 million owed to the Goodwins on or about February 22, 2019; and (5) $2.5 million owed to the Goodwins on or about February 22, 2020 (Stip. Fact ¶ 111; DX6, pp. 6-7; *accord* DX117, pp. 98-99).

321.    The evidence adduced at trial demonstrates that Decade failed to make any of the payments owed to the Goodwins pursuant to the promissory note attached to the SPA (10/12/21 Trial Tr. 174:24-175:10 (A. Goodwin direct)).

322.    Furthermore, the Employment Agreements required Decade to furnish salary and bonus payments to Aaron and Eric Goodwin and to reimburse them for business expenses (DX149, pp. 2, 4, 18, 20).

323.    The evidence adduced at trial demonstrates that Decade failed to remit payment to Aaron Goodwin of at least $616,667.12 in salary and bonus payments and expense reimbursements owed under the Employment Agreements (PX92, p. 1; 10/12/21 Trial Tr. 176:22-178:11 (A. Goodwin direct); Stip. Fact ¶ 113).

324.    The evidence adduced at trial demonstrates that Decade failed to remit payment to Eric Goodwin of at least $44,938.24 in salary payments and expense

reimbursements owed under the Employment Agreements (PX92, p. 1; 10/12/21 Trial Tr. 176:22-178:11 (A. Goodwin direct); Stip. Fact ¶ 113).

325.     Each of the breaches, standing alone (*a fortiori*, when taken together), reflects the substantial extent to which the purported purpose behind the parties' contract was frustrated.

326.     Each of the breaches, standing alone (*a fortiori*, when taken together), reflects the willfulness of Decade's default.

327.     The breaches therefore constitute material breaches of the SPA.

328.     Accordingly, any further performance by the Goodwins of the SPA or any obligation thereunder is excused.  *Plotnik v. Meihaus*, 146 Cal. Rptr. 3d 585, 596 (Cal. Ct. App. 2012).

### Unenforceability Ground #3: Mutual Departure from the Written Agreement

329.     "A valid modification" of a contract simply "requires proof of . . . mutual assent." *PMC, Inc. v. Porthole Yachts, Ltd.*, 76 Cal. Rptr. 2d 832, 834 (Cal. Ct. App. 1998); *accord Rose v. Spa Realty Assocs.*, 366 N.E.2d 1279, 1283 (N.Y. 1977) (recognizing contractual modification where "the conduct of the parties evidences an indisputable mutual departure from the written agreement"); *John Hancock Life Ins. Co. of N.Y. v. Solomon Baum Irrevocable Family Life Ins. Tr.*, 357 F. Supp. 209, 218 (E.D.N.Y. 2018), *aff'd*, 783 F. App'x 89 (2d Cir. 2019) ("[R]atification may be implied when a party fails to repudiate, or retains the benefit of, an unauthorized transaction when he knows of the material facts concerning the agreement.").

330.     To the extent the final versions of the Employment Agreements encompassed the assignment provision in Section 28 and the final version of the SPA

encompassed the unlettered paragraph at the end of Section 2.4, the conduct of the parties evidenced an indisputable mutual departure from the written agreement.

331.    The evidence adduced at trial demonstrates that Decade directed Aaron Goodwin to remit advance payments under the SPA directly to Decade, and specifically not to any lockbox controlled by 23 Capital (10/12/21 Trial Tr. 141:7-142:4, 158:5-24 (A. Goodwin direct); 10/15/21 Trial Tr. 64:20-65:10, 73:1-74:15 (D. James direct)).

332.    The evidence adduced at trial further demonstrates that Decade concealed from the Goodwins: (i) the loan agreement between Decade and 23 Capital, (DX25; 10/26/21 Trial Tr. 49:18-20 (A. Goodwin cross); C. Aden Dep. Tr. 135:21-136:6, 140:22-142:2, 150:6-151:24; 23 Capital Dep. Tr. 131:9-15; J. Traub Dep. Tr. 90:4-17; C. Johnson Dep. Tr. 45:23-46:21; K. Eisenberg Dep. Tr. 36:13-19); (ii) communications concerning the establishment of lockbox accounts to be controlled by 23 Capital, (Stip. Fact ¶ 107); and (iii) communications concerning the drafting and delivery of letters irrevocably directing the Goodwins' clients to remit payment to 23 Capital-controlled lockbox accounts (Stip. Fact ¶ 108).

333.    Additionally, the evidence adduced at trial demonstrates that Decade accepted $1,747,512.67 in direct payments from the Goodwins without any objection (DX79, p. 2; DX83; DX90, p. 1; PX133, p. 69; DX104; DX115; DX145, p. 316 (Dec. 1, 2016 at 2:24 pm, 2:26 pm); DX121, p. 3; DX140, p. 22; Stip. Fact ¶ 91).

334.    Finally, the evidence adduced at trial demonstrates that Decade, through its principal Mr. Aden, advised the Goodwins to ignore 23 Capital entirely, including,

*inter alia*, any purported obligation to remit payment of receivables to a lockbox controlled by 23 Capital (DX145, p. 315; 10/12/21 Trial Tr. 179:14-21 (A. Goodwin direct)).

335.   Under these circumstances, the parties' conduct evidences an undisputable mutual departure from the text of (i) Section 28 of the Employment Agreements and (ii) the unlettered paragraph at the end of Section 2.4 of the SPA. *Rose v. Spa Realty Assocs.*, 366 N.E.2d 1279, 1283 (N.Y. 1977).

336.   Accordingly, Section 28 of the Employment Agreements and the unlettered paragraph at the end of Section 2.4 of the SPA are legally unenforceable.

### *The Trustee Is Not Entitled to a Declaratory Judgment*

337.   The Trustee failed to demonstrate his entitlement to a declaratory judgment that the sale of shares in the Goodwin Entities was validly consummated pursuant to the SPA and that Decade Contracts is thereby the rightful owner of all shares in those companies.

338.   Under California law, a validly formed contract requires mutual consent, which "cannot exist unless the parties agree upon the same thing in the same sense. If there is no evidence establishing a manifestation of assent to the 'same thing' by both parties, then there is no mutual consent to contract and no contract formation." *Bustamante v. Intuit, Inc.*, 45 Cal. Rptr. 3d 692, 698-99 (Cal. Ct. App. 2006); *accord Express Indus. & Term. Corp. v. N.Y.S. Dep't of Transp.*, 715 N.E.2d 1050, 1053 (N.Y. 1999) ("To create a binding contract, there must be a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms.").

339.    The Trustee failed to satisfy his burden to prove, by a preponderance of the evidence, that the Goodwins and Decade agreed upon the same thing in the same sense with respect to the Goodwin Entities purchase transaction.

340.    Indeed, the evidence adduced at trial demonstrates that the Goodwins did *not* agree to myriad material provisions in the SPA and related transactional documents that the Trustee currently seeks to enforce, including, *inter alia*, Sections 27 and 28 of the Employment Agreements and the SPA Edits proposed by 23 Capital that were concealed from the Goodwins by Decade's principal Mr. Aden (PX113, p. 17; DX50, p. 1; DX57, p. 1; DX145, pp. 218-19, 223-24; 10/12/21 Trial Tr. 78:5-79:12, 87:16-91:15 (A. Goodwin direct); 10/13/21 Trial Tr. 14:5-9 (A. Goodwin direct); 10/14/21 Trial Tr. 28:7-19 (A. Goodwin direct); 10/15/21 Trial Tr. 55:19-58:10 (D. James direct); 11/16/21 Trial Tr. 39:20-40:12 (C.A. Mulrain cross); C. Aden Dep. Tr. 170:23-173:25; 23 Capital Dep. Tr. 131:9-15; J. Traub Dep. Tr. 90:4-17; K. Eisenberg Dep. Tr. 36:13-19; Stip. Facts ¶¶ 60-63, 68-69, 71, 72, 77).

341.    Accordingly, the Trustee has not demonstrated that the parties agreed upon "the same thing in the same sense" with respect to the Goodwin Entities purchase transaction.  *Bustamante v. Intuit, Inc.*, 45 Cal. Rptr. 3d 692, 698-99 (Cal. Ct. App. 2006)

342.    The Trustee is therefore not entitled to a declaratory judgment that the SPA is a valid contract or that Decade Contracts is the rightful owner of the Goodwin Entities.

### *The Trustee's Claim Is Barred by Applicable Defenses Asserted by the Goodwins*

343.    The Trustee's claim for declaratory relief is barred by affirmative defenses asserted by the Goodwins, including, among others, the doctrines of *in pari delicto* and unclean hands; laches; waiver; and recoupment and setoff.

344.    "[I]n asserting claims which belonged to the corporate debtor, the bankruptcy trustee is subject to all restrictions, including affirmative defenses, which could be raised, were the debtor corporation able to bring the action itself."   *In re Total Containment, Inc.*, 335 B.R. 589, 620 (Bankr. E.D. Pa. 2005); *see Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 885 F.2d 1149, 1154 (3d Cir. 1989) ("The trustee is, of course, subject to the same defenses as could have been asserted by the defendant had the action been instituted by the debtor" (quotation marks omitted)).

### Affirmative Defense #1: In Pari Delicto and Unclean Hands

345.    The unclean hands doctrine is codified as follows: "No one can take advantage of his own wrong."  Cal. Civ. Code § 3517; *see DD Hair Lounge, LLC v. State Farm Gen. Ins. Co.*, 230 Cal. Rptr. 3d 136, 141 (Cal. Ct. App. 2018) (unclean hands doctrine "actually exists to promote the court's interest in protecting judicial integrity and promoting justice by preventing a wrongdoer from benefiting from his or her misconduct"); *In re Glob. Health Scis.*, No. 04-cv-01486-TJH, 2008 WL 3851934, at *5 (C.D. Cal. Aug. 14, 2008) ("If a transaction before a court of equity is tainted with fraud, the Court has a duty to investigate whether fraud is present and should apply the doctrine of unclean hands if, after investigating, the Court uncovers evidence of fraud in the transaction.").

346.    Under California law, the touchstone of *in pari delicto* and unclean hands "is whether the unclean conduct relates directly to the *transaction* concerning which the complaint is made, i.e., to the *subject matter* involved, and not whether it is part of the basis upon which liability is being asserted." *Peregrine Funding, Inc. v. Sheppard Mullin Richter & Hampton LLP*, 35 Cal. Rptr. 3d 31, 48 (Cal. Ct. App. 2005) (emphasis added)

(internal citations omitted); *accord New Greenwich Litig. Tr., LLC v. Citco Fund Servs. (Eur.) B.V.*, 145 A.D.3d 16, 23 (N.Y. App. Div., 1st Dep't 2016).

347.    Here, the evidence adduced at trial demonstrates that Decade engaged in fraudulent and unclean conduct in connection with the negotiation and execution of the SPA and related transactional documents that the Trustee presently seeks to enforce.

348.    Among other unclean acts, Decade, through its principal or agent, surreptitiously affixed the Goodwins' signature pages from the February 12, 2016 fax transmittal to a version of the Employment Agreements that contained Sections 27 and 28, to which the Goodwins had objected, and thereby deceived the Goodwins as to the material terms of the Employment Agreements they had signed (DX117, pp. 42-54, 70-82; 10/14/21 Trial Tr. 109:7-10 (A. Goodwin direct); 10/15/21 Trial Tr. 52:11-53:24, 54:11-55:15 (D. James direct); 11/16/21 Trial Tr. 49:13-50:5 (C.A. Mulrain cross)).

349.    Additionally, Decade, through its principal Mr. Aden, fraudulently represented to Aaron Goodwin that the terms of the Goodwin Entities share purchase transaction remained the same as those agreed to by the parties pursuant to the Executed LOI and the Stealth Agreement despite Mr. Aden's knowledge of the falsity of this representation and the materiality of the SPA Edits proposed by 23 Capital and concealed from the Goodwins(DX56; DX59, pp. 1, 3-6, 10-13; DX145, pp. 219, 225, 228; 10/12/21 Trial Tr. 82:1-83:1 (A. Goodwin direct); 10/14/21 Trial Tr. 30:15-31:1 (A. Goodwin direct)).

350.    Applicable law does not permit the Trustee, Decade's legal successor, to benefit from Decade's fraudulent conduct in connection with the Goodwin Entities share purchase transaction.  Cal. Civ. Code § 3517.

351.    Accordingly, the Trustee's present claims are barred by the doctrines of *in pari delicto* and unclean hands.

**Affirmative Defense #2: Laches**

352.    "The law helps the vigilant, before those who sleep on their rights."  Cal. Civ. Code § 3527.

353.    The defense of laches applies where a claimant (1) fails to assert a right, (2) for "some appreciable period so as to amount to unreasonable delay," (3) which prejudices an adverse party.  *In re Marriage of Powers*, 267 Cal. Rptr. 350, 359 (Cal. Ct. App. 1990); *accord N.Y. Pub. Int. Rsch. Grps., Inc. v. Levitt*, 62 A.D.2d 1074, 1075-76 (N.Y. App. Div., 3d Dep't 1978).

354.    Here, the evidence adduced at trial demonstrates that Decade failed to bring to the Goodwins' attention at any point prior to the present litigation any purported deficiencies with the Goodwins' contractual performance, including, without limitation, any supposed requirement that the Goodwins' clients remit payment directly to a lockbox (10/15/21 Trial Tr. 64:20-65:10 (D. James direct); DX79, p. 2; DX83; DX90, p. 1; PX133, p. 69; DX104; DX115; DX145, p. 316; DX121, p. 3; DX140, p. 22; Stip. Facts ¶¶ 91, 107, 108).

355.    Decade's acceptance of millions of dollars in direct payments from the Goodwins without any objection while failing to bring to the Goodwins' attention any supposed deficiencies with the Goodwins' contract performance prejudiced the Goodwins' legal rights.

356.    Accordingly, the Trustee's present claims are barred by the doctrine of laches.

### Affirmative Defense #3: Waiver

357.    "California courts will find waiver when a party intentionally relinquishes a right or when that party's acts are so inconsistent with an intent to enforce the right as to induce a reasonable belief that such right has been relinquished." *Wind Dancer Prod. Grp. v. Walt Disney Pictures*, 215 Cal. Rptr. 3d 835, 853 (Cal. Ct. App. 2017); *accord Holland Loader Co. v. FLSmidth A/S*, 313 F. Supp. 3d 447, 468 (S.D.N.Y. 2018), *aff'd*, 769 F. App'x 40 (2d Cir. 2019).

358.    Here, the evidence adduced at trial demonstrates that Decade's principals were fully aware of 23 Capital's expectation that the Goodwins' clients remit payments directly to a lender-controlled lockbox, but nonetheless directed the Goodwins to remit direct payments to Decade; accepted the Goodwins' direct payments without objection; and instructed the Goodwins to ignore 23 Capital entirely (10/12/21 Trial Tr. 179:14-21 (A. Goodwin direct); 10/15/21 Trial Tr. 64:20-65:10 (D. James direct); DX79, p. 2; DX83; DX90, p. 1; PX133, p. 69; DX104; DX115; DX145, pp. 315-16; DX121, p. 3; DX140, p. 22; Stip. Facts ¶¶ 91, 107, 108).

359.    Decade's acts are entirely inconsistent with an intent to enforce either of Section 28 of the Employment Agreement or the unlettered paragraph at the end of Section 2.4 of the SPA.

360.    Accordingly, the Trustee is held to have waived any entitlement to relief under Section 28 of the Employment Agreement or the unlettered paragraph at the end of Section 2.4 of the SPA.

**Affirmative Defense #4: Recoupment and Setoff**

361.   "Recoupment is the setting up of a demand arising from the same transaction as the plaintiff's claim or cause of action, strictly for the purpose of abatement or reduction of such claim." *Univ. Med. Ctr. v. Sullivan*, 973 F.2d 1065, 1079 (3d Cir. 1992); *see Lee v. Schweiker*, 739 F.2d 870, 875 (3d Cir. 1984) ("The justification for the recoupment doctrine is that where the creditor's claim against the debtor arises from the same transaction as the debtor's claim, it is essentially a defense to the debtor's claim against the creditor rather than a mutual obligation, and application of the limitations on setoff in bankruptcy would be inequitable.").

362.   Likewise, "[t]he right of setoff (also called 'offset') allows entities that owe each other money to apply their mutual debts against each other, thereby avoiding the absurdity of making A pay B when B owes A."). *Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16, 18 (1995); *see In re Stienes*, 285 B.R. 360, 362 (Bankr. D.N.J. 2002) ("The requisite elements of a Section 553 setoff include that: (1) the creditor holds a claim against the debtor that arose before the commencement of the case; (2) the creditor owes a debt to the debtor that also arose before the commencement of the case; (3) the claim and debt are mutual, and (4) the claim and debt are each valid and enforceable.")

363.   As the SPA is not enforceable, the affirmative defense of recoupment and setoff is moot.

## <u>CONCLUSION</u>

For the reasons set forth above, the Court hereby finds in favor of the Goodwins on their counterclaims for fraud in the execution, fraudulent misrepresentation, and fraudulent inducement (D.I. 7); and against the Trustee on his claims for declaratory judgment (D.I. 1).

The Court will convene a trial to determine the amount of compensatory and punitive damages to be awarded to the Goodwins and whether to subordinate the claims of 23 Capital (and its successor and assigns) to the claims of the Goodwins[4] at the earliest convenience of the Court. [5] Judgment shall not be entered at this time, pending trial as to damages. An Order will be entered.

_____
Christopher S. Sontchi
United States Bankruptcy Judge

Dated: December 27, 2021

---

[4] *See* 11 U.S.C. §510(c)(1) ("after notice and a hearing, the court may— (1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest.").

[5] *See* D.I. 259 (Order granting Goodwins' *Motion to Bifurcate Issues of Liability and Damages* and further ordering that, if the Court finds liability, the Court will schedule a damages trial "at a time of mutual convenience to the Court and the parties.").